## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DONALD OLENDZKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 08-3196 |
| | ) | |
| NEIL ROSSI, BECKY SUDBRINK, | ) | |
| RICHARD PILLOW, JENNIFER STOUDT, | ) | |
| TERRY POLK and RICHARD ORR, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, NEIL ROSSI, BECKY SUDBRINK, RICHARD PILLOW, JENNIFER STOUDT, n/k/a JENNIFER WARD, TERRY POLK and RICHARD ORR, by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, and for their Memorandum of Law in Support of Motion for Summary Judgment state as follows:

### I. INTRODUCTION

Plaintiff is employed at Jacksonville Correctional Facility as a Psychologist III by the Illinois Department of Corrections. In 2004, Plaintiff was elected to the Executive Board of Local 3549 of the American Federation of State, County, and Municipal Employees ("AFSCME"). Plaintiff alleges that Defendants retaliated against him for activities Plaintiff conducted on behalf of the union by, among other things, removing Plaintiff from his duties as a hostage negotiator, relocating his office, requiring Plaintiff to see inmates with inadequate security, banning Plaintiff from health care staff meetings, preventing plaintiff from making decisions regarding the observation and care of suicidal inmates, removing Plaintiff from his responsibilities to engage in after-hour call back activities, requiring Plaintiff to work in three to four different locations, and threatening Plaintiff with discipline without cause. For the reasons given below, Defendants are entitled to summary judgment.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Plaintiff filed his complaint on September 10, 2008.  (Doc. #1.)

2.  Several of Plaintiff's claims concern incidents that occurred more than two years prior to the filing of Plaintiff's complaint, including:

    a.  Plaintiff claims his pager was removed on June 8, 2006.  (Ex. 1 at 55; Ex. 2.)

    b.  Plaintiff claims he was removed from his responsibilities to engage in after hour call back activities on June 8, 2006.  (Doc. #1 at ¶ 23(f); Ex. 1 at 56–57.)

    c.  Plaintiff claims he was prevented from making decisions regarding the observation and care of suicidal inmates in 2005 because Defendant Sudbrink did not inform him about a torn safety smock.  (Ex. 1 at 131.)

3.  Since March 1989, Plaintiff has been employed by the Illinois Department of Corrections at the Jacksonville Correctional Center as a Psychologist III.  (Ex. 1 at 5–6, 9.)

4.  Plaintiff is a member of the American Federation of State, County, and Municipal Employees ("AFSCME").  (Ex. 1 at 30.)

5.  Since April 2004, Plaintiff has been an elected member of the Executive Board of Local 3549 of AFSCME.  (Ex. 1 at 30.)

6.  Defendant Neil Rossi became the Assistant Warden of Programs at Jacksonville Correctional Center in 2004.  (Ex. 1 at 34; Ex. 3, Rossi Dep. 10.)

7.  Plaintiff reported to Assistant Warden of Programs Rossi from 2004 until February 2005.  (Ex. 1 at 19–20.)

8.  From February 2005 to November 15, 2006, Plaintiff's direct administrative supervisor was Defendant Becky Sudbrink.  (Ex. 1 at 18, 25–26; Ex. 4.)

9.  Defendant Becky Sudbrink is the Health Care Unit Administrator for Jacksonville Correctional Center.  (Ex. 5, Sudbrink Dep. 5.)

2

10.     Defendant Becky Sudbrink has not supervised Plaintiff since November 15, 2006.  (Ex. 1 at 98.)

11.     Effective November 15, 2006, by order of Warden Terry Polk, Plaintiff was supervised by the Assistant Warden of Programs.  (Ex. 1 at 26; Ex. 4.)

12.     At that time, Assistant Warden Rossi informed Plaintiff that he no longer fell under the Health Care Unit; rather, Plaintiff was considered part of Programs.  (Ex. 1 at 125–26.)

13.     With the exception of Neil Rossi, none of the Defendants had contact with Plaintiff prior to his becoming a member of the union Executive Board.  (Ex. 1 at 34.)

14.     Plaintiff claims he has suffered retaliation for activities he allegedly engaged in on behalf of the union, including:

   a.      Participating in labor management meetings and safety and health committee meetings (Doc. #1 ¶ 15);

   b.      Representing union members in the presentation of grievances (Doc. #1 ¶ 15); and

   c.      Representing Missy Utter, a union member, during a September 2006 meeting with Defendant Neil Rossi, Defendant Becky Sudbrink, and union vice president John Clegg.  (Ex. 1 at 70–72.)

15.     Defendant Becky Sudbrink has never participated in labor management meetings.  (Ex. 1 at 292–93.)

## JOB RESPONSIBILITIES

16.     As a Psychologist III, Plaintiff's job duties include providing mental health services to inmates in need of such services, providing crisis management for inmates, and screening inmates for work release.  (Ex. 1 at 7–8.)

17.     As a function of Plaintiff's job, he is also required to:

   a.      "Ensure that all mental health services delivered are accurately documented,

distributed, and maintained." (Ex. 6 at 00002; *see* Ex. 1 at 263.)

b.    "Maintain safety and sanitation standards." (Ex. 6 at 00002, 00026.)

c.    "Serve as the Mental Health Professional, coordinating and providing mental health services." (Ex. 6 at 00002.)

d.    "Be an active participant of the Health and Safety Committee." (Ex. 6 at 00004; *see also* Ex. 6 at 00019, 00027.)

e.    "[S]erve as a member of the Quality Assurance Committee, rendering recommendations." (Ex. 6 at 00018.)

f.    "Schedule and coordinate Crisis Intervention Team training." (Ex. 6 at 00002; *see also* Ex. 1 at 10; Ex. 6 at 00010, 00013, 00018.)

g.    Keep track of inmates with mental health problems, monitor their care, and prepare the "call line" list of inmates to be seen by the psychiatrist. (Ex. 1 at 205, 256; Ex. 7.)

h.    Exercise management responsibilities over the care of suicidal inmates and ensure their safety. (Ex. 1 at 134, 139.)

i.    File incident reports whenever an unusual incident occurs. (Ex. 1 at 88.)

j.    Report sanitation issues to management. (Ex. 8, Polk Dep. 79).

k.    "Perform all additional duties as they relate to the Psychologist III position as directed which are reasonably within the scope of [Plaintiff's] job description." (Ex. 6 at 00004.)

**PAGER**

18.    In June 2006, Warden Polk instructed Defendant Sudbrink to deny Plaintiff's request for two hours of call-back pay regarding two after-hours phone calls Plaintiff placed to Jacksonville on May 28 & 29, 2006. (Ex. 1 at 43–44.)

19.     Plaintiff filed a grievance over the matter, which was resolved by paying Plaintiff one hour of compensatory time.  (Ex. 1 at 41, 45.)

20.     After the denial of callback pay, Plaintiff asked Assistant Warden Rossi and Warden Polk if he was required to wear a pager.  (Ex. 1 at 45; Ex. 9, Plaintiff's Initial Disclosures pp. 275–76.)

21.     Defendant Rossi and Defendant Polk believed that Plaintiff did not want to carry his pager if he was not required to do so.  (Ex. 8 at 57; Ex. 3 at 39–40.)

22.     Plaintiff was not and is not required to wear a pager; it is voluntary.  (Ex. 1 at 42.)

23.     On June 8, 2006, Defendant Rossi told Plaintiff he should turn in his pager and that he did not need to carry it.  (Ex. 9.)  Defendant Rossi also sent Plaintiff an email indicating that Plaintiff would be turning in his pager, and that "[h]e is no longer required to wear a pager." (Ex. 2.)

24.     On June 8, 2006, Defendant Sudbrink sent out a memorandum indicating that per Warden Polk, the Medical Director was to be called with all after hours mental health issues.  (Ex. 1 at 56–57.)

