IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

DONALD OLENDZKI,                        )
                                        )
              Plaintiff,                )
                                        )
      v.                                )        Case No.  08-3196
                                        )
NEIL ROSSI, BECKY SUDBRINK,             )
RICHARD PILLOW, JENNIFER                )
STOUDT, TERRY POLK, and RICHARD         )
ORR,                                    )
                                        )
              Defendants.               )

**MEMORANDUM OF THE PLAINTIFF, DONALD OLENDZKI, IN
OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

Donald Olendzki ["Olendzki"] went to work for the Illinois Department of Corrections

["Department"] in 1989.  Throughout the course of his employment, he has worked as the

psychologist at the Jacksonville Correctional Center ["JCC"].

During the first fifteen years of his employment at JCC, Olendzki enjoyed excellent

working and personal relationships with his supervisors and was well regarded by them.

This relationship changed in 2004.  At that time, Olendzki, a member of the American

Federation of State, County and Municipal Employees ["AFSCME"], Local Union No. 3549

["Union"], was elected to its Executive Board.  In that office he represented its members in labor

disputes with the JCC management team.

In performing his Union responsibilities, Olendzki raised with the wardens, assistant

wardens and healthcare administrator at JCC various concerns and complaints on the part of the

Union and its members.  Oftentimes, his efforts were ignored by the JCC management staff

requiring Olendzki to intensify his efforts.  His activities in this respect were not well received

and he began receiving treatment from his supervisors which was not only different from how he

had been treated during his first fifteen years of employment, but was also different from how

other JCC staff members were treated.

Among other things, steps were taken by his supervisors which:  1) made it more difficult

for Olendzki to do his job; 2) increased his workload with unnecessary busy work; 3) removed

him from a prestigious assignment on the Department's hostage negotiating team; 4) attempted

to subject him to a psychological evaluation; 5) required him to treat dangerous inmates with

serious mental health disorders without having security protection; and 6) attempted to discipline

him because of meritless allegations that he had harassed a supervisor.

In the midst of this treatment Olendzki, on September 10, 2008, initiated this proceeding

under 42 U.S.C. § 1983 against six of his supervisors.[1]

In this case Olendzki claims that his advocacy on behalf of members of his Union is

protected by both the freedom of speech and association rights embodied in the First

Amendment to the Constitution.  He also claims that the Defendants' conduct was directed

toward him because he exercised those rights.  In so doing, they interfered with his exercise of

those rights.

With the close of discovery, the Defendants now seek summary judgment.  In this respect

they claim that:  1) several of Olendzki's claims are time barred; 2) Olendzki's speech was

---

[1]  The Defendants in this case are:  1) Neil Rossi ["Rossi"], an assistant warden at JCC;
2) Becky Sudbrink ["Sudbrink"], the healthcare administrator at JCC; 3) Richard Pillow
["Pillow"], an assistant warden at JCC; 4) Jennifer Stoudt a/k/a Jennifer Ward ["Stoudt"], a
warden at JCC; 5) Terry Polk ["Polk"], a warden at JCC; and 6) Richard Orr ["Orr"], a deputy
director of the Department.

pursuant to his duties at JCC and was not protected by the First Amendment; 3) Olendzki's speech did not relate to a matter of public concern entitling him to First Amendment protection; 4) Olendzki did not suffer a sufficient deprivation to violate his First Amendment rights; 5) Olendzki has not produced sufficient evidence of a causal connection between the Defendants' treatment toward him and his Union advocacy to warrant a trial; and 6) Olendzki's claims are barred by qualified immunity.

For reasons which follow, the Defendants' contentions are meritless. First, Olendzki's activities arose because of his role as a Union official, not an employee of the Department. Second, both his speech and his Union association were protected by the First Amendment. Third, the treatment directed toward Olendzki did impinge upon his First Amendment rights. Fourth, plentiful evidence exists that a causal connection exists between Olendzki's protected conduct and the treatment directed toward warranting a trial.[2] Finally, a reasonable government official would have been on notice that Olendzki's speech and union association was protected by the First Amendment.

## II.  STATEMENT OF FACTS[3]

### A.  The Defendants' Undisputed Material Facts.

#### 1)  Material facts which are undisputed.

---

[2] Olendzki does agree to the dismissal of Orr from this case. Orr was joined only because of his apparent involvement in removing Olendzki from the Department's hostage negotiating team. Discovery has revealed that Orr, although he was aware of the decision, had no meaningful role in making that decision other than to inform Olendzki of the decision. Because JCC was under his jurisdiction, he was the individual who informed Olendzki of the decision.

[3] As used in this document, the term "Olendzki's Statement" refers to the statement of additional material facts which is contained in Section II (B) of this instrument.

With respect to the material facts claimed to be undisputed by the Defendants, Olendzki agrees that the following facts are undisputed and material except as otherwise shown:  1,2,3,4,5, 6,7,8,9,10,11,12,14 (to the extent it represents some, but not all, of Olendzki's activities on behalf of the Union for which he claims to have been retaliated [see Olendzki's Statement]), 16, 17 (except Olendzki was not, as a part of his job at JCC, required to serve on the Health and Safety Committee [¶32,33 of Olendzki's Statement]), 18,19,20,26,27,29,30,31 (except it was not at the request of Hooker [¶118 of Olendzki's Statement]), 32 (only to the extent Polk wanted Olendzki removed from NEMAT.  Olendzki never voluntarily surrendered his pager [¶63,64,117, 118,124,135-137 of Olendzki's Statement].  Olendzki's time commitment to NEMAT was only four hours per quarter and Polk and Rossi made assignments which unreasonably increased Olendzki's workload [¶56,57,109,124 of Olendzki's Statement]), 33 (however, NEMAT imposed a de minimus burden of Olendzki's time [¶109,118 of Olendzki's Statement]), 34,36,37, 38,39,41,42 (only to the extent their approval was necessary.  Polk was the driving force in Olendzki's removal from NEMAT [¶118,119,125 of Olendzki's Statement]), 44,46 (except Polk did ask that Olendzki be removed from NEMAT [¶118,119,125 of Olendzki's Statement]), 48, 51,52,53,54,55,56,57,58,59 (except Olendzki's office was relocated to the Healthcare Unit), 60 (except no reference was made to the retirement of a co-worker as a reason for the relocation [¶147,148 of Olendzki's Statement]), 62,63 (however, Dr. Lockland was only occasionally at JCC), 64,65,67,68,69,70,72,74 (to the extent Olendzki was barred from attending healthcare staff meetings after he was relocated to the Clinic Services Unit), 75 (only to the extent it represents Rossi's testimony.  Olendzki previously attended healthcare staff meetings when he was assigned to the Clinical Services Unit [¶93 of Olendzki's Statement]),

77,78,79,83,84,85 (only to the extent that Olendzki was supposed to receive that information from Tomhave), 99,100,101,102, 103,104,105,106 ( except those individuals neither have one on one contact with psychotic inmates nor see psychotic inmates when no one else is present in the Clinical Services Unit [¶172 of Olendzki's Statement]), 116,117,118,119,120,121,129 (except that denials occurred because of misinformation provided by Stoudt [¶203 of Olendzki's Statement]), 134,136 (to the extent that is a part of Olendzki's contention.  The other part is that he was not informed of the changes even though they effected his job responsibility [¶204 of Olendzki's Statement]), 139,140,141, 142, and 144.

    **2) Material facts which are disputed.**

    With respect to the Defendants' statement of material facts, Olendzki disputes:  21 [¶63, 64,117,118,124,125 of Olendzki's Statement], 23,24,43 [¶114 of Olendzki's Statement], 45 [¶118,119 of Olendzki's Statement], 61 (office remained vacant in the Healthcare Unit after Olendzki was moved back to the Clinical Services Unit [¶147,148,152,173 of Olendzki's Statement]), 65 (Olendzki was directed to see inmates in the operations conference room.  Prior to receiving that directive, he had been seeing inmates in the Healthcare Unit where a security officer was present [¶148,149 of Olendzki's Statement], 66 (Olendzki was directed to see inmates in the operations conference room.  Prior to receiving that directive, he had been seeing inmates in the Healthcare Unit where a security officer was present [¶148,149 of Olendzki's Statement], 73 (available office space remained in the Healthcare Unit after Olendzki's relocation [¶147,148,152 of Olendzki's Statement], 107 [¶163-168,170 of Olendzki's Statement], 125 (only to the extent it refers to a specific communication.  Olendzki, as a Union official, had continuing encounters with Sudbrink because of her ongoing violations of the

collective bargaining agreement [¶69-90, 206-209 of Olendzki's Statement], 126 (except under Department protocols, those decisions are to be made by a mental health professional.  Olendzki was never consulted about the decision [¶54 of Olendzki's Statement]), 127, 128, and 143 (the hostage incidents occurred over three years prior to his medical leave during which he was able to engage in his duties for the Department [¶217 of Olendzki's Statement].

**3) Facts which are immaterial.**

Olendzki asserts that the following facts are irrelevant to the resolution of any material issue in the instant summary judgment proceeding:  13,15,22,25 (prior to the Defendants removing Olendzki's pager, he could be and was reached when he was away from JCC), 28,34, 40,47 (Polk requested that Olendzki be removed from NEMAT [¶118,119,125 of Olendzki's Statement]), 49 (the terms of Orr's letter removed Olendzki from all hostage negotiating responsibilities [¶121 of Olendzki's Statement], 50 (the terms of Orr's letter removed Olendzki from all hostage negotiating responsibilities [¶121 of Olendzki's Statement], 71,76,80,81,82,86, 87,88,89,90,91,92,93,94,95,96,97,98,108,109,110,111,112,113,114,115,122,124,130,131,132, 133,135,137,138, and 145.

**B. Olendzki's Additional Undisputed Facts.**

OLENDZKI'S INITIAL WORK RELATIONSHIPS AT JCC

1.    In March of 1989 Olendzki became employed by the Department.  Since then he has served as the only psychologist JCC [Olendzki Declaration ¶4, Olendzki Dep.7, Polk Dep.12-13, Ward Dep. 12].

2.    Olendzki maintained a working relationship with many members of the management of JCC including the Warden, the Assistant Warden of Programs, the Assistant Warden of

Operations, and the Healthcare Unit Administrator.  In performing his duties, Olendzki dealt frequently with the individuals serving in those positions.  In addition to working with individuals serving in those capacities, he would from time to time socialize away from work with many of them [Olendzki Declaration ¶6].

3.  Prior to March of 2004, Olendzki enjoyed an extremely good working relationship with members of management at JCC.  Consistently, he was complimented by them on his performance.  They sought out his advice and assistance, assigned him to a number of special projects and made available to him specialized training in various aspects of mental health, hostage negotiations, and hostage survival strategies [Olendzki Declaration ¶7].

## THE  JCC STAFF AND MANAGEMENT TEAM

4.  In July of 2004 J.R. Walls became the Warden at JCC.  Earlier in Olendzki's career with the Department, Walls had been employed at JCC as both a lieutenant and a captain.  They got along well with one another at that time [Olendzki Declaration ¶17].

5.  On December 16, 2005 Terry Polk became the Warden at JCC [Olendzki Declaration ¶28].

6.  In early 2006 Neil Rossi was an Assistant Warden at JCC.  At that time Olendzki enjoyed a good working relationship with Rossi.  Prior to 2006 Rossi was not involved in labor management issues at JCC and normally did not attend labor management meetings [Olendzki Declaration ¶29].  As the Assistant Warden of Programs Rossi supervised, among other things, the Clinical Services Unit and the Health Care Unit [Rossi Dep.11, Olendzki Dep.20-21, Sudbrink Dep.17].  He became Olendzki's supervisor in late 2006

[Rossi Dep.58].

7.    Sudbrink has been employed at JCC since February 2005 as its healthcare administrator
      [Sudbrink Dep.5].   In that position she supervised about a dozen employees including
      employees who were members of the Union.  At one time she was Olendzki's
      administrative supervisor [Sudbrink Dep.11-12, Olendzki Declaration ¶33].  In her
      position grievances were initially submitted to her for resolution  [Sudbrink Dep.13].

8.    In 2006 Orr was the Deputy Director who supervised JCC [Orr Dep.6-9, Olendzki
      Dep.22-23].

9.    Richard Pillow began working at JCC in 2007 as assistant warden [Pillow Dep.5-6]. In
      November 2007 he became Olendzki's supervisor [Pillow Dep.7, Olendzki Declaration
      ¶99].

10.   Jennifer Stoudt became warden at JCC on January 24, 2008 replacing Polk [Olendzki
      Declaration ¶83, Ward Dep.5-6, 8-9][4].

11.   Becky Quinn was employed at JCC at one time as a correctional nurse [Quinn
      Declaration ¶4].

12.   Delinda Wilkerson began working as a nurse at JCC when it opened in the early to mid
      1980s.  She remained at JCC until 2006 when she transferred to the Pittsfield Work
      Camp [Wilkerson Declaration ¶5].

13.    JCC is a Level 5 minimum security facility.  It is a high minimum facility [Polk Dep.12,
      Olendzki Dep.14-15].  In 2005 it housed 1000 inmates [Polk Dep.11, Rossi Dep.17].

_____

      [4]Stoudt's name has been changed to Jennifer Ward.  In this instrument she shall be
referred to by her former name of Stoudt.

14.     At time relevant to this case, inmates who had committed violent crimes including sexual

        assaults and murders and had an extended release dates were among those confined to it

        [Rossi Dep.18-20, Polk Dep.12].

OLENDZKI'S UNION INVOLVEMENT

15.     Cameron Watson is employed as a correctional officer at JCC.  He is a member of the

        Union and from 2004 to 2006 he was the Vice President of the Union.  Since 2006 he has

        served as the President of the Union [Watson Declaration ¶4,5]

16.     Chuck Stout worked at JCC as a correctional officer and correctional sergeant [Stout

        Declaration ¶5].  Since September of 2000, he has been employed by AFSCME as a staff

        representative and assists local unions in various labor relations matters [Stout

        Declaration ¶4, 6].

17.     As a psychologist for the Department, Olendzki was a member of a collective bargaining

        unit represented by the Union.   He was not active in the Union or its affairs prior to April

        of 2004 [Olendzki Declaration ¶5, Olendzki Dep.30-32].

18.     On April 1, 2004 Olendzki was elected to the Executive Board of the Union.  His election

        to the Executive Board represented the first time he ever held an office in the Union

        [Olendzki Declaration ¶8, Olendzki Dep. 30-32].

19.     As a member of the Executive Board of the Union, Olendzki represented the interests of

        its members with respect to the terms and conditions of their employment at JCC.  He

        frequently addressed issues on behalf of the Union and its members with management

        staff at JCC [Olendzki Declaration ¶9, Polk Dep.20].   His Union duties included

        enforcing the contract, representing members, attending meetings, advocating for

members, addressing contract violations, filing grievances, and attempting to resolve issues prior to filing a grievance [Olendzki Dep.32].

20.  Stout has known Olendzki for many years.  They were co-employees at JCC.  Over the years Stout has been able to observe Olendzki's interactions with both employees at JCC and members of its management staff.  For many years, based upon Stout's observations, Mr. Olendzki was highly regarded not only by his co-employees at JCC, but also by members of the management staff at JCC [Stout Declaration ¶7, 8].

21.  Stout attended labor management meetings at JCC.  At those meetings, he observed Olendzki's conduct and his interactions with members of the management staff [Stout Declaration ¶10].  Olendzki was an extremely effective advocate for the Union at these meetings.  While he was professional during those meetings, he was also was very direct and effective in advocating his position [Stout Declaration ¶11].

22.  Frequently during those meetings, both Rossi and Pillow were in attendance during the time each served on the management staff at JCC.  Frequently, each of them would become extremely angry with Olendzki during those meetings.  Rossi would often raise his voice and shout at Olendzki.  Pillow would also raise his voice and from time to time would tell Mr. Olendzki he had no business speaking during the course of those meetings.  In Stout's view the conduct of each of them toward Olendzki bordered on the abusive [Stout Declaration ¶12].

23.  On at least one occasion while Stout was assigned to work with the Union, Olendzki was removed from his office in the Healthcare Unit and assigned to work in another area at JCC.  When this occurred, the Union raised that subject at several labor management

meetings Stout attended.  The reason the Union was given for his removal was that the

Healthcare Unit needed his office for other purposes.  This reason was suspect because

there was available space which could serve the claimed needs of the Healthcare Unit

without relocating Olendzki.  This was pointed out at labor management meetings, but

was ignored by management representatives who attended that meeting [Stout

Declaration ¶16].

24.     According to Polk, a union official would be properly representing his members by

bringing workplace safety or health issues to the attention of management.  When

bargaining unit work is given to non-bargaining unit individuals, that is a legitimate issue

to raise with management [Polk Dep.44-45, 91-92].


