IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DONALD OLENDZKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-3196 |
| | ) | |
| NEIL ROSSI, BECKY SUDBRINK, | ) | |
| RICHARD PILLOW, JENNIFER | ) | |
| STOUDT, TERRY POLK, and | ) | |
| RICHARD ORR, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

RICHARD MILLS, U.S. District Judge:

Donald Olendzki, an Illinois Department of Corrections psychologist,

has filed this § 1983 action against six of his supervisors.

He claims that Defendants retaliated against him because of his union

advocacy, in violation of the First Amendment.

In sum, and for the reasons that follow, the Defendants' summary

judgment motion is Allowed.

# I. INTRODUCTION

Since 1989, Plaintiff Donald Olendzki has been employed with the Illinois Department of Corrections as a Psychologist III at the Jacksonville Correctional Center (JCC).   In 2004, the Plaintiff was elected to the Executive Board of Local 3549 of the American Federation of States, County, and Municipal Employees ("AFSCME").   In that office, he represented its members in labor disputes with the management team at the JCC.

The Plaintiff filed a civil rights action pursuant to 42 U.S.C. § 1983, wherein he alleged that Defendants retaliated against him in violation of his First Amendment rights for activities conducted on behalf of his union. The named Defendants include six of his supervisors: Neil Rossi, Becky Sudbrink, Richard Pillow, Jennifer Stoudt, Terry Polk, and Richard Orr.[1]

The Defendants claim that summary judgment is warranted for a number of reasons.  They contend that: (1) several claims are time-barred; (2) the Plaintiff has failed to identify constitutionally protected activity; (3)

---

[1]The Plaintiff agrees to the dismissal of Orr from this case.

2

the Plaintiff has no evidence that Defendants' alleged actions were caused by protected activity engaged in by the Plaintiff; (4) the Plaintiff has not demonstrated that he has suffered a deprivation under the First Amendment; (5) even if the Plaintiff could assert a prima facie case of retaliation, the evidence shows that Defendants acted for valid non-retaliatory reasons; and (6) the Defendants are entitled to qualified immunity.   The Plaintiff contends that Defendants' contentions are without merit.

## II. FACTUAL BACKGROUND

### (A)

The Plaintiff filed his Complaint on September 10, 2008.  Several of his claims concern incidents that occurred more than two years prior to the Complaint's filing, including: (1) the Plaintiff's claim that his pager was removed on June 8, 2006; (2) his claim he was removed from his responsibilities to engage in after hour call back activities on June 8, 2006; and (3) his claim he was prevented from making decisions regarding the observation and care of suicidal inmates in 2005 because Defendant

Sudbrink did not inform him about a torn safety smock.

Defendant Neil Rossi became the Assistant Warden of Programs at the JCC in 2004. The Plaintiff reported to Rossi from 2004 until February of 2005. From February of 2005 until November 15, 2006, the Plaintiff's direct administrative supervisor was Defendant Becky Sudbrink, who is the Health Care Unit Administrator for the JCC. Sudbrink has not supervised the Plaintiff since November 15, 2006. Effective November 15, 2006, by order of Warden Terry Polk, the Plaintiff was supervised by the Assistant Warden of Programs. At that time, Assistant Warden Rossi informed the Plaintiff that he no longer fell under the Health Care Unit. He was now considered part of Programs.

The Plaintiff claims that he suffered retaliation for activities he allegedly engaged in on behalf of the union, including but not limited to the following: (1) participating in labor management meetings and safety and health committee meetings; (2) representing union members in the presentation of grievances; and (3) representing union member Missy Utter during a September 2006 meeting with Defendants Rossi and Sudbrink and

4

union vice president John Clegg.  Sudbrink has never participated in labor management meetings.

(B)

As a Psychologist III, the Plaintiff's job duties include providing mental health services to inmates in need of such services, providing crisis management for inmates, and screening inmates for work release.  He is also required to:

a.    "Ensure that all mental health services delivered are accurately documented, distributed, and maintained."

b.    "Maintain safety and sanitation standards."

c.    "Serve as the Mental Health Professional, coordinating and providing mental health services."

d.    "Be an active participant of the Health and Safety Committee."

e.    "[S]erve as a member of the Quality Assurance Committee, rendering recommendations."

f.    "Schedule and coordinate Crisis Intervention Team training."

g.    Keep track of inmates with mental health problems, monitor their

5

care, and prepare the "call line" list of inmates to be seen by the psychiatrist.

h.    Exercise management responsibilities over the care of suicidal inmates and ensure their safety.

i.    File incident reports whenever an unusual incident occurs.

j.    Report sanitation issues to management.

k.    "Perform all additional duties as they relate to the Psychologist III position as directed which are reasonably within the scope of [Plaintiff's] job description."

In June of 2006, Warden Polk instructed Defendant Sudbrink to deny the Plaintiff's request for two hours of call-back pay regarding two after-hours phone calls the Plaintiff placed to Jacksonville on May 28 and 29, 2006. The Plaintiff filed a grievance over the matter, which was resolved by paying the Plaintiff one hour of compensatory time.

Following the denial of callback pay, the Plaintiff asked Assistant Warden Rossi and Warden Polk if he was required to wear a pager. Defendants Rossi and Polk claim they believed that Plaintiff did not want

to carry his pager if he was not required to do so.  The Plaintiff says that he had no problem carrying a pager.  The Defendants allege that Plaintiff was not and is not required to carry a pager.  It is voluntary.

The Defendants allege that on June 8, 2006, Rossi told the Plaintiff he should turn in his pager and that he did not need to carry it.  Rossi also informed the Plaintiff that he would be turning in his pager, and that "[h]e is no longer required to wear a pager."  On June 8, 2006, Sudbrink sent out a memorandum providing that per Warden Polk, the Medical Director was to be called with all after hours mental health issues.  The Defendants allege that Plaintiff did not at that time possess a pager and the facility did not have a means of ensuring that he could be reached at all times.

(C)

The Plaintiff served on a statewide hostage Negotiations Management Team ("NEMAT") from its inception sometime in the 1990s until October 1, 2006.  The Plaintiff also served on a local hostage negotiations team at the Jacksonville facility.  Service as a hostage negotiator is a voluntary undertaking, for which there is no compensation.  At the time that

7

Plaintiff's service with NEMAT ended, Deputy Director Ron Meek and Statewide Coordinator Jeffrey Hooker were in charge of the team. However, the Plaintiff's position at Jacksonville fell under the administrative chain of command of Deputy Director Richard Orr. On June 21, 2006, at the request of Mr. Hooker, Defendant Terry Polk sent Hooker a memorandum listing several reasons why Polk felt that Plaintiff should be removed from NEMAT. The Plaintiff disputes that the memorandum was sent at Hooker's request.