25.     Plaintiff did not at that time possess a pager and the facility did not have a means of ensuring that Plaintiff could be reached at all times.  (Ex. 1 at 55–56.)

**NEMAT DECISION**

26.     Plaintiff served on a statewide hostage Negotiations Management Team ("NEMAT") from its inception sometime in the 1990s until October 1, 2006. (Ex. 1 at 50, 67–68; Ex. 10.)

27.     Plaintiff also served on a local hostage negotiations team at the Jacksonville facility.  (Ex. 1 at 77.)

28.     Service as a hostage negotiator is a voluntary undertaking, for which there is no compensation.  (Ex. 1 at 80; Ex. 11, Hooker Aff. ¶ 3.)

5

29.     At the time that Plaintiff's services with NEMAT ended, Deputy Director Ron Meek and Statewide Coordinator Jeffrey Hooker were in charge of the team.  (Ex. 1 at 69–70; Ex. 12, Orr Aff. ¶ 4.)

30.     However, Plaintiff's position at Jacksonville fell under the administrative chain of command of Deputy Director Richard Orr.  (Ex. 12 at ¶¶ 3, 7; Ex. 13, Orr Dep. 8, 17.)

31.     On June 21, 2006, at the request of Statewide Coordinator Jeff Hooker, Defendant Terry Polk sent Mr. Hooker a memorandum listing several reasons why Defendant Polk felt that Plaintiff should be removed from NEMAT.  (Ex. 8 at 51; Ex. 11 at ¶ 10; Ex. 14.)

32.     Defendant Polk felt that Plaintiff should be removed from NEMAT because: 1) Plaintiff did not want to carry his pager, 2) Plaintiff had complained about not having enough time to attend to his duties at Jacksonville, 3) being removed from NEMAT would give Plaintiff more time to concentrate on his duties, and 4) Terry Louden, Correctional Counselor II at Jacksonville, was also on NEMAT, and Defendant Polk felt one member from Jacksonville was sufficient.  (Ex. 8 at 53–54; Ex. 14.)

33.     Plaintiff had in fact complained about insufficient time and resources to complete his job duties.  (Ex. 15.)

34.     Plaintiff received a memorandum dated September 27, 2006 from Deputy Director Rick Orr indicating that as of October 1, 2006, Plaintiff's services as a hostage negotiator would end. (Ex. 1 at 67–68; Ex. 12 at ¶ 7.)

35.     Plaintiff believes that Defendant Orr retaliated against him because of a meeting Plaintiff allegedly had with Assistant Warden Neil Rossi three days prior concerning a member of AFSCME (Ex. 1 at 70–72), and because of a number of conflicts Plaintiff allegedly had with Assistant Warden Rossi (Ex. 1 at 74).

36.     Plaintiff testified that he was told by Regional Coordinator Trent Routien and Deputy Director Meek that his warden had called and asked that Plaintiff be removed from the team. (Ex. 1 at 65–67.)

37.     Neither Mr. Routien nor Deputy Director Meek told Plaintiff which warden allegedly contacted them, when the contact was made, or provided Plaintiff with any details regarding the alleged request.  (Ex. 1 at 67.)

38.     Defendant Orr was not present at the meeting between Assistant Warden Rossi and Plaintiff. (Ex. 1 at 72.)

39.     Plaintiff has no evidence that Defendant Orr was aware of the meeting.  (Ex. 1 at 72.)

40.     Plaintiff believes that Assistant Warden Rossi asked Defendant Orr to remove Olendzki from NEMAT, but has no evidence of such contact.  (Ex. 1 at 75.)

41.     Plaintiff's claims against Defendant Orr are limited to the decision to remove Plaintiff from NEMAT and Defendant's alleged involvement in the decision to remove Plaintiff from the local hostage negotiation team.  (Ex. 1 at 76–77.)

42.     Deputy Director Ron Meek and Statewide Coordinator Jeffrey Hooker made the decision to remove Plaintiff from NEMAT.  (Ex. 12 at ¶ 4; Ex. 11 at ¶ 12.)

43.     The reasons conveyed to Defendant Orr by Deputy Director Meek and Mr. Hooker concerned Plaintiff's performance on the team.  (Ex. 13 at 16–17; Ex. 12 at ¶ 5.)

44.     However, because Plaintiff's position at Jacksonville fell under Defendant Orr's administrative chain of command, Defendant Orr drafted the September 27, 2006 memorandum terminating Plaintiff from NEMAT.  (Ex. 13 at 17; Ex. 12 at ¶ 7; Ex. 11 at ¶ 15.)

45.     Defendant Orr drafted the memorandum on the representations of Deputy Director Ron Meek and Statewide Coordinator Jeffrey Hooker.  (Ex. 12 at ¶ 7.)

7

46.     No one asked Defendant Orr or Jeff Hooker to remove Plaintiff from NEMAT because of Plaintiff's union activities.  (Ex. 12 at ¶ 9; Ex. 11 at ¶ 16.)

47.     Neither Defendant Orr nor Jeff Hooker removed Plaintiff from NEMAT because of his activities on behalf of the union, or for any other retaliatory purpose.  (Ex. 12 at ¶ 10.)

48.     Plaintiff believes that Defendant Orr's memorandum of September 27, 2006 also removed him from the local hostage negotiation team at Jacksonville.  (Ex. 1 at 77.)

49.     Plaintiff admitted that Warden Terry Polk expressed an interest in keeping Plaintiff on the local hostage negotiation team.  (Ex. 1 at 81.)

50.     Plaintiff did not want to be on the local hostage negotiation team after he was removed from NEMAT, and stated that he would refuse to re-volunteer if asked to remain on the team.  (Ex. 1 at 80.)

**OFFICE**

51.     From 1989 until early 2006, Plaintiff's office was located in the Clinical Services area at Jacksonville Correctional Center.  (Ex. 16, Answers of the Plaintiff, Donald Olendzki, to the Defendants' Interrogatories 20.)

52.     Clinical Services is housed in a single building containing the facility's Segregation Unit and the Health Care Unit.  The three areas are separated by brick firewalls.  Clinical Services is located between the Health Care Unit and Segregation.  (Ex. 1 at 11.)

53.     From at least 1989 until the present, inmate medical records have been located in the Health Care Unit.  (Ex. 1 at 86.)

54.     From 1989 until early 2006, Plaintiff would see inmates for psychological evaluations in his office in Clinical Services without security personnel present.  (Ex. 1 at 84; Ex. 3 at 65.)

55.     During this 16 to 17 year period, there was no security guard posted in Clinical Services. (Ex. 1 at 84.)

8

56.     Also during this period of time, Plaintiff would pick up his patients' medical charts from the Health Care Unit and take them to his office in Clinical Services.  (Ex. 1 at 86.)

57.     To get from his office in Clinical Services to the Health Care Unit, Plaintiff would exit the Clinical Services area and travel approximately 40 feet to the Health Care Unit entrance. (Ex. 1 at 86.)

58.     Plaintiff would have to travel an additional 30 feet from the Health Care Unit entrance to the records room to pick up charts.  (Ex. 1 at 86.)

### The First Office Move

59.     In early 2006, Plaintiff's office was relocated to the Mental Health Unit at Plaintiff's request. It remained there until February 2007.  (Ex. 1 at 87–88.)

### The Second Office Move

60.     Defendant Rossi informed Plaintiff in December 2006 that Plaintiff would move back to his former office in Clinical Services after the retirement of a coworker.  (Ex. 17.)

61.     Warden Terry Polk testified that Plaintiff was moved back to his former office in Clinical Services to free up office space in the Health Care Unit for Dr. Lochard.  (Ex. 8 at 69; *see also* Ex. 18; Ex. 19.)