THE LABOR MANAGEMENT MEETINGS

25.     As a member of the Executive Board, Olendzki regularly attended labor management

meetings at JCC.  Members of management, including the warden, attended these

meetings.  The purpose of the meetings was to discuss and attempt to resolve various

issues that arose from time to time concerning the interests of members of the Union.  At

the meetings, Olendzki acted as the Union spokesman concerning health and safety issues

[Watson Declaration ¶13, Olendzki Declaration ¶10. Rossi Dep.21, Polk Dep.21-23,

Ward Dep.16-17].

26.     Olendzki often raised at those meetings issues about Sudbrink's violations of the

collective bargaining agreement.  It was a constant part of the meetings.  Rossi stopped

attending most labor management meetings when issues were raised about the Health

Care Unit [Olendzki Dep.290-291].

27.    In 2007 Olendzki regularly made comments at both the labor management meetings and
the Health and Safety Committee meetings that mentally ill inmates were creating a
dangerous condition for staff at JCC.  In his capacity as a Union representative, Olendzki
pointed out that steps needed to be taken to address this situation in order to reduce the
danger to staff members [Olendzki Declaration ¶76].

28.    At a December 17, 2007 labor management meeting in which both Polk and assistant
warden Pillow were present, Olendzki again raised issues about the dangerous condition
with inmates not receiving psychiatric care, the failure of management to bargain over
the implementation of the telepsychiatry program and Sudbrink's continuous activities in
doing work which eroded the bargaining unit [Olendzki Declaration ¶82].  Later, at the
first labor management meeting Stoudt attended on February 25, 2008, Olendzki again
raised those same issues [Olendzki Declaration ¶85].

29.    After Stoudt became the warden at JCC, she, after several labor management meetings in
which Olendzki was in attendance, refused to allow him to speak during the course of
those meetings and adopted the position that only the Union president could speak during
those meetings.  Prior to that time as long as Stout had attended labor management
meetings, all Union officers who were in attendance were entitled to speak [Watson
Declaration ¶14].


THE HEALTH AND SAFETY COMMITTEE

30.    JCC had a Health and Safety Committee.  The healthcare unit administrator was a

member of that Committee.  The purpose of the Committee was to discuss and deal with health and safety issues affecting both inmates and staff at both JCC and its satellite camps.  During these meetings, the Union representatives would bring to the attention of management health and safety issues effecting the staff.  The collective bargaining agreement covering the employment of bargaining unit members of the Union at JCC provides for this Committee [See Exhibit A to Olendzki Declaration, Olendzki Declaration ¶11, Sudbrink Dep.14-15].

31.     There is at least one Union member on the Health and Safety Committee.  Olendzki was the Union representative on the Committee [Sudbrink Dep.14-15, Rossi Dep.23-24].

32.     Prior to his election to the Executive Board, Olendzki had neither been a member of the Health and Safety Committee nor attended meetings of the Health and Safety Committee.  Upon joining the Executive Board, Olendzki was appointed by the Union as one of its representatives to the Health and Safety Committee.  At no time during his employment at JCC was he assigned by management to that Committee [Olendzki Declaration ¶12, 13].

33.     The Union identified Olendzki on a roster of its officers as its representative of the Health and Safety Committee [Olendzki Declaration ¶15, see sample roster attached as Ex. C to Olendzki Declaration].

34.     As a part of his job as a psychologist at JCC, Olendzki was never required to serve on the Health and Safety Committee.  Olendzki's job specifications propounded by Department of Central Management Services ["CMS"] do not include that requirement.  [Olendzki Declaration ¶16, see Ex. D to Olendzki Declaration].

35.   Olendzki attended Health and Safety Committee meetings as the union representative and
      regularly expressed his views and concerns.  Sudbrink attended those meetings.
      Olendzki would bring up terms relating to union member's employment.  The dentist's
      hygiene came up several times.  The spread of MRSA was a concern due to the fact soap
      and paper towels were not purposely provided in the bathrooms.  Sudbrink through her
      required inspections failed to document this problem [Olendzki Dep.293-294, Rossi 24-
      25].

36.   At the February 13, 2008 meeting of the Health and Safety Committee, Olendzki reported
      on behalf of the Union a concern that a dangerous dental tool was missing, but that
      management had done nothing to lock down the facility in an attempt to find that tool.
      His concern was that this created a safety risk to staff members [Olendzki Declaration
      ¶84].

37.   At a Health and Safety Committee meetings Olendzki pointed out that Sudbrink did not
      bring the concerns of the nurses at the work camps to the Health and Safety Committee.
      As the union representative he demanded that she copy all the monthly inspections and
      provide them to the members of Committee [Olendzki Dep.294].

38.   Olendzki would normally ask Sudbrink during the Health and Safety Committee
      meetings if she had addressed concerns brought up at prior meetings [Olendzki Dep.294-
      295].

39.   Rossi presided over Health and Safety Committee meetings.  When Olendzki would raise
      concerns about Sudbrink's behavior at Health and Safety Committee meetings, Rossi
      would become very defensive and protective of her.  Typically, when Olendzki raised

these types of concerns, Rossi would become extremely angry with Olendzki [Watson Declaration ¶11].

40.   Olendzki recently left the Health and Safety Committee and has been replaced by another Union member.  This shift in Committee membership was made by the President of the Union [Olendzki Declaration ¶77, Watson Declaration ¶7].

CHANGES IN OLENDZKI'S TREATMENT AFTER HE JOINED THE EXECUTIVE COMMITTEE

41.   When Walls became the Warden at JCC, Olendzki and Walls renewed their relationship. Initially, they had a cordial relationship.  He complimented Olendzki on his service to JCC and was very helpful to him [Olendzki Declaration ¶18].

42.   Beginning in late 2004 Olendzki began to advocate at labor management meetings on behalf of Dominic Casey.  Casey was, under the collective bargaining agreement, entitled to fill a vacant field services position.  Walls was insistent that the position go to another employee.  He was very resistant to assigning the position to Casey.  The Casey situation became an ongoing issue which Olendzki raised time and again at labor management committee meetings.  Oftentimes during these meetings, Walls became visibly angry with him.  He raised his voice and made known his displeasure with the position Olendzki was taking [Olendzki Declaration ¶19].

43.   Throughout the winter and spring of 2005, the labor management committee meetings were confrontational.  Initially, the issues in dispute involved the failure to reassign Mr. Casey.  A number of health issues which were raised at those meetings by the Union also became a point of contention.  Olendzki was the lead spokesman for the Union in

presenting these issues.  Walls became extremely angry during these meetings because of the Union's unwillingness to agree with him on those issues.  Walls began at that time taking actions against Olendzki which he had never previously experienced during his years at JCC [Olendzki Declaration ¶20].

44.    In January of 2005 Olendzki underwent knee surgery.  Two weeks later, his doctor released him to return to work with the restriction that he would have to use crutches for several weeks.  His immediate supervisor approved his return.  Warden Walls, without giving a reason, refused to permit Olendzki to return to work on crutches even though a number of other employees were allowed to return to work while they were using crutches.  When Olendzki pointed that out to Warden Walls during a labor management meeting, he smiled and said "if you don't like it find a job someplace else." [Olendzki Declaration ¶21, 24].

45.    In March of 2005 Warden Walls countermanded  an order Olendzki had given to place an inmate in a suicide watch strip cell.  Throughout his employment at JCC Olendzki would routinely give these orders.  Never had such an order been previously countermanded [Olendzki Declaration ¶22].

46.    In March of 2005 Olendzki was asked to give a speech at McMurray College.  He had done this in the past and been allowed to use work time.  Walls initially refused Olendzki's request to use work time to give the speech at the College [Olendzki Declaration ¶23].

47.    On May 20, 2005 Olendzki represented a Union member, Trish Moore, in a meeting she had with Walls.  During that meeting, Walls raised his voice and began engaging in what

Olendzki considered unprofessional behavior toward Moore.  Olendzki intervened and requested that Walls conduct himself in a more professional manner.  Walls became extremely angry with Olendzki [Olendzki Declaration ¶25].

48.   In June of 2005 Olendzki had additional knee surgery.  Walls again refused to allow him to return to work on crutches even though a number of other employees had been allowed to return to work on crutches and his work as a JCC psychologist was sedentary [Olendzki Declaration ¶26].

49.   During this period Walls rarely spoke to Olendzki outside of the labor management meetings.  He also became angry with Olendzki when Olendzki brought to his attention grievances, issues and concerns on behalf of employees.  This behavior began in late 2004 when Walls and Olendzki began disagreeing on issues presented at labor management meetings and continued until the time he left JCC [Olendzki Declaration ¶27].

OLENDZKI'S RELATIONSHIP WITH ROSSI

50.   In January of 2006 Olendzki requested that he be allowed to move his office from the Clinical Services Unit to the Healthcare Unit.  It was more efficient for him to work in the Healthcare Unit because all of the medical files for inmates which Olendzki needed to provide treatment to them were located in that unit.  It would also allow Olendzki to see inmates in an area where a security officer was present.  There was an available vacant office in the Healthcare Unit at that time and Rossi granted his request [Olendzki Declaration ¶30, Polk 23-24].

51.   Before Olendzki moved to the Health Care Unit Rossi saw him every day.  They had a

good working relationship.  According to Rossi, Olendzki was a very good employee. He never had problems with Olendzki's work [Rossi Dep.15-16, ].

52.   Their working relationship changed after Olendzki moved to the Health Care Unit when they disagreed about labor matters.  Rossi became very angry.  Rossi did not like it when Olendzki brought Union issues to his attention and would become angry with him [Olendzki Dep.50, 302-303].  Olendzki addressed noncompliance of union issues with Rossi as frequently as needed [Olendzki Dep.301].

53.   If a union issue came up in the Programs area, Olendzki took it to Rossi.  Missy Utter was a Wexford Corporation employee who worked in the Health Care Unit. Sudbrink oversaw her work.  She was a Union member [Rossi Dep.56-57].  In September 2006 Olendzki represented Utter relating to her termination, Rossi was supportive of Sudbrink and became angry at Olendzki when he pointed out that Sudbrink had taken Utter's final paycheck and, instead of delivering it to her, returned it to the home office of Wexford in Pennsylvania.  Olendzki suggested that this was evidence of some vindictiveness on behalf of Sudbrink toward Utter.  When Olendzki made that comment, Rossi became quite angry.  He raised his voice, got red in the face and pointed his finger at Olendzki yelling "you can't say that to her."  He directed Olendzki not to speak during the balance of meeting.  Olendzki  remained calm, but nonetheless informed Rossi that as a representative of the Union it was his obligation to speak on behalf of its members.   It was the first time Olendzki had seen him that angry.  Since then Olendzki has seen Rossi angry on other occasions when dealing with union issues [Olendzki Declaration ¶63, Olendzki Dep.304].

54.     On November 29, 2006 Rossi issued an order indicating that either the warden or one of the assistant wardens would make determinations about whether a suicidal inmate would be placed on strip celled status. At all times while Olendzki was employed as a psychologist for the Department, its administrative directives required that a qualified mental health professional make that determination. Rossi's order was contrary to those directives [Olendzki Declaration ¶68].

55.     On December 4, 2006 Olendzki received an order from Rossi requiring him to move his office out of the Healthcare Unit and back into the Clinical Services Unit. He gave no reason for that directive. Olendzki requested to speak with him about his order, but he refused to talk with Olendzki. After Olendzki moved back to the Clinical Services Unit, the office he had occupied in the Healthcare Unit remained empty [Olendzki Declaration ¶69].

56.     As a psychologist at JCC, Olendzki provided in-service training on a weekly basis to all staff members. He did this through a video presentation which was replayed to staff members. On December 7, 2006 Olendzki received a memo from Rossi instructing him to begin providing this type of training to all staff members through weekly in-service classes. Instead of doing it through a pre-taped video presentation, Olendzki would have to attend weekly sessions and give a live presentation. Engaging in this activity would occupy approximately 15% of his work time [Olendzki Declaration ¶70].

57.     At the time Rossi made the training request, Olendzki had complained to both Polk and Rossi that because of the influx of mentally ill inmates his workload was increasing and he had inadequate clerical assistance. When Olendzki pointed out to Rossi why teaching

weekly in-service classes was not workable, Rossi became angry and threatened to assume the responsibility for preparing his schedule. The following day Olendzki was instructed to provide even more in-service training which would occupy a even more of his time [Olendzki Declaration ¶71].

58.     On April 8, 2008 Olendzki sent to Rossi the Union's list of items which it wished to discuss at the April 10, 2008 scheduled meeting of the Health and Safety Committee. Rossi was the chairman of that committee. The issues that were on the Union's agenda all related to health and safety matters which were appropriate for discussion at meetings of that Committee. At the time of the April 10, 2008 meeting, Rossi refused to discuss any of these issues at the meeting [Olendzki Declaration ¶95].

OLENDZKI'S RELATIONSHIP WITH POLK

59.     On February 14, 2006 a food service supervisor was assaulted by an inmate and sustained serious injuries. A number of members of the bargaining unit worked in the same area where the food service supervisor had been assaulted. On behalf of staff working in that area, the Union raised at both health and safety committee meetings and labor management meetings the need to have a security officer posted in the food service area. Throughout the winter and spring of 2006, this became an issue which was aggressively presented by the Union at these meetings. At these meetings, Olendzki actively argued on behalf of the Union. Warden Polk was resistant to posting a security officer and refused the Union's request. Nonetheless, the Union continued to raise the issue with him. Eventually, Polk became angry at these meetings because the Union was insistent that a security officer be posted [Olendzki Declaration ¶31,32].

60.   Throughout the summer of 2006 as a member of the Executive Committee most
      knowledgeable about health and safety issues, Olendzki had frequent discussions with
      Polk about the unsanitary practices of the Wexford Corporation dentist.  Because no
      action was taken against the dentist, it was necessary for Olendzki on an ongoing basis to
      complain to Polk.  During these meetings when Olendzki complained to Polk, he became
      extremely angry that Olendzki continued to raise the issue [Olendzki Declaration ¶58].

61.   On June 30, 2006 Polk sent an email to Wendy Navarro and Deputy Director Orr
      referring Olendzki for a psychological examination.  In that email he stated that Sudbrink
      noticed both a decline in Olendzki's work performance and bizarre behavior on his part
      [Dep.Ex.2].

62.   From time to time Olendzki would be called on off duty hours by JCC.  Normally, these
      calls related to emergency situations relating to an inmate who was in crisis.  Typically,
      Olendzki would give an order or direction to the individual to whom he was speaking
      concerning the inmate.  Prior to the spring of 2006, Olendzki had always received two
      hours of call back pay when that occurred.  In the spring of 2006 Polk decided that
      Olendzki should not receive call back pay even though he had been receiving it for many
      years [Olendzki Declaration ¶41].

63.   Olendzki was informed by Polk that he would not be compensated for time spent away
      from work responding to telephone calls.  Polk was aware that Olendzki had been
      receiving that benefit for many years.  Olendzki asked Polk and Rossi whether in view of
      that he was required to wear a pager.  At that point, Rossi became extremely angry and
      said that he was. At no time did Olendzki refuse to wear a pager or even express

reluctance to wear the pager.  He merely asked if he was required to wear a pager.  Forty five minutes after the meeting Olendzki received a telephone call from Rossi directing him to turn in his pager [Olendzki Declaration ¶42, 43].

64.   The next day Olendzki received a telephone call from Trent Routien, the regional coordinator for NEMAT informing him that he understood that Olendzki refused to carry a pager.  Olendzki indicated to him that was incorrect.  He explained to Routien that he never refused to carry a pager, but when he was denied call back pay he asked if he was going to be required to carry a pager.  Olendzki made it clear to Routien that he had no objections or concerns about wearing a pager [Olendzki Declaration ¶44].

65.   On August 30, 2006 in the Healthcare Unit Olendzki passed Polk in a hallway.  Olendzki said hello to Polk, but Polk refused to acknowledge him [Olendzki Declaration ¶62].

66.   On October 10, 2006 Olendzki attended as a Union representative the monthly Health and Safety Committee meeting.  He complained at that time that thirty mentally ill inmates were not seen in September of 2006 and that inmates were arriving from the Department's reception and classification center with no mental health screening reports or records.  Because this was happening on an ongoing basis and presented a danger to Union members who worked around newly arrived inmates, Olendzki felt that this was something which should be raised and addressed.  Olendzki repeated those concerns at the October 23, 2006 labor management meeting.  Mr. Polk was in attendance at that meeting [Olendzki Declaration ¶66].

67.   In the summer and fall of 2007 the Union had raised on a continuing basis with Polk, Sudbrink's conduct in eroding the Union's bargaining unit by having non-bargaining unit

members do bargaining unit work.  While he promised to take action to curb Sudbrink's

conduct, Polk did nothing to curb her actions.  Olendzki continued to tell Polk that

Sudbrink was still engaging in the same activities and he felt he had gone back on his

word to the Union [Olendzki Declaration ¶80].

68.    On December 4, 2007 Olendzki received a telephone call from Polk.  He hollered to

Olendzki  "go back on his word!  Go back on his word!  I see where you're going with

this!"  Before Olendzki could respond, Polk hung up the phone.  A minute later, he called

back and in an angry voice said "what do you mean go back on his word?"  Olendzki

explained to Polk that he had made verbal agreements, but had not delivered on them.