Defendant Polk felt that Plaintiff should be removed from NEMAT because: (1) he did not want to carry his pager; (2) the Plaintiff had complained about not having enough time to attend to his duties at Jacksonville; (3) being removed from NEMAT would give the Plaintiff enough time to focus on his duties at Jacksonville; (4) Terry Louden, Correctional Counselor II at Jacksonville, was also on NEMAT, and Defendant Polk felt one member from Jacksonville was sufficient. The Plaintiff notes that he never voluntarily surrendered his pager. The Plaintiff had in fact complained about insufficient time and resources to complete

8

his job duties.  However, the Plaintiff alleges that his time commitment to NEMAT was only four hours per quarter and Polk and Rossi made assignments which unreasonably increased his workload.

The Plaintiff received a memorandum dated September 27, 2006 from Deputy Director Rick Orr indicating that as of October 1, 2006, the Plaintiff's service as a hostage negotiator would end.  The Plaintiff believes the decision was made because of a meeting he allegedly had with Assistant Warden Rossi three days prior to becoming a member of AFSCME, and because of a number of conflicts Plaintiff allegedly had with Rossi.

The Plaintiff states that it was Defendant Polk who requested that Plaintiff be removed from NEMAT.  The Defendants assert that Meek and Hooker made the decision to remove the Plaintiff from NEMAT.  The Plaintiff states that this was only to the extent their approval was necessary and that Polk was the driving force behind his removal from NEMAT. Because the Plaintiff's position at JCC fell under Defendant Orr's administrative chain of command, Orr drafted the September 27, 2006 memorandum terminating the Plaintiff from NEMAT.

The Defendants claim that the reasons for removal conveyed to Orr by Deputy Director Meek and Mr. Hooker concerned the Plaintiff's performance on the team.  The Plaintiff disputes this assertion and emphasizes that he attended periodic drills, assisted in the training of other negotiators, and participated in the negotiations at a hostage crisis at the Dixon Correctional Center.  Following the incident at Dixon which occurred in May of 2006, the Plaintiff received several complimentary notes, including one from Meek and Hooker.

No one asked Defendant Orr or Jeff Hooker to remove the Plaintiff from NEMAT because of the Plaintiff's union activities.  Neither individual removed the Plaintiff from NEMAT because of his union activities, or for any other retaliatory purpose.  The Plaintiff claims this assertion is immaterial because it was Warden Polk who requested that he be removed. The Plaintiff believes that Defendant Orr's memorandum of September 27, 2006 also removed him from the local hostage negotiation team at the JCC. The Plaintiff admitted that Polk expressed an interest in keeping him on the local hostage negotiation team.  The Plaintiff did not want to be on the

local hostage negotiation team after he was removed from NEMAT, and states that he would refuse to re-volunteer if asked to remain on the team.

(D)

From 1989 until early 2006, the Plaintiff's office was located in the Clinical Services area at the JCC.  Clinical Services is housed in a single building between the facility's Segregation Unit and the Health Care Unit. The three areas are separated by brick firewalls.  From at least 1989 until the present, inmate medical records have been located in the Health Care Unit.  From 1989 until early 2006, the Plaintiff would see inmates for psychological evaluations in his office in Clinical Services without security personnel present.  During this 16 to 17 year period, there was no security guard posted in Clinical Services.  Throughout the period, the Plaintiff would pick up his patients' medical charts from the Health Care Unit and take them to his office in Clinical Services.  To get from his office to the Health Care Unit, the Plaintiff would exit the Clinical Services area and travel approximately 40 feet to the entrance.  The Plaintiff would have to travel an additional 30 feet from the Health Care Unit entrance to the

records room to pick up charts.

In early 2006, at his request, the Plaintiff's office was relocated to the Health Care Unit.  It remained there until February of 2007.  Defendant Rossi informed the Plaintiff in December of 2006 that he would move back to his former office in Clinical Services.  The Defendants allege Warden Polk testified that Plaintiff was moved back to his former office in order to free up space in the Health Care Unit for Dr. Lochard.  However, the Plaintiff asserts that his office in the Health Care Unit remained vacant. Dr. Lochard is one of the medical doctors associated with the Wexford Corporation, a private vendor contracting with the state for medical services.  The office space in the Health Care Unit was used by Dr. Lochard, though the Plaintiff notes he was only occasionally at the JCC.

After being moved back to his former office in Clinical Services, the Plaintiff stated that he did not want to see his patients in Clinical Services without security present.  However, the Plaintiff could have continued to see patients in Clinical Services as he had from 1989 through 2006 if he so chose.  The Defendants contend that in response to the Plaintiff's concerns

about safety, Jacksonville management offered the Operations Building as an alternative place to see patients.  The Plaintiff asserts that he was "directed" to see inmates in the operations conference room.  Prior to receiving that directive, he had been seeing inmates in the Health Care Unit where a security officer was present.  The Plaintiff testified that seeing patients in the Operations Building required him to pack up a portable office and added five to ten minutes of travel time, a situation which Plaintiff described as "less than ideal."  During this time period, Defendant Polk sent the Plaintiff an email inquiring as to whether there was an office in the Health Care Unit in which the Plaintiff could see patients, to which the Plaintiff responded, "No . . . The only exception is on Wednesday from 4-6 pm when I have been instructed to use Amanda Tomhave's office in HCU after she goes home."

In June of 2007, the Plaintiff's office was again moved to the Health Care Unit.  On April 4, 2008, the JCC's next warden, Jennifer Stoudt, moved the Plaintiff's office back to Clinical Services, where it has remained ever since.  The Plaintiff believes Defendant Stoudt moved his office

because of a phone call Plaintiff had with Defendant Becky Sudbrink on April 3, 2008, concerning the preparation of a "call line," or list of patients to be seen by the psychiatrist during a telepsychiatry clinic scheduled for that day.  The Defendants allege Stoudt testified that she moved the Plaintiff's office back to Clinical Services because his position fell under Program Services, which is associated with Clinical Services and because the facility needed a space for telepsychiatry services in the Health Care Unit. However, the Plaintiff claims that available office space remained in the Healthcare Unit after Olendzki's relocation.

The Plaintiff claimed that he was banned from attending health care staff meetings after his position was transferred from the Health Care Unit staff to the Clinical Services Unit.  Defendant Rossi testified that since Plaintiff fell under Programs, he was no longer considered part of the Health Care Unit staff.  The Plaintiff notes that he previously attended healthcare staff meetings after he was relocated to the Clinical Services Unit.  The Plaintiff did not attempt to attend one of these staff meetings after being designated a part of Programs.

14

Telepsychiatry is a means of providing psychiatric services to inmates through video by a psychiatrist located at a remote location. Wexford Corporation provides medical services, including telepsychiatry, to JCC on a contract basis. The Plaintiff claims that Defendant Sudbrink prevented him from performing one of his job duties by failing to provide him with a time sheet used by Wexford psychiatrists referred to as a TM-02 form. Defendant Sudbrink does not work for Wexford, use the TM-02 form, or receive the TM-02 form. The Plaintiff does not know if anyone at the Department of Corrections received the TM-02 form. Acting Assistant Warden Walls sent the Plaintiff an email on December 9, 2009, stating that Sudbrink is not responsible for providing the Plaintiff with the TM-02.