62.     Dr. Lochard is one of the medical doctors associated with the Wexford Corporation, a private vendor contracting with the state for medical services.  (Ex. 1 at 71, 171.)

63.     The newly vacated office space in the Health Care Unit was used by Dr. Lochard.  (Ex. 19.)

64.     After being moved back to his former office in Clinical Services, Plaintiff indicated that he did not want to see his patients in Clinical Services without security.  (Ex. 1 at 93.)

65.     However, Plaintiff could have continued to see patients in Clinical Services as he had from 1989 through 2006 if he so chose.  (Ex. 1 at 93.)

66.     In response to Plaintiff's concerns about safety, Jacksonville management offered the

9

Operations Building as an alternative place to see patients.  (Ex. 1 at 94.)

67.   Plaintiff testified that seeing patients in the Operations Building required him to pack up a portable office and added five to ten minutes of travel time, a situation which Plaintiff described as "less than ideal."  (Ex. 1 at 94–95.)

68.   During this period of time, Defendant Polk sent Plaintiff an email inquiring as to whether there was an office in the Health Care Unit in which Plaintiff could see patients, to which Plaintiff responded, "No. . . . The only exception is on Wednesday from 4-6pm when I have been instructed to use Amanda Tomhave's office in HCU after she goes home."  (Ex. 1 at 100–101; Ex. 20.)

**The Third Office Move**

69.   In June of 2007, Plaintiff's office was again moved to the Health Care Unit.  (Ex. 1 at 97, 103.)

**The Fourth Office Move**

70.   On April 4, 2008, Jacksonville's next warden, Defendant Jennifer Stoudt, n/k/a Jennifer Ward, moved Plaintiff's office back to Clinical Services.  (Ex. 1 at 104.)  Plaintiff's office has remained in Clinical Services ever since.  (Ex. 1 at 13.)

71.   Plaintiff believes Defendant Stoudt, n/k/a Ward, moved his office because of a phone call he had with Defendant Becky Sudbrink on April 3, 2008 concerning the preparation of a "call line," or list of patients to be seen by the psychiatrist during a telespychiatry clinic scheduled for that day.  (Ex. 1 at 105.)

72.   Defendant Stoudt, n/k/a Ward, did not participate in the April 3, 2008 phone call.  (Ex. 1 at 107).

73.   Defendant Stoudt, n/k/a Ward, testified that she moved Plaintiff's office back to Clinical Services because his position fell under Program Services, which is associated with Clinical

10

Services, and because the facility needed a space for telepsychiatry services in the Health Care Unit.  (Ex. 21, Ward Dep. 20, 25, 32; Ex. 22; Ex. 23.)

## HEALTHCARE STAFF MEETINGS

74.   Plaintiff claimed that he was banned from attending health care staff meetings after his position was transferred from the Health Care Unit staff to Programs.  (Ex. 1 at 125–26.)

75.   Defendant Rossi indicated that since Plaintiff fell under Programs, he was no longer considered part of the Health Care Unit staff.  (Ex. 1 at 125–26.)

76.   Plaintiff admitted that he never attempted to attend one of these staff meetings after being designated a part of Programs.  (Ex. 1 at 127.)

## TELEPSYCHIATRY

77.   Telepsychiatry is a means of providing psychiatric services to inmates through video by a psychiatrist located at a remote location.  (Ex. 24, Pillow Dep. 9–10.)

78.   A private entity known as Wexford Corporation provides medical services, including telepsychiatry, to Jacksonville Correctional Center on a contract basis.  (Ex. 5 at 22; Ex. 24 at 12; *see also* Ex. 1 at 58.)

79.   Plaintiff claims that Defendant Sudbrink prevented Plaintiff from performing one of his job duties by failing to provide him with a time sheet used by Wexford psychiatrists referred to as a TM-02 form.  (Ex. 1 at 218–20.)

80.   Defendant Sudbrink does not work for Wexford, use the TM-02 form, or receive the TM-02 form.  (Ex. 5 at 28; Ex. 25; Ex. 26; *see also* Ex. 27.)

81.   Plaintiff does not know if anyone at the Department of Corrections received the TM-02 form. (Ex. 1 at 226.)

82.   Acting Assistant Warden Walls sent Plaintiff an email on December 9, 2009 stating that Defendant Sudbrink is not responsible for providing Plaintiff with the TM-02.  (Ex. 28.)

**CALL LINE PREPARATION**

83. As one of his job duties, Plaintiff prepares lists of patients (or "call lines") to be seen by remote psychiatrists through telepsychiatry.  (Ex. 1 at 205, 210, 256; Ex. 7.)

84. Plaintiff claims that Defendants Sudbrink and Pillow interfered with his ability to prepare the patient list by failing to inform Plaintiff of the times in which Wexford psychiatrists would be holding their clinics, and by permitting Amanda Tomhave, a Wexford employee, to remove a few patients from the psychiatrist's call line in March 2008.  (Ex. 1 at 205–08, 211.)

**Clinic Times**

85. Plaintiff received information of the psychiatrists' schedules from Amanda Tomhave, a Wexford employee, but sometimes received that information in an untimely manner, or not at all.  (Ex. 1 at 215.)

86. Plaintiff asserts that Ms. Tomhave was supervised by Defendant Sudbrink, but admits that Ms. Tomhave was not a state employee and did not work for the Department of Corrections.  (Ex. 1 at 216–17.)

87. Defendant Sudbrink was not Plaintiff's supervisor for the period in which he claims to have been denied information by Defendant Sudbrink.  (Ex. 1 at 212.)

88. Defendant testified that he contacted one of the psychiatrists to obtain his schedule and was told that the psychiatrist only gave that information to Amanda Tomhave.  (Ex. 1 at 212.)

**Triage Decision**

89. Defendant Pillow sent Plaintiff an email on March 12, 2008 indicating that the psychiatrist requested a shortened patient list after Plaintiff had left the premises.  Defendant Pillow told Amanda Tomhave to remove the last three patients that were scheduled thinking that Plaintiff had listed the patients in order of importance.  (Ex. 1 at 206; Ex. 29.)

90. Plaintiff has no reason to doubt Defendant Pillow's explanation.  (Ex. 1 at 207.)

**PRIVACY**

91.    Defendant Sudbrink is the privacy officer for Jacksonville Correctional Center.  (Ex. 1 at 241; Ex. 5 at 28; Ex. 30.)

92.    Prior to November 13, 2008, Plaintiff had received copies of medical records, specifically telepsychiatry reports, which he would sometimes hold in his office for a day or two while he gathered the data he needed.  (Ex. 1 at 239–40.)

93.    After she was named the privacy officer by the warden, Defendant Sudbrink reviewed the Department's administrative directives, whereupon Defendant Sudbrink questioned whether copies of medical records should be going to Plaintiff.  (Ex. 5 at 28–29.)

94.    Defendant Sudbrink contacted the state privacy officer for input on the matter.  (Ex. 5 at 29; Ex. 31.)

95.    Jonathan Sisson, Chief Privacy Officer for the Department of Corrections informed Defendant Sudbrink that if at all possible, staff should access medical and mental health information directly from the medical file in a controlled environment.  Mr. Sisson also informed Defendant Sudbrink that it was not a good practice to make copies of medical documents unless there are extenuating circumstances.  (Ex. 31; Ex. 32.)

96.    Plaintiff has access to all the information he needs in the original medical files.  (Ex. 1 at 240; *see also* Ex. 33.)

97.    Defendant Sudbrink informed Plaintiff that he could no longer keep copies of medical records in his office for any period of time due to privacy concerns under the HIPAA law.  (Ex. 1 at 239–240; Ex. 34; *see also* Ex. 35; Ex. 36; Ex. 37.)