He then said "you wanna come up here to his office and talk with me?"  Olendzki agreed

and walked to his office.  He admitted that Sudbrink was doing work which should be

done by members of the bargaining unit.  He then said "I gotta do what I gotta do!"  He

further indicated that "Springfield" had told him to do whatever he had to do to keep

things going.  When Olendzki told him he should live up to his earlier promises and order

Sudbrink to stop doing bargaining unit work, Polk refused claiming that he has to do

what he had been directed by Springfield.  Throughout the conversation, Polk was

extremely angry with Olendzki [Olendzki Declaration ¶81].

OLENDZKI'S RELATIONSHIP WITH SUDBRINK

69.    Sudbrink became Olendzki's supervisor the day he moved from the Clinical Services

Unit to the Health Care Unit [Rossi Dep.31, Ex.3].

70.    Quinn worked in the Healthcare Unit.   Sudbrink was her supervisor.  Quinn had frequent

contacts with Sudbrink on a daily basis [Quinn Declaration ¶5, 8].

71.   Almost from the beginning of her employment at JCC, Sudbrink engaged in an ongoing practice of violating the collective bargaining agreement by giving work which was reserved for members of the collective bargaining unit to individuals who were not a part of that unit.  She also directed bargaining unit members to perform work which was supposed to be done by employees of Wexford Corporation.  She did this on a daily basis [Olendzki Declaration ¶34, Olendzki Dep.289-290, Wilkerson Declaration ¶12, 13, 14, Quinn Declaration ¶10].

72.   When Olendzki's office was located in the Health Care Unit between January of 2006 and February 2007, he was in the unit most of the work day.  He was able to observe Sudbrink violating the collective bargaining agreement because it is a small unit [Olendzki Dep.295-296].  It was the first time a Union officer worked in that Unit and could observe the activities of its administrator [Watson Declaration ¶9, Stout Declaration ¶15].

73.   As a member of the Executive Board, it was Olendzki's  responsibility to ensure that the terms of the collective bargaining agreement were followed by the Department.  When he discovered that Ms. Sudbrink was not adhering to the collective bargaining agreement, Olendzki approached her and expressed his concerns.  Olendzki suspected that she was not familiar with the terms of the collective bargaining agreement and he wanted to explain to her of what the agreement provided.  Sudbrink did not like it and ignored what he told her.  She continued to violate the agreement.  Accordingly, on an ongoing basis Olendzki would bring to her attention things she was doing which violated its terms.  This continued throughout the period of time Sudbrink served as the Healthcare Unit

Administrator.  Eventually, grievances were filed against Sudbrink because of her repeated violations of the terms of the collective bargaining agreement.  These grievances were normally sustained in favor of the Union.  Notwithstanding this, she continued to violate the agreement.  When Olendzki raised his concerns with Sudbrink, he attempted to be polite and professional.  Olendzki never spoke to her about personal issues [Olendzki Declaration ¶35, 36, 39, Olendzki Dep.290, 296-297, Wilkerson Declaration ¶15, Sudbrink Dep.88, Watson Declaration ¶10, Stout Declaration ¶13,14].

74.  Olendzki's Union activities angered Sudbrink [Olendzki Dep.260].  Sudbrink was constantly violating the collective bargaining agreement through the assignments she was giving to staff members [Olendzki Dep.260-261].

75.  Sudbrink attended Health and Safety Committee meetings with Olendzki [Sudbrink Dep.85]. At the Health and Safety Committee meeting Olendzki was a representative of the Union.  He made comments at those meeting which upset Sudbrink because they were critical of her [Sudbrink Dep.85-86].

76.  Quinn would frequently observe Olendzki and Sudbrink communicating with one another.  At no time did Quinn ever observe Olendzki say or do things which were improper.  At all times when she observed him communicating with Ms. Sudbrink, he was professional and conducted himself appropriately [Quinn Declaration ¶11, 13].

77.  On August 15, 2006 Kristen Kruzan, another Union representative, and Olendzki met with Sudbrink and the Wexford Corporation Medical Director to discuss contemplated disciplinary action which was going to be taken against Missy Utter, a Union member employed by Wexford Corporation.  As a Union representative, Olendzki also

represented Union members employed by Wexford Corporation.  During the course of that meeting, Sudbrink became very angry and upset [Olendzki Declaration ¶61].

78.    Within the first year of her employment at JCC, Ms. Sudbrink began complaining to Quinn about Olendzki.  Her complaints were never specific.  She accused him of being mean to her and angry at her.  She also complained that he was always bringing up with her union issues.  With the passage of time, these comments on Sudbrink's part toward Olendzki became more and more frequent [Quinn Declaration ¶12].

79.    Sudbrink frequently complained about Olendzki to Rossi.  She complained Olendzki was watching her work and that he was worried she was doing bargaining unit work.   Rossi became tired of dealing with Sudbrink's complaints about Olendzki [Rossi Dep.77-78, 80, Ex.38].  Sudbrink complained about Olendzki because she felt like he was attacking what she was doing [Sudbrink Dep.25].

80.    On several occasions Ms. Sudbrink asked Quinn to read emails written to Sudbrink  by Olendzki.  She indicated that she wanted Quinn to know how he was talking to her. Quinn felt very uncomfortable that she was trying to draw her into a dispute she had with Olendzki [Quinn Declaration ¶23].

81.    Sudbrink complained to her supervisors about Olendzki and even filed a gender discrimination complaint against him claiming his behavior was because of her sex [Sudbrink Dep.32].

82.    Polk wrote an email to Navarro on June 30, 2006.  Prior to that date Sudbrink discussed Olendzki's behavior with Polk.  Polk noted in his email that Sudbrink described a decline in Olendzki's work performance and reluctance to do his duties.  [Sudbrink Dep.35-37,

Ex.2].

83.    In June or July of 2006 Polk sent an email to Navarro asking to refer Olendzki for a
       psychiatric evaluation because of Sudbrink's remarks.  At that time Olendzki and
       Sudbrink were having a lot of problems [Polk Dep.36, 41,72, Ex.2,8].

84.    Sudbrink had reported to Polk that Olendzki exhibited bizarre behavior.  Polk had not
       personally observed such behavior other than on one occasion in May of 2006 when
       Olendzki asked if Polk was recording their conversation [Polk Dep.37].

85.    At no time did Olendzki ever discuss Katie Couric with Sudbrink.  That was not a topic
       he would have discussed with Sudbrink given the nature of their relationship [Olendzki
       Declaration ¶40].   Sudbrink recalls no incidents of bizarre behavior by Olendzki other
       than what she claims he said about Katie Couric [Sudbrink Dep.95-96, Ex.2].

86.    Sudbrink told Polk she was afraid of Olendzki and thought he might do something to her,
       not that he threatened her [Polk Dep.73].  Sudbrink said Olendzki was very belligerent
       and confrontational about things.  Being belligerent and confrontational would be
       violations of the Rules of Conduct and grounds for discipline and would be the basis for
       an Internal Affairs investigation [Polk Dep.74].

87.    Polk acknowledges that there were no incident reports relating to Olendzki that warranted
       a psychiatric evaluation or even discipline [Polk Dep.72, Ex.8].

88.    Olendzki received an email from Sudbrink in June of 2006 that after hours the JCC
       medical director was to be called with all mental health issues.  Prior to that date
       Olendzki was the individual normally called on any after hour emergencies [Olendzki
       Dep.54-55].

89.    In June of 2006 Sudbrink prepared a memo indicating that per Polk the medical director was to be called on all after hours emergencies.  Sudbrink issued a separate memo that indicated the nurses were no longer to call Olendzki for after hour emergencies.  He was not allowed to manage inmates on suicide watch on the weekends.  According to Sudbrink it was Polk's order [Olendzki Dep.56-57, Ex.27].

90.    Following the relocation of his office to the Healthcare Unit, Olendzki normally saw inmates in his office.  In February of 2006 after the incident with the food service supervisor, JCC was on lockdown.  Inmates could not leave their rooms without being escorted by a security officer [Olendzki Declaration ¶37].

91.    While JCC was on lockdown status, Olendzki was required to see two suicidal inmates. At that time, he was suffering from severe pain in his hip whenever he walked.  He requested that the suicidal inmates be escorted to his office so that he could see them in his office.  Olendzki  asked Sudbrink if he could see the inmates in his office rather than seeing them at another location at JCC explaining to her his hip problem.  She immediately denied his request and said if Olendzki was unable to walk that far he should go on medical leave.  At the same time inmates were being escorted to the Healthcare Unit to see the physicians who were providing medical treatment to them [Olendzki Declaration ¶38].

92.    At a September 18, 2006 labor management meeting, Olendzki complained that Sudbrink had ordered Union members who were employed by the Department to perform work which was supposed to be performed by Wexford Corporation in violation of the collective bargaining agreement.  He also pointed out that she continued to perform her

own work which was supposed to be done by members of the collective bargaining unit. Olendzki  also complained that the dentist had not modified his behavior and still presented safety and health risks to inmates and staff.  Polk was in attendance at that meeting [Olendzki Declaration ¶64].

93.    On November 15, 2006 Olendzki received a memo from Rossi informing him that effective immediately he, rather than Sudbrink, would be Olendzki's direct supervisor. Olendzki was informed that he would no longer be a member of the Healthcare Unit staff or entitled to attend staff meetings of the Healthcare Unit.  Throughout his employment with the Department as a psychologist at JCC, Olendzki had normally attended staff meetings of the Healthcare Unit [Olendzki Declaration ¶67].

94.    In order to treat a mentally ill inmate Olendzki needed access to the inmate's medical file.  The charts were maintained in the Health Care Unit and clerical employees in the Unit would pull files for Olendzki prior to the time he was scheduled to see an inmate.  In September of 2008 clerical employees working under the supervision of Becky Sudbrink began refusing to pull his medical files.  Ms. Sudbrink witnessed their refusal, but did nothing to direct them to provide him the medical files.  At the same time, other healthcare professionals scheduled to see patients had the files for their patients pulled. Olendzki was able to observe the files pulled for the dentist, the optometrist, and the physicians [Olendzki Declaration ¶123, Quinn Declaration ¶7].

95.    On October 14, 2008 a psychiatrist following a telepsychiatry session noted in a report that an inmate he was treating had homicidal ideations toward Olendzki.  Because Sudbrink was not providing him with those reports, Olendzki was not informed of those

ideations even though he continued to work around that inmate.  His concerns about his safety at JCC increased as a result of that incident [Olendzki Declaration ¶125].

96.    On November 13, 2008 Becky Sudbrink directed that Olendzki was not to receive copies of telepsychiatry reports.  Earlier, AFSCME and the labor relations unit of the Department directed that psychologists at correctional facilities were to receive those reports.  Psychologists at other facilities received those reports.  The problem to Olendzki in not having access to those reports was he would not be aware of the deterioration in the psychiatric well-being of inmates particularly psychotic inmates.  Not only did this hamper him in performing his duties as a psychologist, but created safety risks for him and other members of the Union [Olendzki Declaration ¶124].

97.    On November 14, 2008 Pillow reported to Stoudt that Sudbrink had complained to him of harassment against her by Olendzki.  She informed him that she could not and would not work around Olendzki any further.  According to Pillow, Sudbrink at that time was quite emotional [Dep.Ex.23].

98.    On April 21, 2008 Sudbrink issued a memorandum indicating that a request for inmate medical charts would have to be made two days in advance of when the chart was needed.  Previously, Olendzki had made a request for inmate charts the afternoon before he was scheduled to meet with the inmates.  Olendzki noticed that the dentist, optometrist, physicians and x-ray technicians were able to request patient charts at the time of treatment [Olendzki Declaration ¶104, 105].

THE HEALTH CONCERNS RELATING TO THE DENTIST

99.    In the summer of 2006 Olendzki was requested by several employees including Vicki

Campbell, a medical records employee,  to address the dentist's lack of hygiene and his inappropriate dental practices.  Olendzki sent a series of emails about the dentist.  He then spoke to the dentist and brought the issues to the attention of Sudbrink and the Safety and Health Committee on several occasions.  The Safety and Health Committee instructed Sudbrink to tell the dentist to use correct sanitary precautions.  The dentist did not comply.  Olendzki then addressed the issues with Rossi.  He continued to receive complaints from staff members.  The dentist would work on inmates without gloves and then in the break room he would use his hand to get ice.  Olendzki continued to document the dentist's noncompliance through incident reports and emails to Sudbrink, Polk and Rossi [Olendzki Dep.279-280, Sudbrink Dep.21-22, Olendzki Declaration ¶53,54, 55,57, 59, Polk Dep.78, Ex.9].

100.    Rossi acknowledged a dentist coming into contact with other individuals after having his hands in an inmate's mouth and still wearing the treatment gown or gloves could have created a health risk.  It was an appropriate issue for any employee or the union to address with management  [Rossi Dep.61-62].

101.    The dentist at JCC worked for Wexford Corporation.  If there was a sanitation issue with the dentist Olendzki would have been the person to bring it to Polk's attention [Polk Dep.78-79, Ex.9].

102.    As a registered nurse, it was Quinn's view that the dentist's practice of not wearing protective garments while treating inmates and then coming to the break room in the same garments  was a very unsanitary practice and one which created health risks to JCC staff, particularly in a break room where employees were consuming food.  Quinn

discussed her concerns in that respect with Olendzki [Quinn Declaration ¶14].

103.   While the problem with the dentist was ongoing, Sudbrink mentioned to Quinn in a
       disgusted tone of voice that Olendzki had raised a union complaint relating to the dentist
       [Quinn Declaration ¶15].

104.   On July 31, 2006 Rossi directed Sudbrink to inform the Healthcare Unit staff that their
       break room was being eliminated [Olendzki Declaration ¶56].   Thereafter, the employee
       break room in the Healthcare Unit was closed.  The microwave, refrigerator and other
       furniture in that room were moved into the hallway.  No reason or explanation was given
       for that particular action.  The break room had been available for use by employees for as
       long as Quinn had worked at JCC [Quinn Declaration ¶16].

105.   Rossi was the assistant warden of programs at JCC in the summer of 2006.  The
       Healthcare Unit was within his area of responsibility.  When she discovered that the
       break room was being closed, Quinn went to Rossi and asked him if she could speak with
       him about the break room being closed.  He responded by saying "you can thank Don for
       that."  He then walked away without discussing the issue with Quinn further [Quinn
       Declaration ¶17].

106.    The dental issues lasted until the dentist left JCC [Sudbrink Dep.22, Olendzki Dep.280].

107.   On August 10, 2006 Cheryl Shelton, another Union representative, and Olendzki met
       with Becky Sudbrink on behalf of two employees.  These employees were working in a
       room which was not properly ventilated.  The working conditions created potential health
       issues for them.  They requested that Sudbrink correct this condition and suggested that a
       microwave oven and coffee machine which were in that room be relocated.  Sudbrink

became angry during the conversation.  She indicated that if the Union pushed this issue

that it "would lose them just like we did the break room."  Olendzki informed her that in

the event the condition was not corrected the Union would take further steps to see that

its members were protected [Olendzki Declaration ¶60].

108.    According to Rossi, Polk made the decision to move Olendzki's office back to the

Clinical Services Unit.  Rossi and Polk discussed it [Rossi Dep.58-59].  Polk made the

decision because Olendzki had issues with the dentist [Rossi Dep.59-60].


OLENDZKI'S REMOVAL FROM NEMAT

109.    NEMAT is the statewide hostage negotiation team of the Department.  Its members

receive four hours of training each quarter [Polk Dep.48-49].

110.    In 2006 Olendzki was one of twenty five employees of the Department that served on

NEMAT.  He had been a member of NEMAT since the early 1990s.  NEMAT responded

to hostage crisis at various correctional facilities operated by the Department.  Members

of NEMAT had received extensive training in hostage negotiations.  Other than attending

hostage crises when called, his commitment to the NEMAT Team in 2006 was limited to

a four hour meeting every three months.  Infrequently, Olendzki would also be asked to

provide some training at the Department's training academy in Springfield, Illinois.  He

served on NEMAT until his removal in September 2006 [Olendzki Declaration ¶45,

Olendzki Dep.64].

111.    In October of 2004 Olendzki attended a hostage crisis drill for NEMAT Team members

at the Vandalia Correctional Center. Olendzki was the most senior member of the team.

He discovered that none of the other team members had been given any assignments [Olendzki Declaration ¶46].

112.    As the drill began, Olendzki's team received a communication from the hostage taker indicating that he was going to kill the hostage.  Under the protocols of NEMAT, this information had to be provided to the command post.  There were no radios, telephones or other means of communication to the command post available.  As the senior member of the team, Olendzki took that information to the command post after consulting with the other members of the team.  When he arrived at the command post, Olendzki explained to the tactical team member who was guarding it the information he wanted to give to the command post.  Olendzki was given permission to enter the command post where he explained the situation.  Olendzki also explained to the individuals in the command post that they had neither telephones, radios nor runners and there was no easy means for communicating with the command post [Olendzki Declaration ¶47].