As one of his job duties, the Plaintiff prepares lists of patients (or "call lines") to be seen by remote psychiatrists through telepsychiatry. The Plaintiff claims that Defendants Sudbrink and Pillow interfered with his ability to prepare the patient list by failing to inform the Plaintiff of the times in which Wexford psychiatrists would be holding their clinics, and by permitting Amanda Tomhave, a Wexford employee, to remove a few

patients from the psychiatrist's call line in March of 2008.

The Plaintiff was supposed to receive information of the psychiatrist's schedules from Amanda Tomhave, but sometimes received that information in an untimely manner or not at all. The Plaintiff asserts that Tomhave was supervised by Defendant Sudbrink, but admits that Tomhave was not a state employee and did not work for the Department of Corrections. Sudbrink was not the Plaintiff's supervisor for the period in which he claims to have been denied information by Sudbrink. The Plaintiff testified that he contacted one of the psychiatrists to obtain his schedule and was told that the psychiatrist only gave that information to Tomhave.

Defendant Pillow sent the Plaintiff an email on March 12, 2008, stating that the psychiatrist requested a shortened patient list after Plaintiff had left the premises. Pillow told Tomhave to remove the last three patients that were scheduled, thinking that Plaintiff had listed the patients in order of importance. The Plaintiff has no reason to doubt Pillow's explanation.

Defendant Sudbrink is the privacy officer for the JCC. Prior to

16

November 13, 2008, the Plaintiff had received copies of medical records, specifically telepsychiatry reports, which he would sometimes hold in his office for a day or two while he gathered the data he needed. After she was named the privacy officer by the warden, Sudbrink reviewed the Department's administrative directives, whereupon Sudbrink questioned whether copies of medical records should be going to the Plaintiff. Sudbrink contacted the state privacy officer for input on the matter. Jonathan Sisson, Chief Privacy Officer for the Department of Corrections, informed Sudbrink that if at all possible, staff should access medical and mental health information directly from the medical file in a controlled environment. Mr. Sisson also informed Sudbrink that it was not a good practice to make copies of medical documents unless there are extenuating circumstances. The Plaintiff has access to all the information he needs in the original medical files.

Defendant Sudbrink informed the Plaintiff that he could no longer keep copies of medical records in his office for any period of time due to privacy concerns under the HIPPA law. On November 13, 2008,

17

Defendant Sudbrink sent out a memorandum stating that per the state privacy officer, telepsychiatry records were to be printed and considered original documents.  No copies of these records were to be made, as the record set resides in the Health Care Unit medical records department.

(E)

While seeing an inmate in the Operations Building conference room in February of 2007, the Plaintiff had what he describes as a "close call" in which he had to step outside of the room and shout for help before security came running to assist.  After the close call, the Plaintiff was directed to see inmates in any available space in the Health Care Unit, including Dr. Lochard's office, Defendant Sudbrink's office, Amanda Tomhave's office, the break room or one of the two exam rooms.   On October 1, 2007, Defendant Rossi issued an order allowing the Health Care Unit officer to carry handcuffs so that an inmate could be restrained before or after an interview at the Plaintiff's request.

In the summer of 2008, the Plaintiff filed several incident reports claiming that he had been ordered by Defendant Pillow and Defendant

18

Stoudt to see inmates in Clinical Services without security.  When asked about this order, the Plaintiff testified that Pillow instructed him that Stoudt had directed Plaintiff to see inmates in Clinical Services from 4 to 6 on Wednesdays, even though there was no security present.  The Plaintiff filed an incident report every time he saw patients without security in Clinical Services, pursuant to Pillow's alleged instructions.  The Plaintiff had access to phones and radios in the Clinical Services building if he required help.  Counselors, assistant wardens, and clerical staff all have contact with inmates in Clinical Services without security stationed in the building.  The Plaintiff notes this does not apply to psychotic inmates.

The Defendants allege that the level of security provided to the psychologists at JCC under Warden Stoudt was consistent with the practice at other facilities, including Taylorville Correctional Center.  The Plaintiff disputes this assertion.

The Plaintiff claims that Defendant Pillow required him to do vendor (Wexford) work by providing a witness signature on a mental health treatment plan (or "Doc 0284 form") used by the Department of

Corrections.   The DOC 0284 form is used in conjunction with telepsychiatry and contains a section wherein the inmate acknowledges his consent to treatment.   By institutional directive, "[a] Mental Health Treatment Plan, DOC 0284, shall be completed and signed by both the mental health professional and the offender who will be receiving ongoing, non-emergency mental health treatment, such as medication, individual or group therapy."   On April 7, 2008, Defendant Pillow instructed the Plaintiff to obtain consent from offenders for the telepsych line, per instruction from Dr. Navarro.   On October 8, 2008, the Plaintiff sent an email to Defendant Sudbrink noting that he had called inmates to complete the mental health treatment plans and sign as a witness, only to discover the nurses had previously signed as witnesses.   The Plaintiff asked if this was a new procedure.   Assistant Warden of Programs Kim Kirchner advised Defendant Sudbrink that he wanted the Mental Health Professional, Plaintiff, to sign the treatment plan.   In response, Sudbrink sent a memo to the nurses instructing them not to sign as a witness on the treatment plan, DOC 0284 form.   The Plaintiff acknowledged that the Department

20

of Corrections needs an inmate's consent to provide non-emergency medical services, including issuing medication.

Prior to August 11, 2008, the JCC had a registered nurse who served as a "designated psych nurse." The Plaintiff testified that at one point the designated psych nurse prepared the case load and call passes in conjunction with the Plaintiff, before he assumed those responsibilities himself. After the Plaintiff took over full responsibility for managing the mental patient caseload, the designated psych nurse was still needed to handle medication issues, contact the doctor, and provide daily information as needed regarding mental patients.

On August 11, 2008, Defendant Sudbrink issued a memorandum stating that there would no longer be a designated psych nurse at JCC. Instead, orders received from the psychiatrist would be taken by whichever nurse was handling physician orders that shift, as on any other medical line. Sudbrink had previously sent an email on July 31, 2008, to Warden Stoudt and Assistant Warden Kirchner stating that a number of other institutions did not have a psych nurse, that abolishing the designation would open up

21

nursing time, and that there were likely duel patient lists created by the designated psych nurse and the Mental Health Professional. The Plaintiff admits that in the absence of the designated psych nurse, another nurse would step in to cover responsibilities. Although the Plaintiff asserts that every other chronic clinic has a designated nurse associated with it, those clinics do not have a health professional similar to the Plaintiff. The Plaintiff testified that when there was no longer a designated psych nurse, the individual nurse would send the Plaintiff notes if there were issues regarding a particular mental patient, but that Plaintiff would simply take those notes back without taking any action. He claimed that he was prevented from contacting the psychiatrists regarding the nurses' notes by Sudbrink and Cindy Holbrock, but admitted that neither Sudbrink nor Holbrock supervised the Plaintiff. The Plaintiff could not recall any specific communication that would have caused Defendant Sudbrink to discontinue the psych nurse designation. However, the Plaintiff claims that he had continuing encounters with Sudbrink based on what he alleges were violations of the collective bargaining agreements.