98.    On November 13, 2008, Defendant Sudbrink sent out a memorandum stating that per the state privacy officer, telepsychiatry records were to be printed and considered original documents.  No copies of these records were to be made, as the record set resides in the

Health Care Unit medical records department.  (Ex. 37.)

**SECURITY**

99.   While seeing an inmate in the Operations Building conference room in February 2007, Plaintiff had what he describes as a "close call" in which he had to step outside of the room and shout for help before security came running to assist.  (Ex. 1 at 95.)

100.  After Plaintiff's "close call" in the Operations Building, Plaintiff was directed to see inmates in any available space in the Health Care Unit, including Dr. Lochard's office, Defendant Sudbrink's office, Amanda Tomhave's office, the break room, or one of the two exam rooms. (Ex. 1 at 100; Ex. 20; Ex. 19.)

101.  On October 1, 2007, Defendant Rossi issued an order allowing the Healthcare Unit officer to carry handcuffs so that an inmate could be restrained before or after an interview at Plaintiff's request.  (Ex. 38.)

102.  In the summer of 2008, Plaintiff filed several incident reports claiming that he had been ordered by Defendant Pillow and Defendant Stoudt, n/k/a Ward, to see inmates in Clinical Services without security.  (Ex. 1 at 115, 117–18.)

103.  When asked about this order, Plaintiff testified that Defendant Pillow instructed him that Defendant Stoudt, n/k/a Ward, had directed Plaintiff to see inmates in Clinical Services from 4 to 6 on Wednesdays, even though there was no security there.  (Ex. 1 at 114.)

104.  Plaintiff filed an incident report every time he saw patients without security in Clinical Services pursuant to Defendant Pillow's alleged instructions.  (Ex. 1 at 115.)

105.  Plaintiff had access to phones and radios in the Clinical Services building if he required help. (Ex. 1 at 124; Ex. 21 at 28–30.)

106.  Counselors, assistant wardens, and clerical staff all have contact with inmates in Clinical Services without security stationed in the building.  (Ex. 21 at 29, 42–43.)

14

107.  The level of security provided to the psychologist at Jacksonville Correctional Center under Warden Stoudt, n/k/a Ward, was consistent with the practice at other facilities, including Taylorville Correctional Center.  (Ex. 21 at 42–43.)

## MENTAL HEALTH TREATMENT PLANS

108.  Plaintiff claims that Defendant Pillow required Plaintiff to do vendor (Wexford) work by providing a witness signature on a mental health treatment plan (or "DOC 0284 form") used by the Department of Corrections.  (Ex. 1 at 166–74; Ex. 39.)

109.  The DOC 0284 form is used in conjunction with telepsychiatry, and contains a section wherein the inmate acknowledges his consent to treatment.  (Ex. 1 at 169, 174–75.)

110.  By institutional directive, "[a] Mental Health Treatment Plan, DOC 0284, "shall be completed and signed by both the mental health professional and the offender who will be receiving ongoing, non-emergency mental health treatment, such as medication, individual or group therapy."  (Ex. 40 at 00687 (effective date 6/1/06); *see also id.* at 00676, 00699 (effective dates 11/01/08 and 11/15/03).)

111.  On April 7, 2008, Defendant Pillow instructed Plaintiff to obtain consent from offenders for the telepsych line, per instruction from Dr. Navarro.  (Ex. 41.)

112.  On October 8, 2008, Plaintiff sent an email to Defendant Sudbrink noting that he had called inmates to complete the mental health treatment plans and sign as a witness, only to discover that nurses had previously signed as witnesses.  Plaintiff asked if this was a new procedure. (Ex. 42.)

113.  Assistant Warden of Programs Kim Kirchner advised Defendant Sudbrink that he wanted the Mental Health Professional, Plaintiff, to sign the treatment plan.  Assistant Warden Kirchner directed Defendant Sudbrink to prepare a memo.  (Ex. 43.)

114.  In response, Defendant Sudbrink sent a memo to the nurses instructing them not to sign as a

witness on the treatment plan, DOC 0284 form.  (Ex. 42; Ex. 44.)

115.    Plaintiff admitted that the Department of Corrections needs an inmate's consent to provide

non-emergency medical services, including issuing medication.  (Ex. 1 at 182, 185.)

**DESIGNATED PSYCH NURSE**

116.    Prior to August 11, 2008, Jacksonville Correctional Center had a registered nurse who served

as a "designated psych nurse."  (Ex. 1 at 248; Ex. 5 at 51.)

117.    Plaintiff testified that at one point the designated psych nurse prepared the case load and call

passes in conjunction with Plaintiff, before he assumed those responsibilities himself.  (Ex. 1

at 250–51; *see also* Ex. 45.)

118.    Plaintiff testified that after he took over full responsibility for managing the mental patient

caseload, the designated psych nurse was still needed to handle medication issues, contact the

doctor, and provide daily information as needed regarding mental patients.  (Ex. 1 at 256.)

119.    On August 11, 2008, Defendant Sudbrink issued a memorandum indicating that there would

no longer be a designated psych nurse at Jacksonville.  Instead, orders received from the

psychiatrist would be taken off by whichever nurse was handling physician orders that shift,

as on any other medical line.  (Ex. 46.)

120.    Defendant Sudbrink had previously sent an email on July 31, 2008 to Warden Stoudt and

Assistant Warden Kirchner indicating that a number of other institutions did not have a psych

nurse, that abolishing the designation would open up nursing time, and that there were likely

dual patient lists created by the designated psych nurse and the Mental Health Professional

(Plaintiff) anyway.  (Ex. 47.)

121.    Plaintiff admits that in the absence of the designated psych nurse, another nurse would step in

to cover responsibilities.

122.    Although Plaintiff asserts that every other chronic clinic has a designated nurse associated

16

with it, those clinics do not have a health professional similar to Plaintiff.  (Ex. 1 at 255–56.)

123.    Plaintiff testified that when there was no longer a designated psych nurse, the individual nurses would send Plaintiff notes if there were issues regarding a particular mental patient, but that Plaintiff would simply send those notes back without taking any action.  (Ex. 1 at 257.)

124.    Plaintiff asserted that he was prevented from contacting the psychiatrists regarding the nurses' notes by Defendant Sudbrink and Cindy Holbrock, but admitted that neither Defendant Sudbrink nor Ms. Holbrock supervised Plaintiff.  (Ex. 1 at 258.)

125.    Plaintiff could not recall any specific communication that would have caused Defendant Sudbrink to discontinue the psych nurse designation.  (Ex. 1 at 261.)

**OBSERVATION AND CARE OF SUICIDAL INMATES**

126.    On November 29, 2006, Defendant Rossi sent an email indicating that the warden, then Defendant Polk, would "have the final say on whether an inmate is to be strip-celled <u>without</u> a safety smock or blanket."   Defendant Rossi indicated that the segregation gallery is extremely cold in the winter, and he did not want to explain how an inmate expired due to cold conditions.  (Ex. 1 at 147–49.)

127.    According to Plaintiff, strip-celling means the inmate is left naked with a metal bunk.  (Ex. 1 at 148.)

128.    Plaintiff testified that in his opinion, the strip-cell policy was initiated because an inmate at Menard Correctional Center had frozen to death.  (Ex. 1 at 154.)

**ADVANCE SICK TIME**

129.    Plaintiff applied for ten days of Advance Sick Time in December of 2008, which was denied by the Director of the Department of Corrections, as well as the Director of the Department of Central Management Services.  (Ex. 1 at 243–44; Ex. 48; Ex. 49.)

130.  Plaintiff's belief that Defendant Stoudt, n/k/a Ward, retaliated against Plaintiff by allegedly recommending denial of sick time is based solely on his assertion that such requests are routinely approved.  (Ex. 1 at 244–45.)