113.    After that drill, Olendzki was informed that he should not have taken the initiative of informing the command post of the information which had been communicated by the hostage taker.  Although what Olendzki was told seemed to be contrary to the protocols of NEMAT, he agreed to follow this directive in the future.  After that Olendzki never received any further criticism concerning his activities or conduct on the NEMAT Team [Olendzki Declaration ¶48, 49].

114.    Olendzki attended periodic drills, assisted in the training of other negotiators, and participated in the negotiations at a hostage crisis at the Dixon Correctional Center.  Following the incident at the Dixon Correctional Center which occurred in May of 2006,

Olendzki received several complimentary notes including one from Jeff Hooker and

Deputy Director Ron Meek who oversaw the NEMAT Team [Olendzki Declaration ¶49].

115. On May 22, 2006 Rossi sent an email to Polk, Sudbrink and Wendy Navarro complaining

that Olendzki, because of his crisis training and NEMAT activities, did not have enough

time to perform his duties at JCC [Dep.Ex.1].

116. On June 7, 2006 Rossi sent an email to Polk questioning why Olendzki and another

employee at JCC were both involved in NEMAT [Dep.Ex.4].

117. On June 14, 2006 Assistant Warden Michael McKinney sent an email to Polk and Rossi

in which he stated that he thought when they pulled Olendzki's pager he would no longer

be on the NEMAT Team [Dep.Ex.6].

118. On June 21, 2006 Polk sent a memorandum to Hooker asking that Olendzki be removed

from NEMAT.  Polk stated in that message that removing Olendzki from NEMAT would

give him additional time to devote to his JCC caseload.  He also stated that Olendzki no

longer wanted to carry a pager.  He claimed that, with Olendzki's current workload,

being assigned to NEMAT was too stressful for him [Dep.Ex.5].

119. Polk would not have written his email if he did not feel Olendzki should be removed

from the team [Polk Dep.55, Ex.5].

120. While Rossi considered removing Olendzki from his NEMAT duties, he never

considered removing from him other work duties [Rossi Dep.28-29].   Rossi does not

know how often NEMAT had meetings or drills, whether quarterly, monthly or weekly

and he never talked with Olendzki or Lowden about how much time they spent on

NEMAT issues [Rossi Dep.44-45].

121.    Olendzki was informed by Trent Routien that one of his wardens had demanded he be removed from NEMAT.  Later that day Olendzki received a letter from Deputy Director Orr indicating that effective October 1, 2006, he was removed from hostage negotiation responsibilities [Olendzki Dep.64-65].  The memorandum indicated NEMAT was being restructured.  NEMAT required 25 members.  It was not streamlined because while Olendzki was removed, others were added [Olendzki Dep.68-69, Ex.28].

122.    On the morning of September 29, 2006 Olendzki received a telephone call from Trent Routien, the regional coordinator for NEMAT.  Routien informed him that he was being removed from the NEMAT Team because a warden from his facility made a call to have him removed.  At 1:30 p.m. on September 29, 2006 a letter was placed in his mailbox from Deputy Director Rick Orr informing Olendzki that his services as a hostage negotiator for the Department would end on October 1, 2006.  This meant that Olendzki was being removed from both the NEMAT Team and the JCC Hostage Negotiating Team [Olendzki Declaration ¶50, 65, Ex.E to Olendzki Declaration, Olendzki Dep. 77, Ex.28].

123.    Orr's only involvement with NEMAT during his first six years with the Department was his involvement in removing Olendzki from NEMAT [Orr Dep.15].

124.    Polk admitted he played some role in the removal of Olendzki from NEMAT.  Polk felt Olendzki should be removed from NEMAT over the pager incident and other reasons.  While Olendzki said he did not want to carry a pager if he was not required to, he did not refuse to carry a pager [Polk Dep.55-57, Ex.5].  Other than encouraging the removal of Olendzki from NEMAT, Polk did not do anything to allow Olendzki more time to work with inmates [Polk Dep.60].

125.   When Olendzki spoke with Deputy Director Meek a week after receiving notice of his

removal from NEMAT Meek indicated he had to honor the request made by his warden

to remove him from NEMAT [Olendzki Dep.66-67].

126.   On one occasion Orr participated in a telephone conference with Deputy Director Ron

Menk, Wendy Navarro and Jeff Hooker.  The conversation related to Olendzki's

continued involvement on NEMAT.  During that conference, they discussed in part

conduct attributed to Olendzki relating to Katie Couric [Orr Dep.15-19].

127.   Other than removing Olendzki from the NEMAT Team, Orr is aware of nothing else

done in 2006 to streamline or restructure NEMAT [Orr Dep.25].

128.   Three days prior to Olendzki being removed from NEMAT Olendzki participated in a

meeting with Rossi, Sudbrink and John Clegg regarding a terminated employee.  Rossi

became very angry at Olendzki for comments made during the meeting.  Rossi tried to

tell Olendzki he could not speak at the meeting.  Rossi was very angry at Olendzki and

three days later Olendzki was removed from NEMAT [Olendzki Dep.70-72].

129.   At no time during the year 2006 did Rossi or Polk ever complain to him that Olendzki

was not properly performing his duties or completing his duties in a timely manner

[Olendzki Declaration ¶52].

130.   In Olendzki's performance evaluation for the year 2006 Olendzki was rated as

satisfactory in his productivity, quality of work, planning and use of time.  At no place is

he criticized for his failure to complete work [Dep.Ex.37].

131.   In the summer of 2006 Rossi and Sudbrink were concerned with Olendzki's productivity.

Polk was not as concerned.  Polk noted that Rossi and Sudbrink were saying Olendzki

was reluctant to complete his job duties [Polk Dep.61].

132.   According to Polk, Sudbrink and Rossi prepared the performance evaluations for
Olendzki.  Issues about Olendzki's job performance should be documented in the
performance evaluation.  If Olendzki was not completing assignments, his supervisor was
supposed to address that issue with him [Polk Dep.63-64, Ex.5].

133.   Polk never talked with Olendzki about his failure to complete all his job duties or being
removed from NEMAT [Polk Dep.64, Ex.5].

134.   Olendzki enjoyed the work he did on the NEMAT Team.  It was professionally fulfilling
and he felt he was making a valuable contribution to the Department.  In all of the years
Olendzki served on the NEMAT Team he was the only individual who was involuntarily
removed from that Team.  When Olendzki was removed, he was upset because he found
the assignment of the NEMAT Team fulfilling and he felt embarrassed and humiliated
because of his removal [Olendzki Declaration ¶51].

135.   Polk knew that if Olendzki did not have a pager, he could not be on NEMAT [Polk
Dep.64-66, Ex.6].

136.   According to Rossi, Olendzki never refused to carry a pager [Rossi Dep.40].  Olendzki's
pager was taken away based upon Polk's decision [Rossi Dep.40].

137.   Olendzki received an email from Rossi and Sudbrink telling him to turn in the pager.
Olendzki asked with his union representative, Cameron Watson, why he was required to
turn in the pager.  Rossi refused to speak to either of them about that subject [Olendzki
Dep.48].

THE LOCATIONS ASSIGNED TO OLENDZKI TO SEE MENTALLY ILL PATIENTS

138.   The Clinical Services Building also houses the Health Care Unit [Olendzki Dep.10-11].
       Normal quitting time for employees in that unit is 4:00 p.m.  Olendzki could be seeing
       inmates any time of day [Rossi Dep.70].  On many occasions when he was assigned to
       the Clinical Services Unit Olendzki was alone in the building with inmates [Olendzki
       Dep.299-300, Pillow Dep.39-41].

139.   The doors to the Clinical Services Unit are always locked.  Most correctional officers do
       not have the keys to open the Clinical Services Unit door.  The Health Care Unit and
       segregation unit security officers would not have keys to Clinical Services Unit. The only
       way a segregation or Health Care Unit security officer could enter Clinical Services Unit
       was if a staff member was present to unlock or open the door [Rossi Dep.71-72].

140.   It was the practice of the Department to transport new inmates to correctional facilities
       each Wednesday.  Typically, new inmates would arrive at JCC late Wednesday
       afternoon.  One of Olendzki's tasks was to make a mental health assessment of newly
       arrived inmates upon their arrival.  On Wednesdays Olendzki would not leave work until
       6:00 p.m. or later.  In order to do the mental health assessments for these inmates,
       Olendzki  would see them in the Clinical Services Unit.  Between 4:00 p.m. and the time
       Olendzki left JCC for the day, there would be no one other than himself and the inmates
       in the Clinical Services Unit.  When Olendzki saw the inmates, he knew nothing about
       their criminal record or mental health history.  He had no access to security protection
       when these inmates were present [Olendzki Declaration ¶111, Rossi Dep. 64-65, Ward
       Dep.21-22, Pillow Dep.39, Polk Dep.13-14].].

141.   Olendzki communicated frequently with psychologists employed by the Department at

other correctional facilities.  He also attended meetings in which psychologists at other facilities are in attendance.  He was aware that in 2006, 2007 and 2008 it was not common for psychologists at correctional facilities of the Department to see inmates suffering from psychiatric conditions in a location in which security was not available to them [Olendzki Declaration ¶74].

142.  While Wilkerson worked at JCC, she worked in the Healthcare Unit.  Immediately adjacent to the Healthcare Unit was the Clinical Services Unit.  The Healthcare Unit would have on a regular basis inmates visited who are in need of medical treatment.  Because inmates regularly visited that unit, there was a correctional officer placed in that unit to provide security [Wilkerson Declaration ¶9].

143.  Unlike the Healthcare unit, the Clinical Services Unit normally did not have inmates other than those who visited the psychologist when he was assigned to that unit [Wilkerson Declaration ¶10].

1st OFFICE MOVE

144.  Olendzki's office was located in the Clinical Services Unit from 1989 through 2005 [Olendzki Dep. 12-13, 84].

145.  When Olendzki started working at JCC most inmates were within six months of release and relatively healthy.  Olendzki would deal with minor adjustment reactions, nervousness and anxiety.  Presently, JCC houses inmates serving eight years or less.  It is a high minimum security prison [Olendzki Dep. 13-14].

146.  In early 2006 Olendzki requested his office be moved to the Health Care Unit.  Olendzki expressed to Rossi that the inmate population had changed at JCC and the inmates were

more dangerous.  There were 300 murderers and class x offenders at Jacksonville.  Also, it was inefficient for Olendzki to lock his office 20 to 30 times a day in order to go to Health Care Unit to get files, consult with nurses and doctors.  To obtain inmate medical files Olendzki would lock his office, exit the Clinical Building and walk 40 feet to the Health Care Unit.  Rossi granted the request.  At that time Olendzki got along well with him [Olendzki Dep.84-86, Watson Declaration ¶8, Rossi Dep.55-56, Olendzki Dep.85-86, 88].

2nd OFFICE MOVE FEBRUARY, 2007

147.  At the direction of Rossi, Olendzki's office was relocated out of the Healthcare Unit.  The only explanation given for that action was that his office was needed for other purposes.  At all times after he was removed, there remained available space in the Healthcare Unit for him [Watson Declaration ¶12]

148.  On February 1, 2007 Mr. Rossi directed that Olendzki would begin seeing mentally ill inmates in the operations conference room at JCC.  He was given no reason for the move [Olendzki Dep.297, Polk Dep.68].   Up to that point in time, Olendzki had seen patients in the Healthcare Unit where a security officer was present.  Seeing patients in the operations conference room afforded him less security protection than he had in the Healthcare Unit.  Security officers were more distant from the operations conference room and not as responsive as the security officer assigned to the Healthcare Unit.  It was also extremely inconvenient for Olendzki to see inmates in the operations conference room which was located several hundred yards from the Clinical Services Unit.  The Healthcare Unit was next door to the Clinical Services Unit.  In order to see mentally ill

inmates in the operations conference room, each day Olendzki had to first go to the Healthcare Unit, secure each inmate's file, pack those files in a cart along with his dictaphone, appointment book, log book, forms he might need and move the cart to the operations conference room. The office Olendzki had occupied in the Healthcare Unit was unoccupied and he could have seen inmates in that location. No explanation was ever given to him why he could not see patients in the Healthcare Unit. Seeing mentally ill inmates in the operations conference room caused him to spend much more time each day than if he had seen those inmates in the Healthcare Unit [Olendzki Declaration ¶72, Olendzki Dep.94-95, 100, Ward Dep. 21, 24].

149.    Being in the Health Care Unit was very efficient for Olendzki and a security guard was present at all times. Rossi had recognized the dangerousness of the inmates and authorized the security guard to handcuff any inmate Olendzki requested him to handcuff [Olendzki Dep.90].

150.    When Olendzki worked in the Clinical Services Unit the only security protection available was a radio or phone [Rossi Dep.70, Ward Dep.28]. The radio assigned to him frequently did not work [Olendzki Dep.124].

151.    On March 13, 2007 Olendzki saw a mentally ill inmate in the operations conference room. The inmate indicated his voices were telling him to kill Olendzki. The behaviors and comments made by the inmate during that meeting created what Olendzki believed was a risk to his safety. He attempted to call security, but was unsuccessful in reaching a security officer. As the inmate was becoming more agitated, Olendzki had to walk around him, open the door and then yell for a security officer. Eventually, a security

officer arrived [Olendzki Declaration ¶73, Olendzki Dep.95].

152.   At some point between February and June 2007 Polk emailed Olendzki asking if there

was an office available for Olendzki to use.  Olendzki responded that Rossi had him

seeing inmates in the Operations Building.  Polk responded that he would get back to

Olendzki.  However, he never did [Olendzki Dep.100-101].  At this time Olendzki's

former office in the Health Care Unit was available.  However,  he was not allowed to

use it [Olendzki Dep.101, 103].

3RD OFFICE MOVE JUNE 15, 2007

153.   His Union threatened to file a grievance if Olendzki was not returned to his old office in

the Healthcare Unit.  In the wake of that threat, Rossi agreed in June of 2007 that

Olendzki could move back to his old office in the Healthcare Unit which had always

remained empty [Olendzki Declaration ¶75].  Rossi indicated the move had to be quiet

because Sudbrink did not want Olendzki in the Health Care Unit and Rossi did not want

to upset her [Olendzki Dep.97, 103, 112].

4th OFFICE MOVE APRIL 4, 2008

154.    In April of 2008 Olendzki's office was moved from the Health Care Unit to Clinical

Services Unit.  Stoudt made the decision to move Olendzki's office [Pillow Dep.24].

155.   The day before the move Olendzki was involved in contract negotiations out of town.

Sudbrink called him at 7:30 a.m. and demanded that he prepare a triage list for a

telepsychiatry clinic the next day.  Olendzki said he could not do so and offered to return

to the institution that evening to prepare the list.  Only six patients would be seen out of

the 70 or so that needed care.  Sudbrink refused saying she would not pay him overtime.

She became very upset and claimed he was obstructive.  Quinn was present in the
Healthcare Unit when Ms. Sudbrink talked with Olendzki by telephone and could hear
that Sudbrink was attempting to secure from Olendzki the names of inmates who might
be suitable to be seen for a telepsychiatry session that apparently was to take place on the
following day.  During this conversation, Sudbrink became angry and her face became
extremely red.  It was apparent to Quinn that she was upset with Olendzki.  Because
Quinn was the nurse assigned to the psychiatric clinic, she thought she might be helpful
and asked if she could speak with Olendzki. Quinn asked Olendzki if there was anything
she could do to help with the situation.  Olendzki was quite calm.  He indicated to her
that he did not have any notes or records with him and that it was difficult for him to
identify inmates from memory who should go to the telepsychiatry session.  They were
able to work through a plan that might satisfy Sudbrink.   There was nothing about what
Olendzki said or the way he said it which Quinn believed was improper [Olendzki
Dep.104-107, 110, 112, Olendzki Declaration ¶89, 90, Quinn Declaration ¶19, 20].

156.  After the telephone conversation concluded, Ms. Sudbrink directed Quinn to prepare an
incident report concerning that telephone call.  Quinn explained to her that she only heard
her part in the conversation and noticed nothing which was unusual or improper about
what Mr. Olendzki said.  Quinn questioned whether it was proper for her to submit an
incident report.  Sudbrink told Quinn that she was giving her a direct order to prepare the
incident report.  Quinn prepared an incident report at her direction [Quinn Declaration
¶21].

157.  Following her telephone conversation with Olendzki on April 3, 2008, Sudbrink

submitted an incident report concerning that conversation [Dep.Ex.13].

158.    On April 4, 2008 Stoudt ordered Olendzki to immediately move his office back to the
        Clinical Services Unit.  She gave him less than four hours to pack his office equipment
        and belongings and complete the move  [Olendzki Dep.104-107, 110, 112, Olendzki
        Declaration ¶90].

159.    Rossi refused all requests to explain why Olendzki was moved to the Clinical Services
        Unit.  No doctor was coming to Health Care Unit and there was no tele psych in the
        Health Care Unit at that time [Olendzki Dep.89].