The Defendants allege that on November 29, 2006, Defendant Rossi sent an email stating that the warden, Polk, would "have the final say on whether an inmate is to be strip-celled <u>without</u> a safety smock or blanket." Rossi indicated that the segregation gallery is extremely cold in the winter and he did not want to explain how an inmate expired due to cold conditions. The Plaintiff asserts that pursuant to Department protocols, those decisions are to be made by a mental health professional. According to the Plaintiff, strip-celling means the inmate is left naked with a metal bunk. The Plaintiff testified that in his opinion, the strip-cell policy was initiated because an inmate at Menard Correctional Center had frozen to death.

(F)

The Plaintiff applied for ten days of Advance Sick Time in December of 2008, which was denied by the Director of the Department of Corrections, as well as the Director of the Department of Central Management Services. The Plaintiff claims that the denials occurred because of misinformation provided by Defendant Stoudt. The Defendants

assert that Plaintiff's belief Stoudt retaliated against him by allegedly recommending denial of sick time is based solely on his assertion that such requests are routinely approved.

The Plaintiff filed a grievance alleging that Defendant Stoudt denied his request to attend statewide contract negotiations on behalf of AFSCME. Stoudt suggested to Labor Relations that Plaintiff be denied permission to attend the contract negotiations because there was a continual issue of inmates at Jacksonville not receiving needed services. Stoudt indicated that she could not afford the Plaintiff to be absent from the facility for three to four days a week to attend negotiations because the Plaintiff was the facility's only psychologist. The Plaintiff's request to attend negotiations was ultimately approved.

The Plaintiff claims that Defendant Sudbrink retaliated by filing false charges of harassment against him. Sudbrink's discrimination and harassment complaint was substantiated by the Department's Office of Affirmative Action.

The Plaintiff claims that Defendant Pillow retaliated against him by

24

revising institutional directives without his input.  Moreover, the Plaintiff states that he was not informed of the changes even though they affected his job responsibility.  Revising institutional directives is not listed as a part of the Plaintiff's job duties.  Institutional directives concerning mental health services are authored by the Director of Mental Health Services and the Warden.

The Plaintiff testified that he was ordered by Defendant Stoudt not to communicate mental health business at Jacksonville to the Chief of Mental Health, Dr. Navarro.  When the Plaintiff informed Defendant Pillow that he would not comply with the order, Pillow implied he could be disciplined.  The Plaintiff also testified that Vickie Fair of the Office of Affirmative Action told him that someone could be disciplined with respect to the harassment complaint filed by Sudbrink against the Plaintiff.

The Plaintiff testified that he has been diagnosed with post traumatic stress disorder as a result of hostage incidents at Dixon Correctional Center and Jacksonville Correctional Center.  He has been on medical leave for psychological reasons caused by those hostage incidents.  The Plaintiff

notes that the hostage incidents occurred over three years prior to his medical leave during which he was able to engage in his duties for the Department.  The Plaintiff has never been disciplined.  The Plaintiff has never been denied an employment opportunity.

## III. DISCUSSION

### A. Legal standards

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  The Court construes all inferences in favor of the Plaintiff.  See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011).

The parties dispute what is necessary in order for a plaintiff to demonstrate a prima facie case of retaliation.  The Plaintiff claims that he need only establish that his constitutionally protected conduct was a substantial or motivating factor for retaliatory conduct.  The Defendants assert that but-for causation is required.

The United States Court of Appeals for the Seventh Circuit has held

26

that but-for causation is required in cases which involve First Amendment chilling claims. See Fairley v. Andrews, 578 F.3d 518, 525 (7th Cir. 2009). However, at the summary judgment stage, a plaintiff need only present evidence from which a reasonable jury could find causation. See id. at 526. The Seventh Circuit recently explained:

> To meet the prima facie burden regarding causation in a First Amendment case, a plaintiff needs to show only that the defendant's conduct was a motivating factor, i.e., a "sufficient factor," meaning when something present makes something else bound to happen. . . . The defendant can then rebut that showing, but only by establishing that his or her conduct was not a but-for or "necessary condition" of the harm, i.e., that the harm would have occurred anyway.

See Surita v. Hyde, __ F.3d __, 2011 WL 6644218, at *9 (7th Cir. Dec. 22, 2011) (citing Greene v. Doruff, 660 F.3d 975, 978-79 (7th Cir. 2011)). Therefore, a plaintiff must prove "that (1) he engaged in constitutionally protected speech; (2) the defendants, as public officials, engaged in adverse conduct against him; and (3) the defendants were motivated, at least in part, by his protected speech." Bivens v. Trent, 591 F.3d 555, 559 (7th Cir. 2010). In asserting adverse conduct, a plaintiff must show that he suffered a deprivation that would "deter a person of ordinary firmness"

27

from exercising his First Amendment rights.  See Bridges v. Gilbert, 557
F.3d 541, 552 (7th Cir. 2009).

B. Time-barred claims

The Defendants contend that certain claims which occurred prior to
September 10, 2006, are barred by the two year statute of limitations.
These claims include the removal of the Plaintiff's pager, the removal of
after hour call back activities, and the Plaintiff's claims regarding a ripped
safety smock.  The Plaintiff acknowledges that each of those claims
standing by itself is time-barred, though he notes that the claims can be
considered as relevant "background evidence" of the claims that accrued
after September 10, 2006.  See O'Neal v. City of Chicago, 588 F.3d 406,
409 (7th Cir. 2009) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S.
101, 113 (2002)).

C. Speech Concerning Official Duties/Health and Safety Issues

The Defendants contend that Plaintiff has not asserted a prima facie
claim of retaliation in violation of his First Amendment rights with respect
to his speech concerning health and safety issues, including speech made at

28

Health and Safety Committee meetings.  The Defendants contend that such speech was part of his official duties and thus not entitled to First Amendment protection.

A public employee has a protected right, in certain circumstances, to speak "as a citizen addressing matters of public concern."  See Bivens, 591 F.3d at 560 (quoting Garcetti v. Ceballos, 547 U.S. 410, 417 (2006)). However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Garcetti, 547 U.S. at 421. "This is because when employees speak pursuant to their official duties they are not speaking as citizens, regardless of whether the speech is about a matter of public concern."  Bivens, 591 F.3d at 560.