**REQUEST TO ATTEND NEGOTIATIONS**

131.  Plaintiff filed a grievance alleging that Defendant Stoudt, n/k/a Ward, denied his request to attend statewide contract negotiations on behalf of AFSCME.  (Ex. 50.)

132.  Defendant Stoudt, n/k/a Ward, suggested to Labor Relations that Plaintiff be denied permission to attend the contract negotiations because there was a continual issue of inmates at Jacksonville not receiving needed services.  Defendant Stoudt indicated she could not afford Plaintiff to be absent from the facility for three to four days a week to attend negotiations because Plaintiff was the facility's only psychologist.  (Ex. 21 at 26, 32; Ex. 22.)

133.  Plaintiff's request to attend negotiations was ultimately approved.  (Ex. 50.)

**AFFIRMATIVE ACTION COMPLAINT AGAINST PLAINTIFF**

134.  Plaintiff claims that Defendant Sudbrink retaliated against Plaintiff by filing false charges of harassment against him.  (Ex. 16 at 5; Ex. 1 at 160–62.)

135.  Defendant Sudbrink's discrimination and harassment complaint was substantiated by the Department's Office of Affirmative Action (Ex. 1 at 160–61; Ex. 51.)

**ALLEGED INSTITUTIONAL DIRECTIVE REVISION**

136.  Plaintiff claims that Defendant Pillow retaliated against him by revising institutional directives without his input (Ex. 16 at 6.)

137.  Revising institutional directives is not listed as a part of Defendant's job duties.  (*See* Ex. 6.)

138.  Institutional directives concerning mental health services are authorized by the Director of Mental Health Services and the Warden.  (*See* Ex. 40 at 00667–00688.)

18

**ALLEGED THREATS OF DISCIPLINE**

139. Plaintiff testified that he was ordered by Defendant Stoudt, n/k/a Ward, not to communicate mental health business at Jacksonville to the Chief of Mental Health, Dr. Navarro.  (Ex. 1 at 155.)

140. Plaintiff testified that when he indicated to Defendant Pillow that he would not comply with the order, Defendant Pillow implied he could be disciplined.  (Ex. 1 at 155–56.)

141. Plaintiff also testified that Vickie Fair of the Office of Affirmative Action told him that somebody could be disciplined with respect to the harassment complaint filed by Defendant Sudbrink against Plaintiff.  (Ex. 1 at 161–63.)

**PLAINTIFF IS CURRENTLY ON MEDICAL LEAVE**

142. Plaintiff testified that he has been diagnosed with post traumatic stress disorder as a result of hostage incidents at Dixon Correctional Center and Jackson Correctional Center.  (Ex. 1 at 281–82.)

143. Plaintiff has been on medical leave for psychological reasons caused by those hostage incidents.  (Ex. 1 at 282.)

144. Plaintiff has never been disciplined.  (Ex. 1 at 156, 157, 209).

145. Plaintiff has never been denied an employment opportunity.  (Ex. 16 at 25.)

### III.  STANDARD

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). The nonmoving party must point to specific facts showing that there is a genuine issue for trial, and inferences relying on mere speculation or conjecture will not suffice. *Id.* The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Id.*

## IV.  ISSUES AND ARGUMENT

**A.      Several of Plaintiff's claims are time-barred.**

A two-year statute of limitations applies to § 1983 claims in Illinois. *Licari v. City of Chicago*, 298 F.3d 664, 667–68 (7th Cir. 2002). Accordingly, Plaintiff's claims regarding incidents occurring prior to September 10, 2006 are time-barred. These claims include, but are not limited to, the removal of Plaintiff's pager, the removal of after hour call back activities, and Plaintiff's claims regarding a ripped safety smock.  (Facts 2.)

**B.      Plaintiff has failed to establish a prima facie claim of retaliation in violation of his First Amendment rights.**

To succeed on a claim of retaliation under the First Amendment, Plaintiff must establish 1) that he has engaged in constitutionally protected speech, 2) that but for the protected speech, his employer would not have taken the same action, and 3) that Plaintiff suffered a deprivation because of the employer's action. *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 500–01(7th Cir. 2010) (citing *Gross v. FBL Financial Servs., Inc.*, 129 S. Ct. 2343 (2009)). If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to demonstrate that he would have taken the same action in the absence of the protected speech. *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009). If the defendant carries this burden, the plaintiff must produce sufficient evidence to allow a reasonable jury to determine that the defendant's reasons were pretextual.  *Id.*

**1.      Plaintiff's speech concerning health and safety issues, including speech made at Health at Safety Committee meetings is not protected under the First Amendment.**

A public employee has a protected right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, "when public employees make statements pursuant to their official duties, the employees are not

20

speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. *Garcetti* requires a threshold determination regarding whether the public employee spoke in his capacity as a private citizen or as an employee. *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008). When an employee makes complaints through his or her chain of command regarding issues which the employee is responsible for reporting, these complaints are not speech protected by the First Amendment. *Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010). Generally, when an individual speaks as a union member, this speech does not fall within the purview of *Garcetti*. *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009); *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006). However, this case is distinguishable from *Nagle* and *Fuerst* because Plaintiff was required by his employment to inform management about health and safety threats that he observed in the workplace.

As the facility's psychologist, Plaintiff is required to "[b]e an active participant of the Health and Safety Committee" and maintain safety and sanitation standards in accordance with institutional directives. (Facts 17(b), (d), (j).) Plaintiff's speech regarding: 1) the safety of mental patients under his supervision; 2) the adequacy of safety and sanitation at the facility; 3) the alleged failure to monitor healthcare services; 4) the alleged attempts to have outside contractors and non-bargaining unit employees assume and perform work allegedly designated for union members; and 5) the alleged failure to provide adequate security protections all concern internal matters relating to his job. (*See* Facts 17; Doc. #1 at ¶ 20.) Therefore, when Plaintiff spoke about the conditions at the facility he was speaking as an employee of the Department of Corrections and not as a private citizen. Accordingly, Plaintiff's attendance at Health and Safety Committee meetings and the speech identified above do not constitute protected speech under the *Garcetti.*

21

2.     **Plaintiff's speech was not a matter of public concern and is therefore not protected.**

Whether particular speech is a matter of public concern is analyzed under the *Connick-Pickering* test. *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000). Under the *Connick* portion of the test, the speech must relate to a matter of "political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). If the *Connick* portion of the test is satisfied, a court must then balance the competing interests under the *Pickering* standard to determine whether the interests of the speaker outweigh the interests of the State, as the employer of the speaker, in providing efficient service by way of its employees. *Pickering v. Bd. of Educ. of Township H.S. Dist. 205*, 391 U.S. 563, 568 (1968). "The failure to satisfy either prong of the *Connick-Pickering* test renders . . . [the] section 1983 claim meritless." *Kuchenreuther*, 221 F.3d at 973.

In *Kuchenreuther*, a police officer's comments regarding charitable contributions of fellow officers and the policy of the police department only to issue one set of handcuffs to officers were found to not be matters of public concern. *Id.* at 974–75. In making this determination, the court found that plaintiff "did not address the manner in which the police would serve the public" and that she only addressed an internal matter regarding her work conditions. *Id.* at 975; *see also Bivens*, 591 F.3d at 562 (holding that the fact that the public may have been interested in a grievance and may have benefitted from its resolution does not necessarily raise speech to a matter of public concern).