160.    After his office was moved Olendzki contacted Stoudt about his security concerns [Ward
        Dep.28-29].   There was no security officer assigned to the Clinical Services Unit and
        both Olendzki and Chief of Security Major Lowe thought it was unsafe for him to work
        there [Olendzki Dep.92-93, 99].

161.    On July 8, 2008 Olendzki saw a psychotic inmate in the Clinical Services Unit.  He
        complained of hearing voices telling him to do bad things.  Olendzki contacted Major
        Woods and requested a security officer.  It took approximately five minutes before
        security protection arrived to take custody of the inmate.  On  July 9, 2008 Olendzki saw
        inmates in his office in Clinical Services Unit without a security officer present.  He
        submitted an incident report requesting that security be afforded to him when he saw
        mentally ill inmates.  Olendzki received no response to that incident report [Olendzki
        Declaration ¶118].

162.    On July 23, 2008 Olendzki prepared an additional incident report about performing
        psychological evaluations on newly arrived inmates when no one else was present in the

Clinical Services Unit.  Olendzki asked that a security officer be present when he saw

mentally ill inmates.  Olendzki received no response to that incident report [Olendzki

Declaration ¶121].

163.    At labor management meetings in the spring and summer of 2008, the Union and

Olendzki verbalized the concerns to Stoudt about Olendzki working alone in the Clinical

Services Unit with inmates who were delusional and dangerous as well as demanding

JCC management bargain over the implementation of telepsychiatry.  Olendzki had also

documented his concerns in various incident reports he filed.  In both his incident reports

and in his comments to Stoudt, Olendzki requested the presence of a security officer

when he saw inmates, particularly on Wednesdays.  His concerns were ignored [Olendzki

Declaration ¶113, 116].

164.    Prior to the relocation of his office in April of 2008, Olendzki saw inmates in need of

mental health treatment in the Health Care Unit where adequate security was present.

Upon his relocation to the Clinical Services Unit, he was afforded no security protection.

Upon moving back to the Clinical Services Unit, Olendzki requested that he be provided

with security protection when he saw mentally ill inmates.  In response to that request,

Olendzki received an email from Major Lowe informing him that he could see inmates in

several vacant offices in the Health Care Unit.  Lowe did not have the authority to allow

him to see inmates in the Health Care Unit.  He also did not have a key that would give

him access to those offices [Olendzki Declaration ¶106, 109].

165.    Shortly after receiving the email from Major Lowe, Olendzki was informed by Pillow

that Stoudt had given an order that he would see inmates in need of mental health

treatment in the Clinical Services Unit and would not be provided security.  The individuals who worked in the Clinical Services Unit in addition to himself consisted of the Assistant Warden of Programs, the casework supervisor, the field services counselor and several clerical employees.  Normally, the workday in the Clinical Services Unit ended at 4:00 p.m.  Olendzki informed Pillow that he felt the Warden's order created an unnecessary danger for him given the types of inmates Olendzki was seeing.  His concern was ignored by Pillow [Olendzki Declaration ¶110].

166.   On 3 or 4 occasions in the spring and summer of 2008, a newly arrived inmate would make comments that suggested he was psychotic.  These comments often involved voices telling them to harm someone.  On a number of occasions when this occurred, Olendzki would call security to request assistance.  Security officers did not have a key to Clinical Services Unit and had to await the arrival of a lieutenant to unlock the door [Olendzki Declaration ¶112].

167.   In the late summer of 2008 Olendzki worked out an arrangement with Major Bigelow in which he would assign a correctional officer to provide Olendzki security on Wednesdays when no one else was in the Clinical Services Unit.  Prior to that time, Olendzki had documented a number of incidents in which an inmate he was seeing either threatened or made delusional comments which indicated he was dangerous [Olendzki Declaration ¶114].

168.   Between April of 2008 when his office was reassigned to the Clinical Services Unit and the late summer of 2008 when Olendzki was finally provided with some security protection, there was a vacant office in the Health Care Unit where he could have seen

inmates.  At all times there was a security officer assigned to that unit [Olendzki Declaration ¶115].

169.  To see new inmates on Wednesdays when his office was located in Clinical Services Unit, Olendzki locked and left his office.  He then walked to the Health Care Unit to secure the inmate's medical chart.  He then escorted the inmate to the Clinical Services Unit and unlocked the door to his office.  Olendzki would look at the glass in his door to make sure the inmate would not be ready to attack him.  Olendzki would then interview the inmate [Olendzki Dep.123-124].  After completing his interview with an inmate Olendzki then escorted the inmate back to the Health Care Unit and would escort another inmate for the next interview [Olendzki Dep.123].

170.  Olendzki received direct orders from Pillow and Stoudt that he was to see patients without security from 4 p.m. to 6 p.m. on Wednesdays.  It was included in the order that Olendzki was not to have security in the Clinical Services Unit.  Each time Olendzki followed the order he prepared an incident report documenting the safety issue and renewed his request that security be present [Olendzki Dep.113-115, 117, 118-120, Ex. 29].  Pillow felt Olendzki's security concerns were legitimate [Pillow Dep.41-42].

171.  On nine different occasions Olendzki requested security in his written reports.  He does not know how many oral requests for security he made [Olendzki Dep.121, Ex.29].

172.  While counselors, assistant wardens and clerical staff have contact with inmates Olendzki's contact with inmates was primarily with those who had mental health issues [Ward Dep.29-30].  An inmate with psychotic or who is delusional is more dangerous than an inmate with no psychiatric problems [Ward Dep.30].

173.   Olendzki's old office remained empty during the entire period Olendzki was in Clinical Services Unit [Olendzki Dep.298].

174.   When an inmate was participating in telepsychiatry no one was in the room with him but security was present.  When Olendzki saw the same inmates in the Clinical Services unit he had no security [Olendzki Dep.300-301].

175.   Before telepsychiatry began a psychiatrist came to JCC at least monthly [Pillow Dep.11, Polk Dep.16].   When a psychiatrist saw inmates security was present.  Pillow is not aware of a psychiatrist ever seeing inmates at any time without security present [Pillow Dep.11-12].  Telepsychiatry started in the Clinical Services Unit [Olendzki Dep.300].

TELEPSYCHIATRY AT JCC

176.   Telepsychiatry is a means of providing psychiatric services by a psychiatrist through video. Wexford Corporation provided health care and psychological services to the Department at JCC.  The psychiatrist is located at another facility and treats the inmate by television [Ward Dep.13, Pillow Dep.9-10, 12, Olendzki Declaration ¶96].

177.   In the late summer or early fall of 2007 the Department initiated a plan to implement telepsychiatry at JCC.  Under the telepsychiatry program, a psychiatrist would be at a location remote from JCC and would see a mentally ill inmates by television.  When that program was announced, Olendzki on behalf of the Union began requesting that JCC begin to bargain about issues relating to the implementation of that program insofar as it would effect bargaining unit members and the work which would be done by Wexford Corporation employees.  As an officer of the union Olendzki raised most of the telepsychiatry issues. These requests were ignored [Olendzki Declaration ¶78, 79,

Sudbrink Dep.94, Pillow Dep.22-24].

178.     The Union was concerned whether inmates should receive treatment through

telepsychiatry.  If they did not receive proper care it could create a safety risk. An inmate

could be a danger to the staff if he was not receiving appropriate psychiatric care [Ward

Dep.17-19].

179.     In the early spring of 2008 the Department and its medical provider, Wexford

Corporation began a psychiatry program at JCC.  Because of some problems in the

delivery of that service, Warden Stoudt terminated it until those problems could be

corrected [Olendzki Declaration ¶96].

180.     On February 27, 2008 Sudbrink sent an email to Pillow and Healthcare Unit staff

members concerning procedures she and Pillow had developed regarding the

telepsychiatry program.  Although Olendzki had consistently been requesting on behalf

of the Union that they engage in bargaining over the implementation of that program,

they did not share that email either with him or any other representative of the Union

[Olendzki Declaration ¶86].

181.     On March 7, 2008 the Union filed a class wide grievance because of the continuing

refusal to bargain over the implementation of the telepsychiatry program and the actions

of Sudbrink in eroding the bargaining unit.  Stoudt was informed at that time of the

Union's demand to bargain over the implementation of the telepsychiatry program

[Olendzki Declaration ¶87].

182.     At the March 24, 2008 labor management meeting, Olendzki again reported the safety

risks associated with inadequate precautions being taken in dealing with mentally ill

inmates and the failure of management to bargain over the implementation of the telepsychiatry program [Olendzki Declaration ¶88].

183.  On April 9, 2008 at a safety and health committee Olendzki, on behalf of the Union, expressed a concern about the implementation of the telepsychiatry program.  The Union's concern was that the Wexford Corporation psychiatrist was not versed in Department policies.  As a consequence, he approved the assignment of a mentally ill inmate to a satellite work camp.  Because of the inmate's condition, he was a danger to Union members assigned to that work camp.  At that time, Rossi served as the Chairperson of the Safety and Health Committee [Olendzki Declaration ¶97].

184.  On April 10, 2008 Assistant Warden Rossi sent Olendzki an email informing him that he was refusing to discuss telepsychiatry issues at safety and health committee meetings which the Union had requested be included on the schedule [Olendzki Declaration ¶98].

185.  On January 26, 2009 Olendzki returned from his medical leave.  At that time, he was not provided any information concerning when telepsychiatry sessions would occur.  Olendzki was also removed from the responsibility of triaging inmates for telepsychiatry sessions.  He made written requests for information relating to when telepsychiatry sessions would occur and what, if any, responsibilities he was to have for those sessions.  Those emails were sent to both Pillow and Sudbrink.  Olendzki received no responses to his emails from either of them [Olendzki Declaration ¶127].

186.  On February 11, 2009 Olendzki received a telephone call from Assistant Warden Pillow.  He was extremely angry.  He indicated that the Health Care Unit had not received information from him which it needed to schedule inmates for a telepsychiatry session.

Olendzki explained to him that he had sent earlier emails asking for clarification concerning his role in telepsychiatry.  Olendzki also explained to him that he was never informed when telepsychiatry sessions occurred.  Pillow indicated to Olendzki that he had spoken with Sudbrink and she informed him that she had given Olendzki all the information he needed.  Olendzki explained to him that this was not true.  Pillow angrily accused Olendzki of being an obstructionist [Olendzki Declaration ¶128].

## SUDBRINK'S HARASSMENT COMPLAINTS AGAINST OLENDZKI

187.   Sudbrink and Olendzki had issues before Pillow arrived at JCC.  Sudbrink had previously told Pillow she felt harassed by Olendzki.  When Pillow told her to put her concerns in an incident report, she started writing incident reports [Pillow Dep.33-34].

188.   Pillow told Olendzki that someone had complained he harassed them.  Pillow had called Olendzki into his office to inform him of the allegations.  He would not tell Olendzki who made the complaint or what the allegations were [Olendzki Dep. 157-158, Pillow Dep.26-28, Ex.16].

189.   Olendzki later learned from Pillow that Amanda Tomhave and Sudbrink had filed complaints against him [Olendzki Dep.158].

190.   On April 4, 2008 Pillow informed Olendzki that a complaint had been made against him alleging that he had harassed and intimidated another employee.  When Olendzki indicated to him that he felt that this involved potential discipline and felt he should have a Union representative present, Pillow denied Olendzki that right.  During their conversation, Pillow refused to tell Olendzki who made the complaint or any of the specifics of the complaint.  He did indicate that the complaint did not allege sexual

misconduct.  When Olendzki asked him what it was that he allegedly did, he would not

respond.  When Olendzki asked him what behavior Pillow wanted him to change, he

would not answer.  He stated "you just need to be aware that a complaint has been made

against you.  The Warden will decide what to do with you." [Olendzki Declaration ¶91].

191.   On August 10, 2009 Olendzki was informed that Sudbrink had filed a harassment

       complaint against him.  No details were shared with Olendzki concerning the complaint

       other than that she alleged that he had harassed her and she felt physically threatened.

       Olendzki was also told the date of the incident [Olendzki Declaration ¶131].

192.   Olendzki had very little contact with Sudbrink because of the earlier complaints she had

       made against him.  He was aware of the incident which occurred on the date she alleged

       she was harassed.  On that date, he needed an inmate medical file.  The file was in

       Sudbrink's office.  He stuck his head in her doorway and asked her if she was finished

       with the file and, if so, could he have it because he needed to see that inmate.  She

       provided Olendzki with the file.  The encounter lasted no more than a few seconds.

       Olendzki neither raised his voice with her nor said anything of a threatening nature to her

       [Olendzki Declaration ¶132].

OLENDZKI'S RELATIONSHIP WITH STOUDT AND PILLOW

193.   At approximately 1:30 p.m. on April 4, 2008 Pillow came to Olendzki's office.  He

       handed Olendzki what appeared to be a quickly prepared handwritten list of tasks that he

       wanted Olendzki to perform "asap."  The list essentially consisted of busy work, some of

       which had been done earlier.  Olendzki had never before been provided a list of that type.

       Olendzki promised Pillow that he would get him the information he requested as soon as

reasonably possible, but Olendzki first had to complete a telepsychiatry list and move his office as directed by Stoudt.  At some point during that meeting, Pillow pointed his finger at Olendzki and yelled "I want this done as soon as possible." [Olendzki Declaration ¶92].

194.    At 3:15 p.m. on April 4, 2008, Olendzki was informed that his previously approved time off slips to attend collective bargaining negotiating sessions had been rescinded by Stoudt [Olendzki Declaration ¶93].

195.    On April 7, 2008 Olendzki received two xerox copies of time off slips that had originally been approved by Pillow on March 17, 2008.  Stoudt checked "disapproved" and had written "operational need."  She dated her signature as March 17, 2008.  Olendzki had previously received his time sheet from the timekeeper indicating that his time off request was approved.  Olendzki would not have received that sheet from the timekeeper if Stoudt on March 17, 2008 had disapproved his time off slip [Olendzki Declaration ¶94].

196.    Repeatedly, in late 2007 and into the year 2008, Olendzki and other Union officials requested of Pillow that JCC negotiate with the Union concerning the implementation of the telepsychiatry program.  He consistently refused the Union's requests [Olendzki Declaration ¶101].

197.    In the spring of 2008 JCC had not developed any policies for the implementation of the telepsychiatry program.  Among other things, there was no delineation between work that was supposed to be performed by Wexford Corporation employees and work which was to be performed by JCC employees.  On behalf of the Union, Olendzki consistently reminded Pillow of the lack of policies, the problem of assigning Wexford Corporation

work to bargaining unit employees of the Department and the refusal of JCC management to negotiate with the Union concerning the implementation of the telepsychiatry program.  Pillow would become angry when these requests were made of him [Olendzki Declaration ¶102].

198.   On April 11, 2008 Olendzki was summoned to Pillow's office.  When he arrived at Pillow's office, Pillow was extremely angry with Olendzki.  He directed that Olendzki perform two tasks related to the telepsychiatry program.  Olendzki was aware that under the contract between Wexford Corporation and the Department those tasks were to be performed by Wexford Corporation employees, not employees of the Department.  He informed Pillow of his understanding in that respect.  Pillow became even angrier.   He pointed his finger at Olendzki and said he was giving Olendzki a direct order.  Olendzki indicated to him that he would follow his order but would also file a grievance because he was assigned work which was not within the scope of work that was to be performed by employees of the Department.  He angrily accused Olendzki of being obstructive with respect to the implementation of the telepsychiatry program [Olendzki Declaration ¶103].

199.   On May 24, 2008 Ben Tomhave, a correctional officer at JCC, made comments to Olendzki in the parking lot which he felt were threatening.  On June 12, 2008 Olendzki sent Stoudt an email asking for help concerning a workplace safety concern.  Specifically, he was concerned about the incident with Office Tomhave.  He asked to meet with her to discuss this concern.  Stoudt responded by sending Olendzki an email the following day telling him that he should reduce his concern to an incident report.  He responded to her by informing her that he had already submitted an incident report.

Stoudt responded to his email by indicating that she had seen an incident report from both himself and a witness to the Tomhave incident.  She ignored his request for a meeting [Olendzki Declaration ¶117].

200.    On July 16, 2008 the Union informed Stoudt that it was going to hold an informational picket on July 18, 2008 because of dangerous working conditions at JCC and the lack of any response from management.  One of the incidents giving rise to that informational picket was an attack by an inmate on the wife of Cameron Watson, the Union president.  Mrs. Watson, at that time, was a correctional officer and a member of the bargaining unit.  Because of her involvement, Olendzki  assumed primary responsibility for that informational picket [Olendzki Declaration ¶119].

201.    On either the day Stoudt was notified of the informational picket or the following day, she issued an order restricting the ability of security officers to secure any benefit time away from work.  At no time prior to being informed of the picket had Stoudt indicated to the Union either at a labor management meeting or otherwise of the need to restrict correctional officers ability to take benefit time [Olendzki Declaration ¶120].