According to the Individual Development and Performance System, the Plaintiff's job required him to "[b]e an active participant of the Health and Safety Committee" and maintain safety and sanitation standards in accordance with institutional directives.  Therefore, the Court concludes the

Plaintiff's speech regarding certain matters for the most part concerns internal matters relating to his job. These include: (1) the safety of mental patients under his supervision; (2) the adequacy of safety and sanitation at the facility; (3) the alleged failure to monitor healthcare services; (4) the alleged attempts to have outside contractors and non-bargaining unit employees assume and perform work allegedly designated for union members; and (5) the alleged failure to provide adequate security protections for JCC employees.

However, the Plaintiff emphasizes that he was appointed to the Health and Safety Committee by the Union instead of the Department. His service on the committee was as the Union's representative. Prior to his election as a Union official, the Plaintiff had never served on the Committee. Moreover, the Department's job specifications do not specify that psychologists must serve on the Health and Safety Committee of a correctional facility. The Plaintiff notes that when he left that Committee, he continued to serve as the JCC psychologist. Additionally, his departure from the Committee was directed by the President of the Union.

30

Nevertheless, the Plaintiff was evaluated for his participation on the Health and Safety Committee. He was serving on the committee at the time in question. The Plaintiff signed his evaluation which included this job requirement. Given the environment of a correctional facility, it would seem surprising if any professional employee's responsibilities did not include reporting health and safety issues.

For these reasons, the Court concludes that when the Plaintiff was speaking about conditions at the facility, he generally was speaking as an employee of the Department of Corrections and not as a private citizen. Pursuant to Garcetti, the Plaintiff's claims relating to speech concerning health and safety issues, including speech made at Committee meetings, is generally not protected by the First Amendment. However, the Court recognizes that in this context, there is some overlap between speech that is protected and speech that is not. While speech which touches on internal office affairs does not amount to a "public concern," speech that brings attention to an issue that could compromise prison security can constitute a "public concern," even if the public employee's duties involve

31

security.  See Cygan v. Wisconsin Dept. of Corrections, 388 F.3d 1092,

1100-01 (7th Cir. 2004).  Therefore, the context and content of the speech

must be examined in order determine whether there was a First Amendment

violation.

D. Speech and whether constitutional right was violated

The Defendants contend that summary judgment is warranted as to

some of the claims because much of the Plaintiff's speech concerned matters

which related to his job responsibilities, instead of matters of public

concern.

Courts employ the Connick-Pickering[2] test in analyzing whether a

public employee's First Amendment rights were violated.  See Hernandez

v. Cook County Sheriff's Office, 634 F.3d 906, 914 (7th Cir. 2011).  The

first step is to determine whether the speech addressed a matter of public

concern.  See id.  "If it did, the court must then apply the Pickering

balancing test to determine whether the interests of the [plaintiff] as a

citizen in commenting upon the matters of public concern are outweighed

_____

[2]See Connick v. Myers, 461 U.S. 138 (1983); Pickering v. Bd. of Educ. of
Township High Sch. Dist., 391 U.S. 563 (1968).

by the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. (internal quotation marks and citations omitted). If the speech does not address a matter of public concern, then the Pickering balancing test is not reached because the employees are not speaking as citizens. See id.

Speech involving issues of public safety is "generally a matter of public concern." See Delgado v. Jones, 282 F.3d 511, 517 (7th Cir. 2002). However, "not every prison employee complaint is a matter of constitutional magnitude." Cygan, 388 F.3d at 1100. "[G]overnment employee speech tied up in personal grievances or internal office affairs does not fall within the ambit of 'public concern.'" Id. at 1101. In Cygan, the court determined that a prison guard's speech which brought attention to a staffing issue that potentially could compromise prison security did amount to a matter of public concern. See id. Specifically, the guard complained that the prison dining room did not have enough correctional officers present. See id. at 1096-97. This occurred two weeks after a fight had broken out between inmates when there was a shortage of staff. See id.

33

at 1096.  Four officers sustained minor injuries breaking up that fight.  <u>See</u> <u>id.</u>  These unique circumstances distinguished the prison guard's speech from routine complaints about office policies.  <u>See</u> <u>id.</u> at 1101.

The Defendants assert that the vast majority of the Plaintiff's speech concerns matters solely related to his job responsibilities.  This includes his job duties with respect to preparing the list of patients to be seen by the psychiatrists, the adequacy of his office location, the efficiency of seeing patients in different locations, the adequacy of security in these locations, whether he was entitled to copies of medical records or other information, and what role he was required to play in the implementation of telepsychiatry at the facility.  Because purely personal grievances are not entitled to First Amendment protection, the Defendants contend that Plaintiff cannot meet the first prong of the <u>Connick-Pickering</u> test.

The Plaintiff notes that even if his speech might further his self-interest, it may still be protected under <u>Connick/Pickering</u> if his speech went beyond his own interests and also served the interests of his bargaining unit.  <u>See</u> <u>Gregorich v. Lund</u>, 54 F.3d 410, 416 (7th Cir. 1995)

34

(holding that plaintiff's activities which were not only designed to regain his own lost benefits, but also to obtain union representation for other employees, satisfied the requirements of Connick/Pickering).   "[S]uch activity, in a broad sense, touches upon matters of public concern." Id. at 415.

The Plaintiff maintains that the context of his speech would enable a reasonable factfinder to determine that it arose as part of his duties as an officer of the Union.  The Plaintiff notes that his speech generally occurred in the following settings: (1) Health and Safety Committee Meetings he attended as a representative of the Union; (2) labor management meetings called for the specific purpose of addressing labor relations issues; and (3) situations where the Plaintiff was bringing labor relations issues to the attention of his superiors.

Second, the Plaintiff asserts that the content of his speech related to either public health and safety issues, which were issues of concern to the Union membership.  He raised issues regarding: (1) the lack of adequate protection of staff members in view of the dangers posed by mentally ill

35

inmates; (2) the sanitation practices of the prison dentist; and (3) the need to engage in collective bargaining concerning telepsychiatry so that it could be effective and ensure better safety at the JCC.  The Plaintiff contends that this speech falls within the public safety component of a matter of public concern.

The Plaintiff claims that he has consistently raised issues concerning the failure of JCC management to adhere to the terms of the collective bargaining agreement and the failure of JCC management to engage in collective bargaining over telepsychiatry issues.  His speech also arose out of representing individuals regarding their labor relations interests. Therefore, the Plaintiff alleges the speech was a matter of public concern.

It appears that Plaintiff's alleged protected speech generally occurred in appropriate settings.  There are questions about whether the Plaintiff may have been disruptive or belligerent at times in raising various issues. Accordingly, it is difficult in some instances to determine, pursuant to Pickering, whether the Plaintiff's interest as a citizen in commenting on matters of public concern is outweighed by the Defendants' interest in

36

promoting the interest of JCC and the public services it provides.