Plaintiff's claim of First Amendment retaliation fails because the record demonstrates that he was not speaking out on a matter of public concern. The vast majority of Plaintiff's speech concerns matters solely related to his job responsibilities, including his job duties with respect to preparing the list of patients to be seen by the psychiatrists (*see* Facts 17, 83), the adequacy of his office location (*see* Facts 64–68, 71), the efficiency of seeing patients in different locations, *see id.*, the adequacy of

security in those locations (*see* Facts 99–104), whether he was entitled to copies of medical records or other information (*see* Facts 92), and what role he was required to play in the implementation of telepsychiatry at the facility (*see* Facts 79, 84, 86, 88, 108, 112, 117–19, 121–24). Purely personal grievances do not qualify as matters of public concern. *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010.) As such, Plaintiff cannot meet the first part of the *Connick-Pickering* test. Defendants are therefore entitled to summary judgment.

### 3. Plaintiff has not suffered a deprivation sufficient to establish a claim under the First Amendment.

Under § 1983, retaliatory activities are actionable only if they would "deter a person of ordinary firmness" from exercising First Amendment activity in the future. *Bridges v. Gilbert,* 557 F.3d 541, 552 (7th Cir. 2009). Although Plaintiff argues that Defendant's actions have impaired Plaintiff's ability to do his job, Plaintiff has never been disciplined for failing to do his job, or for any other reason, and has never been denied an employment opportunity. (Facts 144–45.) Plaintiff testified that he is on medical leave for psychological reasons unrelated to Defendant's alleged actions. (Facts 142–43.) The insufficiency of Plaintiff's claimed deprivations is more fully set out below with respect to each Defendants' alleged actions.

### 4. Plaintiff cannot demonstrate that but for Plaintiff's protected activity, the Defendants would not have acted.

#### a. The NEMAT/Local Team decision.

Plaintiff's belief that Defendant Orr removed Plaintiff from NEMAT out of retaliation for his union activities is based on: 1) Plaintiff's assertion that he participated in a meeting with Assistant Warden Rossi concerning the rights of a union member three days prior to his receipt of the September 27, 2006 memorandum (Facts 14(c), 35); 2) hearsay statements by third parties that an unnamed warden called someone at an unknown time asking that Plaintiff be removed for

23

unarticulated reasons (Facts 36–37); and 3) Plaintiff's assertion that he had a number of conflicts with Assistant Warden Rossi (Facts 35).

"In order to establish that a defendant retaliated against a plaintiff because of a protected constitutional right, a plaintiff must demonstrate that the defendant . . . knew of the plaintiff's constitutional activities." *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999).  Plaintiff has no admissible evidence that Defendant Orr was aware of Plaintiff's meeting with Rossi, or that Rossi had any contact whatsoever with Defendant Orr regarding NEMAT.  (*See* Facts 35–40, 46–47.)  The only evidence of any contact between a warden at Jacksonville and a member of NEMAT is Defendant Polk's June 21, 2006 memorandum.  (*See* Facts 31–32.)  There is no mention whatsoever of Plaintiff's union activities in that memorandum.  (*See* Ex. 14.) Even if Plaintiff could establish that Defendant Orr was aware of Plaintiff's meeting with Assistant Warden Rossi, the "mere temporal proximity" of that meeting to Defendant Orr's memorandum is not sufficient to create a genuine issue of material fact.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006).

The record demonstrates that Plaintiff was removed from NEMAT by the Statewide Coordinator Jeff Hooker and Deputy Director Ron Meek because of Plaintiff's performance on the team.  (Facts 42–47.)  Defendant Orr issued the memorandum because Plaintiff was an employee in Defendant Orr's district (Facts 44), and Defendant Polk provided valid reasons for recommending removal.  (Facts 32–33.)

Accordingly, Plaintiff cannot demonstrate that his removal from NEMAT was caused by his union activities.  Plaintiff cannot establish injury for his removal from the local team, because he did not wish to be on the team after being removed from NEMAT.  (Facts 49–50.)  Moreover, the failure of Plaintiff's NEMAT claim necessarily disposes of the local team claim.  Since Plaintiff's only claim against Defendant Orr concerns NEMAT (Facts 41), Defendant Orr is entitled to summary

judgment in full.  Similarly, the remaining Defendants are entitled to summary judgment on this claim.

>    **b.**    **Defendants Polk and Rossi**

Plaintiff's claims against Defendants Polk and Rossi concern: 1) the removal of his pager and removal from after-hours call back duties in 2006 (Facts 18–25); 2) Plaintiff's move back to his old office in Clinical Services in February 2007 (Facts 60–63); 3) alleged interference with Plaintiff's duties regarding suicidal inmates (Facts 126–28); 4) changes to Plaintiff's work locations (Facts 64–68); and 5) Plaintiff's ability to participate in Health Care Unit staff meetings (Facts 74–76).  These actions are insufficient as a matter of law to "deter a person of ordinary firmness" from exercising First Amendment rights.  *See Gilbert,* 557 F.3d at 552.  Indeed, Plaintiff's return to an office and working conditions in which he had operated for more than 16 years without incident (*see* Facts 51–58, 60) is not sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, particularly where Plaintiff characterized the situation as merely "less than ideal." (Facts 67). Plaintiff has simply failed to demonstrate how he has suffered any material injury due to the alleged decisions of Defendant Polk and Defendant Rossi.

>    **1.**    **Plaintiff cannot demonstrate that Plaintiff's union activities were the reason for Defendants' alleged actions.**

Even if Plaintiff's pager and callback claims were not time-barred (*see* Facts 2), Plaintiff has no evidence that Defendants acted because of his union activities.  Plaintiff's only evidence of retaliation is his belief that Defendant Rossi took a personal dislike to Plaintiff (*see* Ex. 1 at 50), and a general assertion that he was treated better prior to becoming a member of the Executive Board (Doc. #1 at ¶ 17).  Plaintiff became a member of the Executive Board in April of 2004 (Facts 5), prior to contact with any of the Defendants in this case except Defendant Rossi (Facts 13), who did not become Plaintiff's supervisor until that same year (Facts 6).  No reasonable jury could conclude

25

that Plaintiff's membership on the Executive Board, untied to any specific speech, was the reason for Defendants' actions.  Plaintiff's failure to set forth any specific evidence tying Defendants' actions to any specific protected activities is fatal to Plaintiff's claims.

The same holds true for Plaintiffs remaining claims against Defendants.  Plaintiff offers no evidence of retaliatory motive other than that he allegedly and routinely raised numerous safety, health, and bargaining issues in various unspecified meetings or communications.  In sum, Plaintiff has demonstrated no causal link between his alleged activities on behalf of the union and Defendants' actions.

> **2.      The same action would have been taken even in the absence of alleged protected activity.**

Even if Plaintiff could demonstrate a prima facie case of retaliation, Defendants have set forth nonretaliatory reasons for all of their actions to which Plaintiff has no rebuttal.  (*See* Facts 20–25.)  The decision to move Plaintiff's office back to Clinical Services was made to create needed office space in the Health Care Unit.  (Facts 60–63).  Plaintiff was directed not to participate in Health Care Unit staff meetings because he had been reassigned to Programs.   (Facts 75). Defendants' directions regarding where Plaintiff should see inmates were attempts to address concerns raised by Plaintiff himself.  (Facts 64–68, 99–101.)  Plaintiff also admitted that Defendants' determination regarding strip-celling inmates was motivated by the death of an inmate at another facility. (Facts 128).  Plaintiff has no evidence that Defendants' reasons were pretexts.  Accordingly, Defendants Rossi and Polk are entitled to summary judgment.

> **c.      Defendant Pillow**

Plaintiff's claims against Defendant Pillow concern: 1) the alleged order to see inmates in Clinical Services without security present (Facts 102–07); 2) the requirement that Plaintiff complete the Mental Health Treatment Plan (DOC 0284 form) (Facts 108–15); 3) the alleged revision of the

institutional directives (Facts 136–38); 4) alleged threatened discipline (Facts 139–41); and 5) alleged failures to provide information related to the telepsychiatry program (Facts 79–82, 91–98). Plaintiff admitted that Defendant Pillow merely conveyed the direct order of Warden Stoudt regarding seeing patients in Clinical Services and has no evidence that Defendant Pillow otherwise participated in that decision.  (Facts 103.)  Plaintiff has made no claim of injury as a result of lack of security.  As to the alleged threat of discipline, Plaintiff has repeatedly admitted that he has never been disciplined.  (Facts 144.)