202.    At the labor management meeting on July 28, 2008 Olendzki took the lead in addressing on behalf of the Union the dangerous working conditions at both JCC and its satellite work camps and the refusal of management to take steps to better protect security officers from dangerous inmates.  Olendzki pointed out recent incidents where a correctional officer was assaulted or placed in risk of danger at the hands of an inmate.  Stoudt stated that she was not going to discuss that issue.  Olendzki indicated to her that it was an extremely dangerous condition which needed to be addressed.  Stoudt directed Olendzki

to leave the meeting.  Olendzki indicated that this was a labor management meeting and that as a spokesman of the Union he was entitled to be present.  At that point she angrily concluded the meeting and directed her management team to leave with her [Olendzki Declaration ¶122].

203.    On November 25, 2008 Olendzki was scheduled to undergo knee replacement surgery.  During the period he was away on leave, some medical complications arose which necessitated Olendzki being away from work for a longer period of time.  He made a written request to use a ten day advance of sick leave time.  There is a provision in the collective bargaining agreement governing his employment allowing for such advances.  During the period that Olendzki was employed at JCC when an individual was away from work for bonafide medical reasons, the Department would routinely grant those requests.  Stoudt forwarded his request to the Department with her comments that she had no written justifications for the advanced leave time.  Her statements were inaccurate.  Olendzki had provided her with medical information justifying the request.  Because of Stoudt's comments, his request was denied.  During his years with the Department, Olendzki had never abused sick leave nor placed upon proof status with respect to taking sick leave [Olendzki Declaration ¶126].

204.    In March of 2009 Olendzki became aware that there had been significant revisions in the institutional directives at JCC pertaining to his role as a psychologist.  Those directives apparently had become effective on November 1, 2008.  Olendzki was never informed of the changes in the directives or provided a copy of those directives.  When he asked Pillow who authored the changes in the institutional directives, he smiled at Olendzki and

refused to answer his question [Olendzki Declaration ¶129].

205.    After Pillow became the acting Warden, he presided on behalf of management at labor management meetings. On October 19, 2009 Pillow angrily informed Olendzki that he was not allowed to speak at those meetings. Instead, his role was to take notes of the meetings. As an Executive Board member, Olendzki was entitled to address concerns on behalf of the Union [Olendzki Declaration ¶133].

## MENTAL HEALTH NURSE

206.    All of the chronic clinics in the Health Care Unit have a designated nurse [Olendzki Dep. 248].

207.    At one time in the Health Care Unit there was a nurse referred to as the mental health nurse [Rossi Dep.82]. The nurse served as a liaison between Olendzki and the Health Care Unit in monitoring the inmates. She kept track of follow-ups with doctors, monitored medications, handled any medication problems or renewals, and was familiar with the case load. The daily contact was important [Olendzki Dep.250-251, 256, Sudbrink Dep.51-53, 56].

208.    On August 11, 2008, Sudbrink sent an email that there would no longer be a designated mental health nurse and Sudbrink removed Quinn from being the dedicated mental health nurse [Sudbrink Dep.65-67, [Olendzki Dep.248-249]. She never assigned a new nurse to assist Olendzki [Sudbrink Dep.67].

209.    The removal of the mental health nurse gave Olendzki more work which prevented him from doing his primary duties [Olendzki Dep.259].

## CHANGES IN THE INMATE POPULATION AT JCC

210.    When a psychiatrist saw inmates at JCC in the Health Care Unit security was always present.  A correctional officer was not assigned to Clinical Services Unit [Rossi Dep.66-67].

211.    For many years during Olendzki's employment at JCC, the inmate population consisted of non-violent offenders who were approaching the end of their incarceration with the Department.  Very few of those inmates suffered from serious mental health disorders.  Most of the inmates in need of mental health services were suffering from either anxiety disorders or depression.  These inmates were not dangerous [Olendzki Declaration ¶107, Wilkerson Declaration ¶6].

212.    By early 2008 there had been a dramatic change in the inmate population at JCC in two respects.  First, there were a significant number of violent offenders who still had up to eight years of incarceration time with the Department.  Second, the number of inmates suffering from mental health disorders had increased fivefold.  Many of these inmates were delusional or psychotic and suffered from serious mental health disorders [Olendzki Declaration ¶108, Wilkerson Declaration ¶7, Quinn Declaration ¶22].

213.    Olendzki is responsible for the mental health care of 1600 inmates at JCC and its two work camps.  The percentage of mentally ill inmates has increased with respect to the general population [Olendzki Dep.16-17].  The prisoner population has become more dangerous over the years.  The number of mentally ill inmates has increased dramatically.  At one time Olendzki had around 15 inmates on some form of antidepressant medication to now over 100 inmates on medication, many of whom are psychotic [Olendzki Dep.15, Wilkerson Declaration ¶8].

214. Prior to 2005 or so Olendzki was not meeting with inmates as dangerous as the ones he met with after 2005.  Prior to 2005 he did not work 4 p.m. to 6 p.m. on Wednesdays [Olendzki Dep.124].

215. Until making his assessment Olendzki did not know about the inmate's mental health history [Olendzki Dep.299].

OLENDZKI'S REACTIONS TO THE TREATMENT EXTENDED TO HIM

216. In 2006 two incidents occurred in connection with his employment for the Department which were upsetting to Olendzki.  The first occurred in February of 2006 when a female staff member at JCC was attacked by an inmate in the food service unit.  The second occurred in May of 2006 when a colleague of Olendzki was taken hostage and assaulted by an inmate at the Dixon Correctional Center.  Both of these incidents were upsetting to Olendzki.  However, his upset was not debilitating.  Olendzki was able to continue working regularly [Olendzki Declaration ¶135].

217. Olendzki's upset from the above incidents became pronounced in the late summer and early fall of 2009 over three years after the 2006 incidents [Olendzki Declaration ¶136].

218. In the fall of 2009 Olendzki became a patient of Obul Reddy, M.D., a Springfield psychiatrist.  He had been developing some symptoms which caused him to believe that he needed to be seen by a mental health professional.  He was hypervigilant and had an excessive startle response.  He was very anxious all the time and especially at the end of the weekends about returning to work.  He had difficulty sleeping.  Olendzki was withdrawn around family members and friends.  He was tearful often at inappropriate times.  He would constantly think and obsess about what was happening to him at JCC

[Olendzki Declaration ¶134].

219.    In January of 2010, based upon the recommendations from Dr. Reddy, Olendzki took a

medical leave of absence from the Department.  He remained away from work until

February 1, 2011 when Dr. Reddy authorized his return to work.  His leave of absence

was necessitated because of the symptoms Olendzki was experiencing that are more fully

described above [Olendzki Declaration ¶137].

### III.  STANDARDS WHICH ARE APPLICABLE<br>IN A SUMMARY JUDGMENT PROCEEDING

Rule 56 of the *Federal Rules of Civil Procedure* provides that a motion for summary

judgment shall be granted only if the pleadings, depositions, answers to interrogatories and

admissions on file together with affidavits, if any, show that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law [*Celotex v. Catrett*,

477 U.S. 317, 91 L.Ed.2d 265 (1986)].

Summary judgment is only appropriate when the record reveals that no reasonable jury

could find for the non-moving party [See *Karazanos v. Navistar International Transportation

Corp.*, 948 F.2d 332 (7th Cir.1991); *Konowitz v. Schnadig Corporation*, 965 F.2d 230 (7th Cir.

1992); *Anderson v. Stauffer Chemical Company*, 965 F.2d 397 (7th Cir.1992); and *McCoy v.

WGN Continental Broadcasting Company*, 957 F.2d 368 (7th Cir.1992)].

Summary judgment is proper if there is no reasonably contestable issue of fact which is

potentially outcome determinative.  At the same time, however, Rule 56 was not intended to

permit a summary judgment proceeding as a substitute for a trial [*Wallace v. SMC Pneumatics,

Inc.*, 103 F.3d 1394, 1396-97 (7th Cir.1997)].

In a summary judgment proceeding the facts and inferences drawn from underlying facts must be viewed in a light most favorable to the party opposing the motion [See *United States v. Diebold, Inc.*, 369 U.S. 654, 8 L.Ed.2d 176, 82 S.Ct. 993 (1962); and *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 89 L.Ed.2d 538, 106 S.Ct. 1348 (1986)].

At the summary judgment stage of a case it is not the court's function to weigh the evidence and determine the truth of the matter, but instead to determine whether there is a genuine issue for trial.  A Court should not determine whether the evidence unmistakably favors one side or the other, but to instead determine whether a fair minded jury could return a verdict for the party opposing the motion on the basis of the evidence presented [See *Anderson v. Liberty Lobby, Inc.* (op.cit.1985); and *Shager v. Upjohn Company*, 913 F.2d. 398 (7th Cir.1990)]. If evidence is subject to conflicting interpretations or if reasonable people might differ as to its significance summary judgment must be denied [See *Egger v. Phillips*, 669 F.2d 497 (7th Cir. 1982); and *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir.1992)].

Summary judgment is often not appropriate in cases involving claims of discrimination where motive or intent are at issue [See *Stumph v. Thomas Skinner, Inc.,* 770 F.2d 93 (7th Cir. 1985); *Bartman v. Allis-Chalmers Corporation*, 799 F.2d 311 (7th Cir.1986); and *McCoy v. WGN Continental Broadcasting Company* (op.cit.1992)].  In the area of employment discrimination intent and credibility are particularly crucial issues.  Accordingly, in those cases the burden which must be satisfied before granting summary judgment is applied with added vigor [see *Sarsha v. Sears, Roebuck & Company*, 3 F.3d 1035, 1038 (7th Cir.1993); *Sample v. Aldi, Inc.*, 61 F.3d 544, 546 (7th Cir.1995); and *Perdomo v. Browner*, 67 F.3d 140 (7th Cir.1995)].  Summary

judgment is only to be granted if the record before the court had it been the record of a complete trial would have entitled the defendant to a directed verdict [See *Sarsha v. Sears, Roebuck and Company*, 3 F.3d 1035 (7th Cir.1993); *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159 (7th Cir. 1994); *CSX Transport, Inc. v. Chicago & North Wester Transportation Company, Inc.*, 62 F.3d 185, 188 (7th Cir.1995); and *Illinois Conference of Teamsters v. Steve Gilbert Trucking*, 71 F.3d 1361 (7th Cir.1993)].

Particular caution is required before granting summary judgment in a claim maintained under a law which allows for trial by jury [See *McCoy v. WGN Continental Broadcasting Company* (op.cit.1992); *Vissar v. Packer Engineering Company, Inc.*, 924 F.2d. 655 (7th Cir. 1991); and *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.1999) quoting *Huff v. Uarco, Inc.*, 122 F.3d 374, 380 (7th Cir.1997)].

## IV.  ARGUMENT

### A)  The Timeliness Of Some Of Olendzki's Claims.

The Defendants argue that three of Olendzki's claims occurred prior to September 10, 2006 and, accordingly, are time barred.  These claims consist of:  a) the Defendants removal of Olendzki's pager; b) the Defendants refusal to compensate Olendzki for callback time; and c) Olendzki's claims regarding a ripped safety smock.  To the extent each of those claims occurred greater than two years prior to the initiation of the above case, Olendzki agrees that each standing by itself is time barred and cannot be a basis for a liability determination against any of the Defendants.  However, those incidents may be considered as relevant background evidence to the claims of Olendzki's relating to events which occurred subsequent to September 10, 2006 [see for example, *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 52 L.Ed.2d 571 (1977); and

*National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 113, 153 L.Ed. 2d 106

(2002)].[5]

### B)   The First Amendment Protects A Public Employee's Right To Advocate Through A Union.

The First Amendment protects a public employee's right to advocate either individually

or through an association.  If a public employer acts out against an individual because of his

union membership or activities, the general constitutional rights of free association and free

speech are implicated.  Protected union activities include advocacy and persuasion on behalf of

union members [see *Hanover Township Federation of Teachers v. Hanover Community School

Corp.*, 457 F.2d 456, 459-460 (7th Cir.1972); and *Gregorich v. Lund*, 54 F.3d 410, 414 (7th Cir.

1995)].

Regardless of whether a claim by a union advocate is grounded in the free association or

free speech components of the First Amendment, our Circuit has analyzed such claims through

the approach developed in *Pickering v. Board of Education*, 391 U.S. 563, 20 L.Ed.2d 811

(1968) and *Connick v. Myers*, 461 U.S. 138, 75 L.Ed.2d 708 (1983) [see *Griffin v. Thomas*, 929

F.2d 1210, 1212-14 (7th Cir.1991); and *Gregorich* at p.414].

### C)   The Elements Of Olendzki's First Amendment Claim.

In evaluating a § 1983 claim for retaliation in violation of the First Amendment, a three

step analysis is required.  First, a court must determine whether the employee engaged in

constitutionally protected speech.  Second, the employee must establish that his speech was a

motivating factor for the retaliatory action.  Finally, the defendant has the opportunity to prove

---

[5]  In *Hildebrandt v. Illinois Department of Natural Resources*, 347 F.3d 1014, 1036, at
footnote 18 (7th Cir.2003), our Circuit adopted the *Morgan* analysis for Section 1983 cases.

that the same action would have been taken against the employee in the absence of his protected speech [see *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 50 L. Ed.2d 471 (1977); and *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir.2004)].

Traditionally, the process of determining whether the speech of a public employee is constitutionally protected involves the balancing two competing interests.

*Pickering* recognized that in public employee free speech cases a balance must be struck between the interest of the employee as a citizen in commenting upon matters of public concern and the interest of the state as an employer in promoting the efficiency of the public service which it performs through its employees. *Connick* expanded upon *Pickering* and recognized that public employees do not relinquish their First Amendment right to free speech even when the subject matter of the speech relates to their employment. A public employee's speech is constitutionally protected if: a) it would be protected if uttered by a private citizen; b) it relates to a matter of public concern; and c) the employer has not shown a convincing reason for forbidding the speech [See also *Hulbert v. Wilhelm*, 120 F.3d 648 (7th Cir.1997); *Brown v. Disciplinary Committee of Edgerton Volunteer Fire Department*, 97 F.3d 969 (7th Cir.1996); and *Dishnow v. School District of Rib Lake*, 77 F.3d 194 (7th Cir.1996)].[6]

The speech of a public employee is protected under the First Amendment provided that it relates to a matter of public concern and the employee's interest in expressing himself on that subject is not outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public service it performs through its employees

---

[6] The Defendants in this case do not bring into play the second prong of the *Pickering/ Connick* equation. They make no claim that a legitimate reason existed for restricting Olendzki's union activities.

[See *Waters v. Churchill*, 511 U.S. 661, 128 L.Ed.2d 686 (1994)].[7]  The process of balancing the interest of the employee in speaking out upon matters of public concern with that of the state in promoting the efficiency of its public service must be applied on a case by case basis because of the variety of factual situations in which an employee might speak out [See *Khuans v. School District 110*, 123 F.3d 1010 (7th Cir.1997)].

### D)  Olendzki's Speech Was Not Undertaken Pursuant To His Duties.

Relying upon *Garcetti*, the Defendants claim that Olendzki's speech was undertaken pursuant to his duties for the Department and was, therefore, not the speech of a citizen protected by the First Amendment.  In advancing this argument, the Defendants claim that Olendzki's complaints through his chain of command regarded issues he was responsible to report as a part of his job and thus not protected by the First Amendment.  Specifically, it claims that Olendzki as a part of his job was required to be a participant in the JCC Health and Safety Committee and his complaints concerning the safety of mentally ill inmates under his supervision, the adequacy of safety and sanitation at JCC, the failures in monitoring healthcare services, the erosion or unwarranted expansion of the work duties of bargaining unit members and the failure to provide adequate security concerned "internal matters relating to his job" [p.21 of Defendants' brief].

In *Garcetti* the Supreme Court held that the First Amendment does not protect a government employee for speech made pursuant to his "official duties."  *Garcetti* cautioned that an employer should not create an "excessively broad job description" in order remove an

---

[7]  *Garcetti v. Ceballos,* 547 U.S. 410, 164 L.Ed.2d 689 (2006), seems to have altered the *Pickering/Connick* equation.  Before balancing the competing interests of the employee and his employer, a court must first inquire whether the employee was speaking as a citizen or pursuant to his job responsibilities.  In the event it was the latter, his speech is not protected by the First Amendment.

employee from First Amendment protections.  Our Circuit in *Sigsworth v. City of Aurora*, 487 F.3d 506 (7th Cir.2007), noted that Garcetti was not a "categorical rule that deprives public employee's speech of First Amendment protection whenever that employee complains of work related misconduct."

Our Circuit has further recognized that comments made by a public employee in his capacity as a union representative does not constitute speech pursuant to his official duties and is not subject to the limitation articulated in *Garcetti* [*Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006); and *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir.2000)].

A reasonable trier of fact in this case could for several reasons conclude that Olendzki's speech arose out of his role as an official for the Union rather than as the psychologist at JCC.

First, Olendzki's speech concerning these topics began after he was elected to the Union's Executive Board.

Second, the context for Olendzki's speech arose out of his Union activities.  It occurred at Health and Safety Committee meetings, labor management meetings or when he was conferring with his supervisors either on behalf of Union members or to address violations of the bargaining agreement.