E. Sufficiency of the deprivation

The Defendants assert that Plaintiff has not suffered a deprivation sufficient to establish a claim under the First Amendment. He has never been disciplined for failing to do his job or for any other reason and has not been denied any employment opportunities. Moreover, the Plaintiff testified that he is on medical leave for psychological reasons which are unrelated to the Defendants' actions.

The United States Court of Appeals for the Seventh Circuit has observed that an adverse employment action is not necessary in § 1983 cases such as this. See Mosely v. Board of Educ. of City of Chicago, 434 F.3d 527, 533 (7th Cir. 2006). Rather, "[a]ny deprivation under color of law that is likely to deter the exercise of free speech . . . is actionable." Id. (quoting Power v. Summers, 226 F.3d 815, 820 (7th Cir. 2000)). Although isolated criticisms may not be enough to constitute such a deprivation, the Seventh Circuit has observed that the alleged injury "need not be great in order to be actionable." Id. at 534 (citations omitted). It has held that "a

campaign of minor harassment was sufficient to deter the exercise of free speech." Id. In Mosely, the court found that plaintiff's inability due to defendants' actions--which included withholding information and being told to rubberstamp proposals--to participate meaningfully in her role as a parent chairperson of a federally sanctioned school committee was sufficient to deter the exercise of free speech. See id. at 534-35.

The Plaintiff claims that the harms he has alleged are not trivial. His removal from a prestigious statewide negotiating team is sufficient to implicate his First Amendment rights, given the professional status of his membership. The Plaintiff further asserts that he was forced to treat dangerous, mentally ill inmates in an environment where he had no security protection. He claims that being forced to work in such a dangerous environment would have a "chilling effect" upon the exercise of his First Amendment rights.

The Plaintiff further alleges that he was denied benefit time and subjected to conduct which made it more burdensome to do his job (i.e., being required to move from location to location, denied knowledge of

38

changes in the JCC mental health protocols which he needed to know in order to perform his job, being given unnecessary increases in his workload by requiring him to personally engage in in-service training instead of doing it through a video presentation).  The Plaintiff asserts that even if this is classified as a minor form of retaliation, it is still actionable.

The Plaintiff further notes that he was accused of harassing a supervisor.  False accusations can be actionable under the First Amendment.  See Mosely, 434 F.3d at 534.

The Plaintiff contends that a reasonable fact finder could conclude that the actions taken against him considered singularly or collectively was conduct of a type which could have a "chilling effect" upon a reasonable public employee's exercise of First Amendment rights.

The Court will address the sufficiency of the claimed deprivations in turn.

### F. Whether Defendants would have acted despite protected activity

#### (1) NEMAT/Local Team Decision

Given the professional status associated with NEMAT, the Court

39

concludes that the claimed deprivation is sufficient to be actionable under the First Amendment. Therefore, the issue becomes whether the Defendants would have acted despite any protected activity.

The Defendants contend that Plaintiff cannot demonstrate that Defendants would not have acted even without the Plaintiff's protected activity. They assert that Plaintiff's belief that Defendant Orr removed him from NEMAT in retaliation for his union activities is based on: (1) the Plaintiff's assertion that he participated in a meeting with Assistant Warden Rossi concerning the rights of a union member three days prior to his receipt of the September 27, 2006 memorandum; (2) hearsay statements by third parties that an unnamed warden called someone at an unknown time asking that Plaintiff be removed for unarticulated reasons; and (3) the Plaintiff's assertion that he had a number of conflicts with Assistant Warden Rossi.

The Defendants contend that the record establishes that Plaintiff was removed from NEMAT by the Statewide Coordinator, Jeff Hooker, and Deputy Director Ron Meek because of the Plaintiff's performance on the

team.  In his affidavit, Hooker states that Plaintiff exhibited "irrational behavior that impacted his fitness for the hostage negotiation team" in the Spring or Summer of 2006, at a NEMAT training exercise at Vandalia Correctional Center.  Hooker states, "During the exercise, Mr. Olendzki burst into a restricted area, acted unprofessionally, and complained about communications between negotiators and the command center."  He further stated that Plaintiff appeared "emotional, upset, and displayed inappropriate behavior."   Hooker further states that after observing the Plaintiff's behavior, he spoke with Deputy Director Meek and Chief of Mental Health Services Dr. Wendy Navarro about removing the Plaintiff from NEMAT.  Meek directed Dr. Navarro to evaluate whether the Plaintiff should remain with the team.  Hooker further says that he had discussions with management concerning behaviors exhibited by the Plaintiff, including reports that Plaintiff had been seen crying over Katie Couric's then-recent departure from the Today Show.

According to his affidavit, Statewide Coordinator Hooker asked Defendant and then-Warden Polk to provide him with a memorandum

documenting reasons why, from the JCC's perspective, the Plaintiff should be removed from NEMAT. Hooker states that during a conference with Dr. Navarro and Deputy Director Meek, Dr. Navarro recommended the Plaintiff's removal from NEMAT because his behavior at the time could present a liability for the Department. According to Hooker, he and Meek made the decision to remove the Plaintiff. The primary reason for the decision was the Plaintiff's irrational behavior and the recommendation of Dr. Navarro.

Defendant Orr was asked to and did prepare the September 27, 2006 memorandum because the Plaintiff was an employee in his district, and Defendant Polk provided reasons for recommending removal. Orr's memorandum said nothing about any irrational behavior by the Plaintiff. It said changes were being made by IDOC "in an effort to streamline and more effectively operate and manage" the agency. NEMAT was part of "this restructuring." The Defendants do not dispute the Plaintiff's assertion that other than his removal, nothing else was done in 2006 to streamline or restructure NEMAT.

42

For the reasons noted above, the Defendants claim that Plaintiff cannot demonstrate that his removal from NEMAT was caused by his union activities.  Additionally, the Plaintiff cannot establish injury for his removal from the local team, because he did not wish to be on the team after being removed from NEMAT.  The Defendants assert they are entitled to summary judgment on this claim.

The Plaintiff notes that he worked at JCC for over 15 years prior to his election to a union office.  He states that during that time, he maintained good professional and personal relationships with JCC command staff.  The Plaintiff claims that his problems with management coincided with his active involvement with the Union.

The Plaintiff contends that Polk, Rossi and Sudbrink all played a role in his removal from NEMAT.  In June of 2006, Rossi sent an email to Polk encouraging the removal.  In a communication with Polk and Rossi, Assistant Warden McKinney reminded them that when the Plaintiff's pager was removed, it was assumed that he no longer would be on the NEMAT team.  On June 21, 2006, Polk sent a memorandum to the NEMAT

administration asking that Plaintiff be removed from NEMAT because he needed more time to devote to his caseload and no longer wanted to carry a pager.  The Plaintiff claims that much of the information in Polk's request came from false information provided by Sudbrink.