### 1.     Defendant's alleged actions are nonactionable.

Plaintiff's claims regarding the Mental Health Treatment Plan, revised institutional directives, and occasional inability to receive information he requested trivial, and do not, as a matter of law, rise to the level of conduct that could reasonably deter a person of ordinary firmness from engaging in speech.  Further, even if Defendant had ordered Plaintiff to see patients without adequate security, the fact that Plaintiff filed an incident report every single time he obeyed that alleged order (Facts 104) demonstrates that he was not deterred from exercising his First Amendment Rights. Accordingly, the alleged acts by Defendant Pillow are nonactionable.  *See Gilbert,* 557 F.3d at 552.

### 2.     Plaintiff cannot demonstrate that Plaintiff's union activities were the reason for Defendant's alleged actions.

Plaintiff has provided no causal link between Defendant Pillow's alleged actions and any protected activity engaged in by the Plaintiff.  Plaintiff's own testimony establishes that the alleged threats of discipline were issued in response to Plaintiff's statement that he would disobey an order of the warden, and in the connection with a complaint of harassment issued against him.  (Facts 140–41.)  Plaintiff's statement regarding the warden's alleged order related solely to his duties as a psychologist and not the union or other public concern.  Plaintiff's statement is therefore not protected under *Garcetti*.  The alleged threat of discipline related to the harassment complaint was

not issued in response to any speech exercised by Plaintiff, but rather in response to the harassment complaint itself, *i.e.* Defendant Sudbrink's speech.  (Facts 141.)  Accordingly, Plaintiff has failed to demonstrate a causal connection between the alleged threats of discipline and any protected activity in which he engaged.

Plaintiff provides no evidence that any of the remaining alleged actions by Defendant Pillow were done because of Plaintiff's union activities.  Plaintiff is required by institutional directive to complete the Mental Health Treatment Plan.  (Facts 110.)  Plaintiff offers no evidence demonstrating that Defendant had a duty to provide Plaintiff with documentation generated by Wexford Corporation for telepsychiatry (*see* Facts 79, 81), or to consult Plaintiff prior to the revision of institutional directives.  Finally, even if Defendant Pillow participated in the decision to require Plaintiff to see inmates in Clinical Services, Plaintiff has no evidence to rebut Defendant Ward's testimony that Plaintiff was directed to see patients in Clinical Services because it was consistent with past practice and other facilities.  (Facts 105–07.).  Accordingly, Defendant Pillow is entitled to summary judgment.

### d.      Defendant Stoudt, n/k/a Ward

Plaintiff's claims against Defendant Stoudt, n/k/a/ Ward, concern: 1) Plaintiff's return to his old office in Clinical Services in 2008 (Facts 70–73); 2) the denial of advance sick time (Facts 129–30); 3) an alleged denial of Plaintiff's request to attend negotiations on behalf of the union (Facts 131–33); and 4) the alleged order to see inmates in Clinical Services without security (Facts 102–07).

Plaintiff testified that Defendant Stoudt, n/k/a/ Ward, moved his office back to Clinical because of a telephone call he had with Defendant Sudbrink the day before.  (Facts 71.)  Stoudt, n/k/a/ Ward, did not participate in that call.  (Facts 72.)  Plaintiff offers no evidence of retaliatory

motive other than the "mere temporal proximity" of that phone call to the decision, which is insufficient to create a genuine issue of material fact. *Tomanovich*, 457 F.3d at 665 (7th Cir. 2006).

Even if Defendant did move Plaintiff's office in response to that phone call, Plaintiff's speech did not concern any union matter, but rather was directed solely to his responsibility to provide a call line of patients to be seen by the telepsychiatrist. (Facts 71). Accordingly, Plaintiff's claim is barred by *Garcetti*. Moreover, Plaintiff has no evidence to rebut Defendant's testimony that she moved Plaintiff's office back to Clinical Services to make room for telepsychiatry services and because his position was associated with Clinical Services. (Facts 73.)

With respect to the denial of advance sick time, the evidence indicates that Plaintiff's request was denied by the Director of the Department of Corrections, not Defendant. (Facts 129.) Plaintiff's assertion that Defendant recommended denial is not supported by any evidence. The further assertion that the alleged recommendation was retaliatory is based solely on Plaintiff's belief that such requests are routinely approved. (Facts 130.) Plaintiff has failed to demonstrate a causal link as a matter of law.

As to Plaintiff's request to attend contract negotiations on behalf of the union, Plaintiff offers no evidence that Defendant denied his request because of his union activities. To the contrary, the only evidence in the record establishes that Defendant had a concern about Plaintiff's absence because he was needed at the facility. (Facts 132.) Further, Plaintiff suffered no harm because his request was granted. (Facts 133.)

Finally, Plaintiff has no evidence to establish a causal connection between his union activities and Defendant's alleged order to see patients in Clinical Services without security. Plaintiff has no evidence to rebut Defendant's testimony that the security provided to Plaintiff was consistent with past practice and other facilities. (Facts 105–07.)

Accordingly, Defendant Stoudt, n/k/a Ward, is entitled to summary judgment.

  **e.**  **Defendant Sudbrink**

  Plaintiff's claims against Defendant Sudbrink concern: 1) Plaintiff's office moves (Facts 60–68, 70–73); 2) Defendant's decision regarding medical record privacy (Facts 91–98); 3) the Mental Health Treatment Plan (Facts 108–15); 4) the alleged revision of institutional directives (Facts 136–38); 5) the ability to participate in Health Care Unit meetings (Facts 74–76); 6) the removal of the psych nurse designation (Facts 116–25); 7) the alleged failure to provide Wexford documentation and information to Plaintiff (Facts 77–90); and 8) the alleged filing of false harassment charges against Plaintiff (Facts 134–35). (*See also* Ex. 16 at 3–5.) All of Plaintiffs' claims against Defendant Sudbrink concern alleged actions taken after Defendant Sudbrink ceased to be Plaintiff's supervisor. (*See* Facts 10.)

  The fact that Defendant Sudbrink ceased to be Plaintiff's supervisor in November of 2006 is fatal to all of Plaintiff's claims against her. Plaintiff fails to demonstrate any basis on which Defendant Sudbrink had a duty to provide him with information or address his concerns, or had the authority to direct his conduct. Without such basis, Plaintiff cannot demonstrate that he has suffered a deprivation because of Defendant Sudbrink.

  Plaintiff claims that Defendant Sudbrink prevented him from receiving documentation and information from the Wexford Corporation vendor, but the evidence establishes that Defendant did not work for Wexford, did not use its forms, and did not supervise its employees. (Facts 80–82.) The evidence also demonstrates that Plaintiff obtained Wexford information from a Wexford employee, Amanda Tomhave. (Facts 85.) Plaintiff has not provided evidence that Defendant had the information he sought, or knew that Plaintiff had not received the information on any given date. (*See* Facts 86–88.)