Third, Olendzki was appointed to the Health and Safety Committee by the Union rather than the Department.  His service on that Committee was as the representative of the Union. Prior to being elected as an official of the Union, he had never served on the Health and Safety Committee.  The Department's job specifications for a psychologist do not specify that a person holding that position must serve on the Health and Safety Committee of a correctional facility. When he left that Committee, he continued to serve as the JCC psychologist.  His departure from

the Committee was directed by the President of the Union [¶19,32,34,40 of Olendzki's Statement].

Fourth, Olendzki's complaints that work was being taken away from bargaining unit members and bargaining unit members were required to do work for the Wexford Corporation in violation of the applicable collective bargaining agreement is precisely the type of comment which would be made by an employee in his capacity as a Union official.  It has nothing to do with the work of a prison psychologist [¶24,26,28 of Olendzki's Statement].

Fifth, Olendzki's complaints about the mental healthcare of inmates was raised at Health and Safety Committee meetings and labor management meetings on behalf of bargaining unit members who worked around these inmates.  It concerned a workplace safety issue affecting the conditions of employment of staff members at JCC.  In this respect his concerns were expressed as a Union representative on behalf of its members not as a prison psychologist [¶25,27,28 of Olendzki's Statement].

Sixth, most of the comments made by Olendzki which are at issue in this case were made at either Health and Safety Committee meetings or labor management meetings.  In each of those meetings Olendzki was there as a representative of the Union speaking on behalf of members of his collective bargaining unit.  The topics raised by him were of common concern to bargaining unit members [¶25-28 of Olendzki's Statement].

Finally, Olendzki's complaints concerning health, safety and sanitation issues at JCC were raised on behalf of employees who were exposed to those practices.  This is the type of subject a Union would raise on behalf of its members.

### E)  <u>Olendzki's Speech Related To A Matter Of Public Concern.</u>

Any analysis into whether speech involves a matter of public concern must focus upon the content, form and context of the speech examined in the light of the record as a whole.  Of the foregoing content is the most import [See *Connick*, 461 U.S. at 147-148].  In fact the content of the speech is the greatest single factor in the *Connick* inquiry [See *Belk v. Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir.1988)].  Speech on a matter of public concern has been defined as "speech relating to any matter of political, social or other concern to the community" [See *Connick*, 461 U.S. at 146 and *Khuans v. School District 110*, 123 F.3d 1010, 1014-1015 (7th Cir. 1997)].  A matter of public concern does not have to be of transcendent importance, but instead a matter in which the public might be interested [See *Eberhardt v. O'Malley*, 17 F.3d 1023 (7th Cir. 1994); and *Dishnow v. School District of Rib Lake*, 77 F.3d 194 (7th Cir.1996)].

A public employee has a First Amendment right to comment on matters of public concern even when he communicates them privately [See *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415, 58 L.Ed.2d 619 (1979); and *Caldwell v. City of Elwood*, 959 F.2d 670, 672 (7th Cir.1992)].  The fact that an employee is speaking privately to an individual other than her employer is often an irrelevant distinction for purposes of the First Amendment.  In *Glass v. Dachel*, 2 F.3d 733 (7th Cir.1993) this Court recognized that a deputy sheriff's off-duty comments during a telephone conversation with a co-employee did not render the conversation to be personal in nature and outside the scope of the First Amendment protection.

Even if Olendzki's speech might further a self-interest on his part, it would be protected under the *Pickering/Connick* approach if his speech went beyond his own interests and served the interests of members of his bargaining unit as well [*Gregorich* at p.416].  Speech related to union interests touches on matters of public concern [*Gregorich* at p.415; *Connick* at p.416; and

*Boddie v. City of Columbus,* 989 f.2d 745, 750 (5th Cir.1993)].

Speech made in the context of organizing or furthering the interests of union members touches on a matter of public concern [*Gregorich* at pp.415-16].

Speech involving issues of public safety "are generally matters of public concern" [*Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir.2002); *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir.1990); and *Cunningham v. Village of Mount Prospect*, 2004 WL 407006 (N.D. Ill.)].

Given both the content, context and form of Olendzki's speech, it constitutes a matter of public concern protected by the First Amendment.

The context of his speech would enable a reasonable trier of fact to conclude that it arose as a part of his duties as an officer of the Union.  Olendzki's speech generally occurred in the following situations:  a) Health and Safety Committee meetings he attended as a representative of the Union; b) labor management meetings called for the specific purpose of addressing labor relations issues; and c) situations where Olendzki was bringing to the attention of his superiors labor relations issues (i.e. the need to bargain over telepsychiatry, violations of the collective bargaining agreement, or the representation of work related interests of Union members).

Second, the content of Olendzki's speech related to either public health and safety issues, interests of common concern to the Union membership or both.  In this respect Olendzki, among other things, raised issues concerning:  a) the lack of adequate protection of staff members in view of the dangers posed by mentally ill inmates; b) the sanitation practices of the prison dentist; and c) the need to engage in collective bargaining concerning telepsychiatry so that it could be affective and ensure better safety at JCC.  This speech falls within the public safety component of a matter of public concern.

Consistently, Olendzki raised issues concerning the failure of JCC management to adhere to the terms of the collective bargaining agreement and the failure of JCC management to engage in collective bargaining over telepsychiatry issues.  His speech also arose out of his activities in representing specific individuals with respect to their labor relations interests.  In this respect his speech fell under the Union activity component of a matter of public concern.

Contrary to the Defendants' contention, the "vast majority of plaintiff's speech" did not relate solely to his job responsibilities, but instead touched upon both public safety and labor relations issues which are matters of public concern protected by the First Amendment and were presented by him as a Union official.

### F)  The Harms Claimed By Olendzki Give Rise To Actionable Claims Under The First Amendment.

The Defendants assert that Olendzki's complaints are non-actionable and would not deter a person of ordinary firmness from engaging in speech.  According to it, Olendzki has "failed to demonstrate how he has suffered any material injury - - due to the Defendants' conduct" [see for example, p.25 of Defendants' brief].  Specifically, they assert he has never been disciplined and has never been denied an employment opportunity.  Moreover, they claim that his medical leave is unrelated to any of the Defendants' alleged actions.[8]

Our Circuit has noted that an alleged injury "need not be great in order to be actionable" under the First Amendment [see *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982); and *Mosely v.*

---

[8]  This point is clearly disputed.  Olendzki's medical leave was directed by his psychiatrist as a result of symptoms which became acute in 2009 [see ¶218,219 of Olendzki's Statement].  Regardless of whether the Defendants' conduct led to his medical condition, the nature of the Defendants' conduct directed toward Olendzki makes claims against him under the First Amendment actionable.

*Board of Education of the City of Chicago*, 434 F.3d 527, 534 (7th Cir.2005)].  The Defendants seem to claim that harm in order to actionable under the First Amendment must rise to the level of a materially adverse employment action of the type which would be actionable under an employment discrimination statute.  This is incorrect.  A harm in order to be actionable in a First Amendment claim must be something which could have a "chilling effect" upon one's exercise of First Amendment rights [see for example, *Bart* at pp.624-25; and *Powers v. Summer*, 226 F.3d 815 (7th Cir.2000)].  A First Amendment claim can go forward based upon allegations of something less than a "tangible detriment" [see *Mueller v. Conlisk*, 429 F.2d 901, 903 (7th Cir. 1970); *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir.1989); *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir.1995); and *Mosely* at p.534].

In this case the harms alleged by Olendzki were far from trivial.  While they may not have effected his pocketbook, they nonetheless would have a "chilling effect" upon a reasonable public employee.

Olendzki claims that he was removed from a prestigious statewide negotiating team in the Department.  Even if he was not compensated for his participation on that team, the status associated with his membership on it could make it a benefit or privilege which if taken away from him would implicate his rights under the First Amendment [see *Mosely* at p.534; *Brown v. Disciplinary Committee of Edgerton Volunteer Fire Department*, 97 F.3d 969 (7th Cir.1996); and *Hyland v. Wonder*, 972 F.2d 1129 (9th Cir.1992)].

Olendzki was forced to treat dangerous, mentally ill inmates in an environment where he had no security protection.  This created a significant threat to his safety.  It would be a stretch to claim that being forced to work in such a dangerous environment would not have a "chilling

effect" upon one's exercise of First Amendment rights.

Olendzki claims that he was denied benefit time and subjected to conduct which made it more burdensome for him to do his job (i.e., being required to move from location to location, denied knowledge of changes in the JCC mental health protocols which he needed to know in order to perform his job, being given unnecessary increases in his workload by requiring him to personally engage in in-service training rather than doing it through a video presentation).  All increased the burdens of his job.  Even if this is characterized as a minor form of retaliation, it is nonetheless the type of conduct which is actionable under the First Amendment [see *Bart* at p.624; *DeGuiseppe* at p.192, and *Mosely* at p.534].

Finally, Olendzki was accused of harassing a supervisor.  Such false accusations are actionable under the First Amendment [*DeGuiseppe* at p.192; *Pieczynski* at p.1333; and *Mosely* at p.534].

A reasonable trier of fact could conclude that the actions taken against Olendzki whether viewed singularly or collectively was conduct of a type which could have a "chilling effect" upon a reasonable public employee's exercise of speech protected by the First Amendment.

### G)  Olendzki Has Identified Facts Sufficient To Resist Summary Judgment That A Connection Existed Between His Protected Speech And The Actions Taken Against Him By The Defendants.

The Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 50 L.Ed.2d 471 (1977) established the causation analysis appropriate for evaluating a First Amendment claim of retaliation.  The Court in that case held that a plaintiff claiming such an injury must show that his conduct was constitutionally protected and was a "substantial factor" or a "motivating factor" for the complained conduct.  If he succeeds in that burden, the

defendant must then establish that he would have engaged in the same conduct "even in the absence of the protected activity."  The defendant bears the burden of proof with respect to the second proposition [see for example *Klunk v. County of St. Joseph*, 170 F.3d 772 (7th Cir.1999)].

Olendzki, in establishing that his protected conduct was a motivating factor for the Defendants' actions, need not show that it was the sole motivation for their actions or that it was event the dominant or primary motivation [see *Rakovich v. Wade*, 850 F.2d 1180 (7th Cir.1988); and *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir.1993)].  As our Circuit noted in *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir.2004):

> "Accordingly, we follow the approach delineated in the majority of our cases, adopted in our sister circuits and compelled by *Mt. Healthy* itself, i.e., a plaintiff alleging First Amendment retaliation must prove by a preponderance of the evidence that his or her protected activity was a motivating factor in the defendants retaliatory action.  To clarify, a motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendants actions" [see *Spiegla* at p.942] (emphasis added).

Our Circuit has employed the same proof causation analysis in First Amendment retaliation claims as the one used in retaliation claims maintained under Title VII of the "Civil Rights Act of 1964" (42 U.S.C. 2000e et.al.).  Thus, in a First Amendment retaliation claim a plaintiff may prevail by establishing a *prima facie* claim of retaliation and submitting evidence that the employer's explanations for its actions was pretextual [see *Johnson v. University off Wisconsin-O'Clare*, 70 F.3d 469, 481-482 (7th Cir.1995); and *Vukadinovich v. North Newton School Corporation*, 278 F.3d 693 (7th Cir.2001)].[9]

---

[9]  Olendzki may establish a *prima facie* claim of First Amendment retaliation applying the Title VII model by showing that:  a) he engaged in protected conduct; b) was the recipient of treatment from the Defendants having a "chilling effect" upon his exercise of protected rights; and c) other employees similarly situated to him who did not engage in protected conduct were treated better that was he [see *Stone v. City of Indianapolis*, 281 F.3d 640 (7th Cir.2002)].

### 1)  The backdrop for Olendzki's claims.

Olendzki's problems with the Defendants and JCC management did not begin in September of 2006.  Instead, they coincided with his active involvement with the Union.

Olendzki worked at JCC for over 15 years prior to his election to a Union office.  During that time, he maintained both a good work and personal relationships with the JCC command staff.  He was well regarded by them.  During this time, he was not active in the affairs of the Union [¶1-4,20 of Olendzki's Statement].

After his election to the Executive Board of the Union, Olendzki represented its members by bringing a variety of issues to the attention of his superiors.  Initially, these issues were brought to the attention of Walls who was then the warden at JCC.  While they earlier enjoyed a cordial relationship, this changed when Olendzki began advocating on behalf of Union members and presenting Union concerns to him, Walls oftentimes became angry and made his displeasure known to Olendzki.  Their relationship digressed to the point where they rarely spoke to one another outside of formal Union management encounters.  Initially, Olendzki brought to the attention of Walls issues concerning the failure to reassign a Union member.  Later, a number of health issues were presented to him.  Walls acted out against Olendzki as early as January of 2005 when he refused to allow Olendzki to return to work following a medical leave without giving a reason for that decision.  Later, he refused to allow Olendzki to give a speech at a local college on work time and countermanded an order which Olendzki as a JCC psychologist

---

However, this is not a rigid formulation.  The elements of a *prima facie* claim will vary from case to case based upon the facts presented [see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L.Ed.2d 668 (1973); and *Van Koteu v. Family Health Mgt., Inc.*, 1998 WL 54615 97th Cir.1998)].

routinely gave.  Later, he again refused to allow Olendzki to return to work on crutches even though other employees had been given that type of permission [¶41-49 of Olendzki's Statement].

Prior to January of 2006, Olendzki maintained a good relationship with Rossi.  Rossi regarded Olendzki as a good employee.  In early 2006 their working relationship changed when Rossi became involved in labor issues.  Olendzki frequently addressed issues with Rossi which became upsetting to Rossi [¶50-58 of Olendzki's Statement].

When Polk became the warden at JCC, Olendzki in performing his Union duties would present various Union issues to him.  Among those issues was Sudbrink's continuing non-compliance with the terms of the collective bargaining agreement and health and safety concerns arising because of unsanitary practices by the JCC dentist in the summer of 2006 [¶59-68 of Olendzki's Statement].

It was during this time period that Polk:  a) removed Olendzki's pager; b) denied him a callback pay benefit which he had been receiving throughout the course of his employment at JCC; and c) requested that Olendzki be directed to undergo a psychiatric evaluation [¶61-64 of Olendzki's Statement].

Upon Sudbrink becoming the healthcare administrator, Olendzki, in fulfilling his Union responsibilities, complained to her continuing violations of the collective bargaining agreement. When Sudbrink ignored these concerns, Olendzki was required to press them.  This became upsetting to Sudbrink and she began a campaign of complaining to both Rossi and Polk about Olendzki [¶71-77,79,81 of Olendzki's Statement].  It was information provided by Sudbrink which prompted Polk requesting that Olendzki be subject to a psychiatric examination [¶83,84 of

Olendzki's Statement].

### 2)  Olendzki's removal from NEMAT.

In September of 2006 Olendzki, after serving for nearly 14 years as a member, was removed from NEMAT.  Polk, Rossi and Sudbrink all played a role in that occurring.  In June of 2006 Rossi sent an email to Polk encouraging the removal of Olendzki from NEMAT.  In a communication with Polk and Rossi, Assistant Warden McKinney reminded them that when Olendzki's pager was removed it was assumed that he would no longer be on the NEMAT Team.  On June 21, 2006 Polk sent a memorandum to the NEMAT administration asking that Olendzki be removed from NEMAT because:  a) Olendzki needed more time to devote to his caseload; and b) Olendzki no longer wanted to carry a pager.  Much of the ammunition contained in Polk's request came from false information provided him by Sudbrink [¶109,110,115-120,124,125,129-133,136,137 of Olendzki's Statement].

These steps occurred at the time when the relationship Olendzki was maintaining against Polk, Rossi and Sudbrink was acrimonious because of labor issues.  Olendzki was pressing Sudbrink's serial non-compliance with the collective bargaining agreement and sanitation practices of the JCC dentist [¶71-77,92 of Olendzki's Statement].[10]

Olendzki was the only one of the 25 member NEMAT Team removed.  At that time another JCC employee also served on NEMAT.  However, only Olendzki was removed from NEMAT [¶110,116,121,122,127 of Olendzki's Statement].

Not only has Olendzki produced the elements of a *prima facie* claim of First Amendment

---

[10]  In the midst of the dispute concerning the JCC dentist, Rossi closed the employee breakroom in the Healthcare Unit.  He gave no reason for that action other than telling Quinn that she could blame "Don" for that action [¶104,105 of Olendzki's Statement].

retaliation, there is evidence in this case that regardless of whose explanation you believe for his removal none are credible.

First, Orr in his letter to Olendzki indicated that the action was being taken to reorganize and streamline NEMAT. There was no reorganization and the only streamlining occurred because of Olendzki's removal [¶121,122,125,127 of Olendzki's Statement].