The Defendants have provided a number of potential explanations for the Plaintiff's removal from NEMAT.  Any one of them alone or in conjunction may be legitimate reason(s) for that decision.  It appears that the pager issue may have resulted from a misunderstanding, or anger on the Plaintiff's part because of the June 2006 denial of callback pay.  Certainly, it may have been reasonable for the Defendants to question the Plaintiff's commitment to NEMAT when he asked Rossi and Polk after being denied callback pay if he was required to wear a pager.

Nevertheless, the reasons for the Plaintiff's removal are somewhat confusing.  Based on his own alleged observations at Vandalia, Statewide Coordinator Hooker may have had legitimate reasons for removing the Plaintiff.  However, he asked Polk and then Orr to provide reasons for removing the Plaintiff from NEMAT.  Polk acknowledged playing a role in

44

the Plaintiff's removal.

There is some evidence in the record that Rossi and Sudbrink were concerned about the Plaintiff's productivity and quality of work, though the Plaintiff's performance evaluations indicate no such problems. No one communicated any problems with productivity. Moreover, service on NEMAT did not require much of a time commitment.

A number of potential explanations for the Plaintiff's removal from NEMAT are offered by the Defendants. Although Polk, Orr and Rossi were not the decisionmakers, the Seventh Circuit has held in Title VII cases that "the retaliatory motive of a 'nondecisionmaker' may be imputed" if "the 'nondecisionmaker' influenced the employment decision by concealing relevant information from, or feeding false information to, the ultimate decisionmaker." See David v. Caterpillar, Inc., 324 F.3d 851, 861 (7th Cir. 2003). The Court notes that Statewide Coordinator Hooker sought the input of the Defendants. The Plaintiff asserts that during this period, his relationship with Defendants Polk, Rossi and Sudbrink was acrimonious due to labor issues. However, there is nothing in the record suggesting that

45

those Defendants influenced Hooker or Meek.

Although the Plaintiff has asserted a potential First Amendment violation, the Court concludes that Defendants are entitled to qualified immunity.  "Generally, qualified immunity protects government agents from liability when their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Hernandez, 634 F.3d at 914 (internal quotation marks and citations omitted).  This involves a two-part inquiry: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." Id.  In terms of the second inquiry, it must be clear "to a reasonable [person] that his conduct was unlawful in the situation that he confronted." Id.  "[Q]ualified immunity provides ample room for mistaken judgments and protects all those but the plainly incompetent and those who knowingly violate the law." Purvis v. Oest, 614 F.3d 713, 720 (7th Cir. 2010) (internal quotation marks and citations omitted).

46

There is nothing in the record tending to show that the Defendants knowingly violated the Plaintiff's First Amendment rights. It appears that the Defendants may have mistakenly believed that Plaintiff did not want to carry a pager. However, it was a reasonable mistake based on the Plaintiff's own actions. Because qualified immunity allows for reasonable mistakes, the Court concludes that Defendants are entitled to qualified immunity on this claim.

(2) Other Alleged Harms

The Plaintiff further asserts that he was forced to treat dangerous, mentally ill inmates in an environment where he had no security protection, which created a risk to his safety.

The Plaintiff alleges that he was denied benefit time and subjected to conduct which made it more burdensome to do his job (i.e., being required to move from location, denied knowledge of changes in the JCC mental health protocols which he needed to know in order to perform his job, given unnecessary increases in his workload by requiring him to personally engage in in-service training rather than doing it through a video presentation).

47

Additionally, the Plaintiff was accused of harassing a supervisor. Even minor forms of retaliation, including "petty harassment," can be actionable. See DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 192 (7th Cir. 1992) ("Lesser retaliation such as demotions, diminished responsibilities, or false accusations all may suffice"); see also Mosely, 434 F.3d at 534.

The Plaintiff next asserts that after he was reassigned to the Clinical Services Unit by Stoudt, she ordered that he not have security protection when he saw inmates and refused various requests made for security protection when he saw dangerous mentally ill inmates.

Although the office moves might otherwise be described as merely inconvenient or "less than ideal," the Court will consider whether there is any connection with the Plaintiff's complaints about security. Public safety can be a public concern. Defendant Sudbrink admitted that Plaintiff confronted her about allegedly not complying with the collective bargaining agreement. It appears that these events occurred around the same time. If there were a connection between those events, there is little doubt that an ordinary person could be deterred from pursuing his First Amendment

48

rights.  If the Plaintiff's office was moved and security concerns were ignored on multiple occasions due to any union activity on his part, then the <u>Pickering</u> balancing test would weigh in favor of the Plaintiff.  However, it does not appear that there was any connection between any protected activity and the office moves.

The undisputed facts show that Defendants did not simply ignore the Plaintiffs' complaints.  The record shows that after a "close call" in the Operations Building, the Plaintiff was directed to see inmates in any available space in the Health Care Unit, including Dr. Lochard's office, Defendant Sudbrink's office, Amanda Tomhave's office, the break room, or one of the two exam rooms.  Moreover on October 1, 2007, Defendant Rossi issued an order allowing the Healthcare Unit officer to carry handcuffs so that an inmate could be restrained before or after an interview at the Plaintiff's request.  Pursuant to Defendant Pillow's alleged instructions, the Plaintiff filed an incident report every time he saw patients without security in Clinical Services.  It is undisputed that Plaintiff had access to phones and radios in the Clinical Services building if he required

49

help.  Moreover counselors, assistant wardens, and clerical staff all have contact with inmates in Clinical Services without security being stationed in the building, though these employees did not have individual contact with psychotic inmates.

The Plaintiff may not have been satisfied with the Defendants' responses to his complaints.  There may be a legitimate argument that Defendants did not do all that they should have done.  At the very least however, qualified immunity protects the Defendants from such mistaken judgments.

The Court further notes that Defendants have alleged that the level of security provided to the psychologist at JCC under Defendant Stoudt was consistent with practices at other facilities, including Taylorville Correctional Center.  Although the Plaintiff disputes this assertion, the allegations that he cites in support of the proposition do not directly address the Defendants' contention.

Accordingly, the Court concludes that Defendants are entitled to summary judgment as to the Plaintiff's claim that his security concerns

were ignored.

The Plaintiff further claims that Defendant Sudbrink retaliated against him by filing false charges of harassment.  There does not appear to be any connection between Sudbrink's claims of harassment and the Plaintiff's exercise of his First Amendment rights.  Sudbrink's discrimination and harassment complaint was substantiated by the Department's Office of Affirmative Action.  Given that finding, there appears to have been a basis for Sudbrink to believe that she was being harassed by the Plaintiff.  Even if she was mistaken, Sudbrink is still entitled to qualified immunity.

a. Defendant Rossi

The Plaintiff asserts that prior to his more active involvement in union activities, he had a cordial relationship with Defendant Rossi. Subsequently, they had various differences pertaining to issues involving Sudbrink, the JCC dentist, and various other health and safety work issues.

The Plaintiff contends that Rossi removed his authority to direct when a suicidal inmate would be in a strip cell status, even though the

Department's directives required those decisions to be made by a mental health professional.