Plaintiff cannot identify any protected speech that caused Defendant Sudbrink to retaliate against him.  As discussed earlier, Plaintiff's claims tied to speech concerning health and safety at Jacksonville are barred by *Garcetti* because Plaintiff is required to report such issues to management. (*See* Facts 17.)  Plaintiff has no evidence that Defendant was aware of any union action Plaintiff engaged in during Labor Management meetings because Defendant Sudbrink did not attend those meetings.  (Facts 15.)   Finally, although Plaintiff testified that he confronted Defendant Sudbrink on a number of occasions concerning alleged erosion of bargaining unit rights, Plaintiff could not recall any specific communication on any specific date that caused Defendant Sudbrink to take any adverse action against him.  (Facts 125.)  Plaintiff's speculative evidence is insufficient to demonstrate a causal link between Plaintiff's protected speech and Defendant's actions. Further, Plaintiff offers no evidence to establish that Defendant participated in the decision to move his office, revised the institutional directives, or prevented him from attending Health Care Unit staff meetings (*see* Facts 76.)  Accordingly, Plaintiff has failed to establish a prima facie case of retaliation against Defendant.

Even if Plaintiff could establish a prima facie case of retaliation, Plaintiff has no evidence to rebut the nonretaliatory reasons for Defendant Sudbrink's actions.  Plaintiff's memorandum to the nurses instructing them not to serve as a witness to the Mental Health Treatment Plan was issued in part to address *Plaintiff's* complaint that the nurses had been serving as witnesses.  (Facts 112–14.) Plaintiff's work load could not have been increased by Defendant's memorandum because he had already been instructed to complete the Treatment Plan himself.  (Facts 111–12.)   Defendant removed the designated psych nurse to increase nurse time after consulting with the other facilities and Jacksonville management.  (Facts 119–20.)  Because Plaintiff had already assumed the duties of preparing the call line for the psychiatrist, it is not clear how Plaintiff was injured by the removal of the designated psych nurse.  (Facts 117–23.)   Plaintiff even testified that although the nurses

31

communicated with him concerning mental patients after there was no longer a designated psych nurse, he would simply return their communications without acting on them.   (Facts 123.). Defendant's decision regarding Plaintiff's access to copies of medical records was made as the facility privacy officer because of valid privacy concerns under the HIPAA law.   (Facts 91–98.) Finally, although Plaintiff alleges that Defendant filed false harassment charges against him, Plaintiff admits that those charges were substantiated by the Department's Office of Affirmative Action. (Facts 134–35.)   Plaintiff has no evidence that the Office of Affirmative Action was even remotely aware of any protected activity engaged in by Plaintiff.   *See id.*

In sum, Plaintiff has failed to demonstrate that Defendant Sudbrink had a duty to provide Plaintiff with information (or even had access to that information), had a duty to respond to Plaintiff's requests, had the power to prevent Plaintiff from doing his job, had any input in his office moves, injured Plaintiff in any fashion, or otherwise retaliated against Plaintiff for any protected activity he may have engaged in.   No reasonable jury could conclude that Defendant Sudbrink has retaliated against Plaintiff because of his union activity.   Accordingly, Defendant Sudbrink is entitled to summary judgment.

**C.**     **Defendants are entitled to qualified immunity.**

Qualified immunity is a defense available to state and federal officials to ensure protection when they are required to exercise discretion in performing their duties.   *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Under the doctrine of qualified immunity, government officials are shielded from liability for civil damages.   *Id*. at 818.   A public official is entitled to qualified immunity if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Id*.; *see also Chathas v. Smith*, 884 F.2d 980, 989 (7th Cir. 1989), *cert. denied*, 493 U.S. 1095 (1990).   Unless it has been authoritatively decided that

certain conduct is forbidden, a public official is entitled to qualified immunity. *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993); *Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 875 (7th Cir. 1987). "Whether an official may be held personally liable for his or her unlawful actions turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time taken." *Townsend v. Vallas*, 256 F.3d 661, 672 (7th Cir. 2001).

A two-part test is used to analyze qualified immunity. *Wade v. Hegner*, 804 F.2d 67, 70 (7th Cir. 1986). First, the alleged conduct must violate a constitutional or statutory duty. *Id.* Second, the statutory or constitutional violations alleged must be so clearly established that a reasonable official would have understood at the time of the incident that the conduct violated the law. *Id.* "For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel . . . the conclusion for every like-situated, reasonable government agent that what [he] is doing violates federal law *in the circumstances*." *Khuans v. School District 10*, 123 F.3d 1010, 1020–21 (7th Cir. 1997). "[I]t is not the simple existence of analogous case law that defeats the claim of qualified immunity; rather, these decisions must demonstrate that, at the time the defendants acted, it was certain that their conduct violated the law." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 620 (7th Cir. 2002).

If it was not clearly established that a protected interest was implicated by an alleged deprivation, the defendants are protected by qualified immunity. *Ulichny v. Merton Community School District*, 249 F.3d 686, 706 (7th Cir. 2001). To defeat qualified immunity, plaintiff must cite preexisting case law demonstrating the existence of a clearly established constitutional right. *Sonnleitner v. York*, 304 F.3d 704, 716--17 (7th Cir. 2002). As discussed above, Plaintiff has failed to establish that he has engaged in constitutionally protected speech under *Garcetti* and the *Connick-*

*Pickering* test.  Therefore, Plaintiff has failed to defeat Defendants' qualified immunity under the first prong of the test.

Moreover, Defendants are entitled to qualified immunity because Plaintiff cannot show that he had a clearly established constitutional right such that a reasonable official would have recognized that his or her conduct with respect to Plaintiff would have violated the law.  It is not clearly established that an employer cannot direct an employee to participate in activities which the employee subjectively believes violates his union contract or which may increase an employee's workload.  It is also not clearly established that an employer may not respond to an employee's speech concerning the health and safety of the work place by modifying the employee's job duties and working conditions or by removing plaintiff from a volunteer team.  Therefore, Defendants are entitled to qualified immunity.

## IV.  CONCLUSION

Plaintiff's claims with respect to retaliation for raising issues of health and safety are barred by the holding of the Supreme Court in *Garcetti*.  Plaintiff has also failed to establish a prima facie case of retaliation in response to exercise of First Amendment rights.  Specifically, Plaintiff has failed to establish that he engaged in protected speech and has failed to establish a causal link between his alleged protected conduct and any adverse action he experienced.  Moreover, Defendants would have taken the same actions with respect to Plaintiff even in the absence of Plaintiff's union activities.  Finally, Defendants are entitled to qualified immunity.  Therefore, summary judgment should be granted to Defendants.

WHEREFORE, for the foregoing reasons, and for the reasons stated in Defendants' statement of undisputed material facts and exhibits, Defendants respectfully request that this Court enter summary judgment in their favor.

<div style="margin-left:40%">

Respectfully submitted,

NEIL ROSSI, BECKY SUDBRINK,
RICHARD PILLOW, JENNIFER STOUDT,
TERRY POLK and RICHARD ORR,

Defendants,

</div>

|  |  |
|---|---|
| Joshua D. Ratz # 6293615 | LISA MADIGAN, Attorney General, |
| Assistant Attorney General | State of Illinois, |
| 500 South Second Street |  |
| Springfield, IL  62706 | Attorney for Defendants. |
| Telephone: 217-782-2077 |  |
| Facsimile:  217-524-5091 | By:   s/Joshua D. Ratz |
| jratz@atg.state.il.us | Joshua D. Ratz |
| Of Counsel | Assistant Attorney General |

**Olenzki v. Rossi et al.**
**USDC-CDIL Case No. 08-3196**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2011, I electronically filed Defendants' Memorandum of Law in Support of Motion for Summary Judgment using the CM/ECF system which will send notification of such filing to the following:

James P. Baker
carenbakerlaw@sbcglobal.net

and I hereby certify that on February 14, 2011, I mailed by United States Postal Service, the document to the following non-registered participant:

None.

Respectfully submitted,

By: s/Joshua D. Ratz
Joshua D. Ratz, #6293615
Assistant Attorney General
Attorney for Defendant
500 South Second Street
Springfield, IL  62706
Tele: (217) 782-2077
Fax: (217) 524-5091
jratz@atg.state.il.us