Second, a reasonable jury could disbelieve NEMAT officials' claim that the decision was made because of performance concerns they had about Olendzki. To the extent there were any concerns by the NEMAT administration concerning Olendzki's performance, they arose because of an incident that occurred nearly two years earlier in October of 2004. That incident was a non-issue and Olendzki performed credibly on NEMAT thereafter. He received no criticisms during that two year period from NEMAT officials. To the contrary he was complimented for his performance in hostage negotiating situations which occurred earlier in 2006 [¶111-114 of Olendzki's Statement]. Orr recalls that in a conversation about Olendzki's removal from NEMAT with these officials there was a comment made about a Katie Couric incident. This could only have come from information provided by Polk [¶84,85,126 of Olendzki's Statement].

A reasonable trier of fact could conclude that Olendzki's removal from NEMAT was motivated by the actions of Polk. As early as June of 2006 Polk made a written request that Olendzki be removed from NEMAT. His reasons for his removal are not credible for several reasons [¶118 of Olendzki's Statement].

First, Olendzki never refused to carry a pager. The decision that he be stripped of his pager was Polk's [¶63,117,118,124,135-137 of Olendzki's Statement].

Second, to the extent there was any inability on Olendzki's part to complete his work,

that was never documented in his performance evaluations as it should have been [¶130,132 of Olendzki's Statement].

Thus, the only steps taken by JCC to enable Olendzki to assume his increased workload was to remove him from NEMAT, a commitment which required only four hours of his time per calendar quarter.  After Olendzki's removal from NEMAT, Rossi in late 2006 assigned some unnecessary responsibilities to him which significantly increased his workload [¶56,57,110,129, 130,132-133 of Olendzki's Statement].

### 3)  The relocations of Olendzki's office.

On two occasions, Olendzki's office was removed from the Healthcare Unit.  The first occurred in February of 2007 when Rossi directed he be moved.  The second occurred in April of 2008 when Stoudt abruptly informed Olendzki he had four hours to move his office [¶147,148, 154-159 of Olendzki's Statement].

On each occasion the relocation was closely associated with Union activities on Olendzki's part.

Prior to Olendzki having an office in the Healthcare Unit, there had never been a Union official located in that Unit.  When Olendzki moved into that unit in early 2006, he became the eyes and ears of the Union.  Through his time in that unit, he discovered that Sudbrink habitually violated the terms of the collective bargaining agreement by giving bargaining unit work to non bargaining unit members and assigning bargaining unit members work which was supposed to be performed by a private contractor of the Department.  Frequently, Olendzki would bring these issues to the attention of JCC management at both labor management meetings and Health and Safety Committee meetings.  Sudbrink became upset with Olendzki's conduct in this respect and

complained to Rossi and others about him [¶72-84 of Olendzki's Statement].

In the midst of this, Olendzki without explanation was removed from his office in the Healthcare Unit.  After he was removed, there remained available space for him to office in that unit [¶147-152 of Olendzki's Statement].

In early April of 2008 Stoudt abruptly directed that Olendzki be removed from his office in the Healthcare Unit.  At the time that action was taken, a dispute existed between the Union and Stoudt concerning bargaining over the implementation of the telepsychiatry program. Shortly prior to Olendzki's relocation, a series of grievances had been filed through Olendzki against JCC management  [¶154-159,163 of Olendzki's Statement].  There was never an explanation given to Olendzki for the relocation of his office and at all times available space remained in the Healthcare Unit [¶159,168 of Olendzki's Statement].

While the relocation of Olendzki's office created inconveniences for him because the medical charts became less accessible to him and he was required to be more mobile, the more significant harm in his relocation was that he was deprived of adequate security protection.

By 2005 the inmate population at JCC had changed.  There were many more inmates who were incarcerated for violent crimes and had extended release dates.  Additionally, there were a number of inmates who suffered from serious psychiatric problems [¶210-215 of Olendzki's Statement].

Following his relocation in 2007 Olendzki was directed to see inmates in the operations conference room.  Security protection in that area was at best undependable.  Following the 2008 relocation Olendzki was required to see inmates in the Clinical Services Unit.  Oftentimes when he saw inmates not only was there no security protection, but no one else was located in the

Clinical Services Unit.  Many officers who were posted at JCC did not even have a key which would access them to the Clinical Services Unit.  Thus, Olendzki was required to work in an area where he was treating dangerous inmates with no security protection.  Stoudt specifically directed that Olendzki was to have no security protection.  In 2008, Olendzki had a number of close encounters with inmates who were suffering from severe psychiatric problems [¶160-170, 174 of Olendzki's Statement].

In contrast it was a practice at JCC at this time that when a Wexford Corporation psychiatrist provided treatment to inmates there was always security protection offered to him [¶175 of Olendzki's Statement].

Predictably, concerns about his safety were disturbing to Olendzki.  A reasonable trier of fact could conclude that this conduct would have a "chilling effect" upon an employee from exercising his free speech rights.

### 4)  Sudbrink's claims of harassment.

After Sudbrink became the healthcare administrator, Olendzki noticed that she did not follow the terms of the collective bargaining agreement with respect to the assignment of work in the Healthcare Unit.  Sudbrink ignored Olendzki's requests that she comply with the contract.  Accordingly, he stepped up his efforts to secure compliance.  He complained about her at both labor management meetings and Health and Safety Committee meetings and filed grievances against her practices [¶71-73,92 of Olendzki's Statement].

Sudbrink became upset with Olendzki's efforts.  She informed Quinn that Olendzki was mean to her and always brought up union issues.  In the summer of 2006 she provided false information to Polk.  She falsely accused Olendzki of engaging in bizarre behavior (i.e., the

Katie Couric incident). Her conduct in this respect led to Polk requesting a psychiatric evaluation of Olendzki [¶74-85,87 of Olendzki's Statement]. She also accused Olendzki of not being able to do his work.[11] Her conduct in this respect played a part in giving Polk ammunition to have Olendzki removed from NEMAT [¶118,124,131,132 of Olendzki's Statement].

Sudbrink frequently complained to Rossi and Polk about Olendzki. Eventually, she filed charges of harassment against Olendzki including claims of sexual harassment and directed a subordinate employee to submit an incident report concerning Olendzki when that employee believed Olendzki had conducted himself appropriately [¶79,81,87,156,157,190 of Olendzki's Statement]. Eventually, her harassment reports led to a formal investigation of Olendzki by the Department's EEO office [¶191,192 of Defendants' Statement of Facts].

A reasonable trier of fact could conclude that Sudbrink's actions were motivated because of her dislike for Olendzki when he repeatedly brought to her attention her violations of the collective bargaining agreement. A reasonable trier of fact could also conclude that her actions created the type of environment which would have a chilling effect upon a public employee's exercise of his First Amendment rights.

### 5)  Miscellaneous actions taken by the Defendants toward Olendzki.

In addition to the actions taken toward Olendzki described earlier, the Defendants acted out in other ways against Olendzki subsequent to September 10, 2006.

### a.  Rossi

Prior to Rossi's involvement in JCC labor relations activities in early 2006, he enjoyed a

---

[11] Although she made these accusations to Polk, in her performance evaluation of Olendzki she raised no concerns about the quality or quantity of his work or his time usage [¶129,130,132 of Olendzki's Statement].

cordial relationship with Olendzki.  After becoming involved in labor matters, Olendzki and

Rossi had various differences concerning issues involving Sudbrink, the JCC dentist and various

other health and safety and work issues [¶6,50-58 of Olendzki's Statement].

A reasonable trier of fact could conclude that in response to those differences Rossi acted

out against Olendzki in several respects.

First, he removed Olendzki's authority to direct when a suicidal inmate would be in a

strip cell status even though the directives of the Department required those decisions to be made

by a mental health professional [¶54 of Olendzki's Statement].

Second, when Olendzki complained that he needed more clerical assistance to keep up

with his workload in view of the increasing number of mentally ill inmates, Rossi instead gave

him unnecessary busy work.   In this respect he required Olendzki to personally attend in-service

training classes to provide instruction rather than doing it through a video presentation which

had been done in the past.  This unnecessarily created a 15% increase in Olendzki's workload.

When Olendzki complained, Rossi not only threatened to take over scheduling his work, but also

gave him additional unnecessary busy work [¶56,57 of Olendzki's Statement].

**b.  Sudbrink**

Sudbrink acted out against Olendzki by encouraging her clerical staff to not give him

medical charts he needed to perform his duties.  She also required him to request medical charts

two days in advance where other healthcare professionals were not required to do such things

[¶94,98 of Olendzki's Statement].

Although it had been the practice at JCC to have a nurse assigned to each medical clinic,

Sudbrink removed the mental health nurse who assisted Olendzki.  This not only increased

Olendzki's work duties, but made him less capable of having in place a system to regularly monitor the condition of mentally ill inmates [¶206-209 of Olendzki's Statement].

When JCC was on lockdown status, Olendzki had to see two suicidal inmates.  At the time he was suffering from severe hip pain when he walked.  He asked Sudbrink if the inmates could be brought to his office rather than him traveling to where they were located.  Sudbrink denied his request and said if he was unable to walk he should go on medical leave.  At the same time, other inmates were escorted to the Healthcare Unit to see medical professionals who were treating them [¶91 of Olendzki's Statement].

In October of 2008 a psychiatrist noted in a report after a telepsychiatry session that an inmate expressed homicidal ideations toward Olendzki.  Sudbrink had refused to provide Olendzki with telepsychiatry reports and thus he was not informed of the inmate's thoughts even though he continued to work around the inmate [¶95 of Olendzki's Statement].  At the same time Sudbrink directed that Olendzki was not to receive copies of telepsychiatry reports even though both AFSCME and the Department had earlier directed that psychologists at correctional facilities were supposed to receive those reports.  This hampered Olendzki's ability to perform his job because he was not aware of any deteriorations in the psychiatric well-being of inmates and created an additional safety risk for him and other members of the Union because he did not know the current mental health status of inmates being seen by the psychologist [¶96 of Olendzki's Statement].

In February of 2008 Sudbrink sent an email to staff members concerning procedures developed for the telepsychiatry program.  She refused to share them with Olendzki even though those procedures were necessary in order for him to perform his job [¶180 of Olendzki's

Statement].

**c.  Stoudt**

In the spring of 2008 shortly after Stoudt's arrival at JCC, there was some serious disagreements between JCC management and the Union.  In March of 2008 these disagreements were reduced to a class wide grievance.  Shortly after that, Stoudt retroactively denied previously approved time off slips for Olendzki to attend collective bargaining negotiating sessions [¶181, 194,195 of Olendzki's Statement].

In May of 2008 when Olendzki was concerned about comments made to him by a correctional officer which he interpreted as a threat, Stoudt refused to see him about his concern [¶199 of Olendzki's Statement].

In November of 2008 Olendzki was scheduled to undergo knee replacement surgery.  As was his right under the collective bargaining agreement, he made a request to take advanced sick time.  That request was denied based upon Stoudt's false comments that she had no written justifications for his request.  Olendzki not only had provided a reason for the request (he was undergoing a surgical procedure), but had never previously abused his sick leave with the Department [¶203 of Olendzki's Statement].

After Olendzki was reassigned to the Clinical Services Unit by Stoudt, she ordered that he not have security protection when he saw inmates and refused various requests made by Olendzki for security protection when he saw dangerous mentally ill inmates [¶160-167, 169-174 of Olendzki's Statement].

**d.  Pillow**

In addition to continually accusing Olendzki as being obstructive with respect to the

telepsychiatry program, when Olendzki was given inadequate information concerning that program to do his job, Pillow modified some institutional directives relevant to Olendzki's job without informing Olendzki of the changes.  After becoming the acting warden, Pillow informed Olendzki that he was not entitled to speak at labor management meetings [¶204, 205 of Olendzki's Statement].

**H)  <u>The Defendants Are Not Entitled To Qualified Immunity.</u>**

The Defendants claim they are entitled to qualified immunity because:  1) Olendzki has failed to establish that his speech was constitutionally protected under both *Garcetti* and the *Pickering/Connick* calculus; 2) it was not clearly established that "an employer cannot direct an employee to participate in activities which the employee subjectively believes violates his union contract or which may increase an employee's workload [p.34 of Defendants' brief]; and 3) it was not clearly established that "an employer may not respond to an employee's speech concerning the health and safety of the workplace by modifying the employee's job duties and working conditions or by removing plaintiff from a volunteer team" [p.35 of Defendants' brief].

This argument is meritless.

*Harlow v. Fitzgerald*, 457 U.S. 800, 73 L.Ed.2d 396 (1982), recognized that governmental officials performing discretionary functions are generally shielded from liability for civil damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

In *Rakovich v. Wade*, 850 F.2d 1180 (7th Cir.1988), our Circuit articulated the "clearly established" standard by stating:

> "We caution that just as a right alleged violated should not be characterized or
> defined so generally that invariably guiding law is found to show that the right

was clearly established, the right should not be defined to intricately that invariably guiding law never can be found" [p.112].

In *Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir.1996), it rejected the narrow view that a claimant must present caselaw which is the precise parallel to the incident at issue in order to overcome qualified immunity stating:

> "The defendants bemoan the fact that there is no prior case directly on point with facts identical to this case. Under the doctrine of qualified immunity, liability is not predicated upon the existence of a prior case that is directly on point. See *McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir.1992). The question is whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful. *Id.* at 294. We believe that reasonable persons standing in the defendants' shoes at the time would have reached just such a conclusion" [p.17].

As the doctrine has developed, a public official can still be on notice that his conduct violates established law even in novel factual circumstances. The facts of a case need not be "fundamentally similar" to those of a prior case in order for a claimant to overcome qualified immunity. The salient question is whether the state of the law at the time of the alleged misconduct gave a public official fair warning that his conduct was unconstitutional [*Hope v. Pelzer*, 536 U.S. 730, 740-41, 153 L.Ed.2d 666 (2002); and *McGreal v. Ostrov*, 368 F.2d 657, 683 (7th Cir.2004)].

The salient question is not whether there is a prior case on all fours with the current claim, but whether the state of the law at the relevant time gave the Defendants fair warning that their treatment of Olendzki was unconstitutional [see *McGreal* at p.683].

Contrary to the Defendants' contentions, Olendzki has provided legal authority indicating that his speech was constitutionally protected under both *Garcetti* and the *Pickering/Connick* standard. In response to the Defendants' contentions that his claims were barred by *Garcetti*,

Olendzki has earlier explained in this instrument how his speech was undertaken in his capacity as a Union official and not as an employee of the Department.  He also cited authority from our Circuit indicating speech by a Union official relating to union matters does not fall under the *Garcetti* rule.

With respect to the Defendants' contention that Olendzki's speech did not involve a matter of public concern and thus was not entitled to constitutional protection under the *Pickering/Connick* equation, Olendzki has earlier cited legal authority supporting two propositions.  First, that speech by a Union official concerning union matters does involve a matter of public concern.  Second, that the speech relating to health and safety issues is considered protected speech.

The Defendants next contend that it was not clearly established that an employer was prohibited from directing an employee to participate in activities which the employee subjectively believes violates his Union contract or which may increase his workload.  There are two problems with the Defendants' contentions.  First, it does what *Rakovich* cautions against.  It defines the issue so intricately that guiding law might never be found.  Second, and more importantly, the Defendants mischaracterize Olendzki's claim.  His First Amendment claim is not that the employer directed him to participate in activities which either violated the collective bargaining agreement or increased his workload.  It is instead that the Defendants, through a variety of means, retaliated against him because as a Union representative he brought issues to its attention which were displeasing to it.  *Gregorich* provides ample authority that a public employer cannot engage in retaliatory actions toward a Union official because of his union activities.

Finally, the Defendants claim that it was not clearly established that they were prohibited from responding to employees' speech concerning health and safety in the workplace by either modifying his job duties and working conditions or by removing the plaintiff from a volunteer team. Presumably, the Defendants are claiming that the conduct directed toward Olendzki in this respect was not of sufficient severity to implicate his First Amendment rights. By September of 2006, two years prior to the initiation of this case, the Defendants were on notice that a campaign of petty harassment including either minor forms of retaliation or false accusations were actionable under the First Amendment [see *DeGuiseppe* at p.192; *Pieczynski* at p.1333; and *Mosely* at p.534]. They were further on notice that removing an employee from a volunteer body where he received minimal or no compensation could be actionable under the First Amendment [see *Mosely* at p.534; *Brown* at p.973-74; and *Hyland* at p.1129].

## V.  CONCLUSION

For the foregoing reasons, the Plaintiff, Donald Olendzki, respectfully requests that the Defendants' motion for summary judgment be denied.


DONALD OLENDZKI, Plaintiff

By:    s/ James P. Baker
                James P. Baker
                Bar Number: 0097802
                Baker, Baker & Krajewski, LLC
                415 South Seventh Street
                Springfield, Illinois  62701
                Telephone: (217) 522-3445
                Facsimile: (217) 522-8204
                E-mail: bschrader2@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2011, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Joshua D. Ratz
Assistant Attorney General
500 South Second Street
Springfield, Illinois   62706
Telephone:  (217) 782-2077
Facsimile:  (217) 524-5091
email:  jratz@atg.state.il.us

<div style="margin-left:40%">

s/ James P. Baker
James P. Baker
Baker, Baker & Krajewski, LLC

</div>