Additionally, the Plaintiff contends that when he complained that he needed more clerical assistance to keep up with his workload in view of the increasing number of mentally ill inmates, Rossi instead gave him unnecessary busy work. Specifically, he required the Plaintiff to personally attend in-service training classes to provide instruction rather than doing it by video presentation as had been done in the past. The Plaintiff claims this resulted in an unnecessary 15% increase in his workload. When he complained, Rossi not only threatened to take over scheduling his work, but also gave him additional unnecessary busy work.

The Court concludes that the harms alleged here do not rise to the level such that they would deter a person of ordinary firmness from exercising his First Amendment rights. It does not appear that the removal of authority to direct when a suicidal inmate would be in a strip cell status affected the Plaintiff's prestige or professional status. The alleged addition of busy work because of the Plaintiff's activities also does not merit First

Amendment protection.

b. Defendant Sudbrink

The Court does not believe that the slight delay in obtaining medical charts due to the actions of Sudbrink rises to the level of a First Amendment violation.

The Plaintiff asserts that although it had been the practice at JCC to have a nurse assigned to each medical clinic, Sudbrink removed the mental health nurse who helped him. This increased his workload and made him less capable of having an effective system to monitor the condition of mentally ill inmates. This appears to be a minor workplace annoyance. Orders received from the psychiatrist would be taken by whichever nurse was handling physician orders at that time. The Court concludes that this is not a First Amendment violation.

The Plaintiff's claim regarding an incident alleged to have occurred when JCC was on lockdown status in February of 2006 is time-barred.

The Plaintiff alleges that, in October of 2008, a psychiatrist noted in a report after a telepsychiatry session that an inmate expressed homicidal

ideations toward him. However, Sudbrink had refused to provide the Plaintiff with telepsychiatry reports and thus he was not informed of the inmate's thoughts even though he continued to work around the inmate. The Plaintiff claims that Sudbrink directed that Plaintiff was not to receive copies of telepsychiatry reports. A memorandum from Sudbrink on November 13, 2008, stated that per instructions from the state privacy officer, telepsychiatry records were to be printed and are to be considered original documents, and were not to be forwarded to anyone but the medical records official and kept in the file in the Health Care Unit. Accordingly, the Plaintiff was treated like others in this regard and was not subjected to a First Amendment violation.

The Plaintiff asserts that in February of 2008, Defendant Sudbrink sent an email to staff members concerning procedures developed for the telepsychiatry program. She refused to share them with the Plaintiff, though he claims the procedures were necessary in order for him to perform his job. The Defendants claim that Plaintiff has not shown that Sudbrink had a duty to comply with his demands. The Plaintiff does not explain why

54

the procedures were necessary for him to do his job.  The Court is unable to conclude there was any First Amendment violation.

### c. Defendant Stoudt

The Plaintiff alleges that, in the Spring of 2008, soon after Defendant Stoudt's arrival at JCC, there were some serious disagreements between JCC management and the Union.  In March of 2008, the disagreements were reduced to a class wide grievance.  Soon thereafter, the Plaintiff claims that Stoudt retroactively denied previously approved time off slips for him to attend collective bargaining negotiating sessions.  Because the record establishes that Plaintiff's request ultimately was granted, the Court concludes that this was not a First Amendment deprivation.

The Plaintiff further asserts that in May of 2008, when he was concerned about comments made to him by correctional officer Ben Tomhave, which the Plaintiff interpreted as a threat, Stoudt refused to see him about his concern.  According to the Plaintiff, Stoudt responded via email telling him that he should reduce his concern to an incident report.  The Plaintiff told Stoudt that he had already submitted an incident report.

The Plaintiff further alleges that Stoudt responded to his email by saying that she had seen an incident report from both himself and a witness to the Tomhave incident. She ignored his request for a meeting.

The Plaintiff has not advanced any argument as to why this amounted to a First Amendment violation. Stoudt may well have believed that a meeting would serve no purpose. She may have thought that Plaintiff had no reason to feel threatened. The Court is unable to determine that Stoudt's refusal to meet with the Plaintiff would deter an ordinary purpose from exercising his First Amendment rights.

The Plaintiff next asserts that in November of 2008, he was scheduled to undergo knee replacement surgery. As was his right under the collective bargaining agreement, he made a request to take advanced sick leave. The Plaintiff claims that the request was denied based upon Stoudt's false comments that she had no written justifications for his request. The Plaintiff states that he not only provided a reason for his request but also had never previously abused sick leave with the Department. The record establishes that the request for advanced sick leave was denied by the

Director of the Department of Corrections, as well as the Director of Central Management Services. The Plaintiff believes that the request was denied based upon Stoudt's alleged false comment that he had provided no justification for his request and on his assertion that such requests are routinely approved. However, this is speculative on the part of the Plaintiff and insufficient to defeat summary judgment.

d. Defendant Pillow

The Plaintiff asserts that in addition to continually accusing him of being obstructive with respect to the telepsychiatry program, when the Plaintiff was given inadequate information concerning that program to do his job, Pillow modified some institutional directives relevant to the Plaintiff's job without informing him of the changes. As the Defendants contend in reply, however, the Plaintiff has not established that Pillow had a duty to confer with him prior to promulgating institutional directives affecting his job. Moreover, the Plaintiff has not shown that he suffered any detriment.

The Plaintiff further asserts that after becoming the acting warden,

Pillow informed him that he was not entitled to speak at labor management meetings. This potentially could be a First Amendment violation, but it is unclear why Pillow allegedly told the Plaintiff he could not speak. As the Defendants contend in reply, the Plaintiff has not established any act or speech that resulted in Pillow's alleged action. The Court declines to speculate as to whether the Plaintiff allegedly was told not to speak for permissible reasons (i.e., because he was belligerent) or impermissible reasons (i.e., in violation of his First Amendment rights).

## IV. CONCLUSION

The Defendants are entitled to summary judgment on all claims. Some of the Plaintiff's claims are time-barred. Regarding some of the other claims, the Court has found that the conduct was not sufficiently severe to "deter a person of ordinary firmness" from exercising his First Amendment rights. Finally, the Defendants are entitled to qualified immunity as to other claims.

The Court notes that Defendants filed a Motion to strike portions of various affidavits in support of the Plaintiff's Response to the Summary

Judgment Motion.  The Defendants pointed to a number of deficiencies which they alleged rendered the applicable portions of the affidavits inadmissible.  In ruling on the Motion, the Court has considered individually the admissibility of all materials offered in support or in opposition to Summary Judgment.

Ergo, the Motion for Summary Judgment [d/e 17] is ALLOWED. The Motion to Strike Affidavits [d/e 26] is DENIED AS MOOT.

The Final Pretrial Conference is Canceled.

The Clerk will enter Judgment in favor of the Defendants and against the Plaintiff.

ENTER: January 18, 2012

FOR THE COURT:


s/Richard Mills
United States District Judge

59